**[Second Circuit Docket No. 26-1671]**

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

---

IBUKUN OGUNBEKUN, as Limited Conservator for
the Estate of Oluwatosin Ogunbekun,
an Incapacitated Person

Plaintiff–Appellant,

– **v.** –

TOWN OF BRIGHTON, BRIGHTON POLICE DEPARTMENT, JULIE KNUTOWICZ, RENEE (STICKLES) FISCHER,

Defendants–Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF NEW YORK (No. 6:15-CV-06332-CJS-MJP)

Hon. Charles J. Siragusa, U.S.D.J.

APPENDIX

Plaintiff-Appellant: Ibukun Ogunbekun, Pro se

12697 Victory Lakes Loop Bristow, VA 20136

Tel: 585-737-8880; Email: ibukun.ogunbekun@yahoo.com

Query Reports Utilities Help Log Out

APPEAL,CASREF,MEDIATION,ProSe

# U.S. DISTRICT COURT
## U.S. District Court, Western District of New York (Rochester)
## CIVIL DOCKET FOR CASE #: 6:15-cv-06332-CJS-MJP

Ogunbekun v. Town of Brighton et al
Assigned to: Hon. Charles J. Siragusa
Referred to: Hon. Mark W. Pedersen
Cause: 42:1983 Civil Rights Act

Date Filed: 05/28/2015
Date Terminated: 05/16/2025
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Ibukun Ogunbekun**
*as Limited Conservator for the Estate of Oluwatosin Ogunbekun, an Incapitated Person*

represented by **Ibukun Ogunbekun**
12697 Victory Lakes Loop
Bristow, VA 20136
585-737-8880
PRO SE

**Anna Marie Richmond**
2500 Rand Building
14 Lafayette Square
Buffalo, NY 14203
716-854-1100
Fax: 716-856-6499
Email: annamarierichmondesq@gmail.com
*TERMINATED: 05/20/2026*

**Rafael O. Gomez**
Gomez Law, LLC
2746 Delaware Avenue
Buffalo, NY 14217
716-324-5554
Fax: 716-302-4334
Email: rgomez@gomez.law
*TERMINATED: 03/11/2021*

**Plaintiff**

**Oluwatosin Ogunbekun**
*TERMINATED: 02/24/2022*

represented by **Anna Marie Richmond**
(See above for address)
*TERMINATED: 05/20/2026*

**Brett D. Tokarczyk**
Gomez & Becker LLP
2746 Delawre Avenue
Buffalo, NY 14217
716 873-0333
Fax: 716 803-6431
Email: btok@gomezbecker.com
*ATTORNEY TO BE NOTICED*

**Oluyomi Faparusi , Sr.**
Fapas Consults
1274 Wheatley Forest Drive
Brentwood, TN 37027
410-375-9817

Fax: 888-893-0365
Email: fapasconsults@gmail.com
*TERMINATED: 08/22/2018*

**Rafael O. Gomez**
(See above for address)
*TERMINATED: 03/11/2021*

V.

**Defendant**

**Town of Brighton** represented by **Eugene Welch**
Tully Rinckey, PLLC
400 Linden Oaks
Suite 110
Rochester, NY 14625
585-492-4700
Email: ewelch@tullylegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jared Kimball Cook**
Tully Rinckey, PLLC
400 Linden Oaks
Suite 110
Rochester, NY 14625
585-899-1408
Email: jcook@tullylegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Elder Mitchell**
Ohrenberger De Lisi & Harris LLP
28 New Driftway
Scituate, MA 02066
716 439-4700
Fax: 716 462-4455
Email: mmitchell@tullylegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Letty L. Laskowski**
Tully Rinckey, PLLC
400 Linden Oaks
Suite 110
Rochester, NY 14625
585-492-4700
Email: llaskowski@vaheygetz.com
*TERMINATED: 04/11/2019*

**Defendant**

**Brighton Police Department** represented by **Eugene Welch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jared Kimball Cook**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Elder Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Letty L. Laskowski**
(See above for address)
*TERMINATED: 04/11/2019*

**Defendant**

**John Does**
*TERMINATED: 02/24/2022*

**Defendant**

**Julie Knutowicz** represented by **Eugene Welch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jared Kimball Cook**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Renee (Stickles) Fischer** represented by **Eugene Welch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jared Kimball Cook**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/28/2015 | 1 | COMPLAINT against Brighton Police Department, John Does, Town of Brighton, filed by Ibukun Ogunbekun.(TF) (Entered: 06/01/2015) |
| 05/29/2015 | | Summons Issued as to Brighton Police Department, John Does, Town of Brighton. (TF) (Entered: 06/01/2015) |
| 05/29/2015 | | Filing fee: $ 400.00, receipt number ROC007971 (TF) (Entered: 06/01/2015) |
| 06/01/2015 | | AUTOMATIC REFERRAL to Mediation The ADR Plan is available for download at http://www.nywd.uscourts.gov/alternative-dispute-resolution. Plan mailed to plaintiff.(TF) (Entered: 06/01/2015) |
| 06/01/2015 | | Notice of Availability of Magistrate Judge: A United States Magistrate of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form (AO-85) is available for download at http://www.uscourts.gov/services-forms/forms. Consent form mailed to plaintiff. (TF) (Entered: 06/01/2015) |
| 06/05/2015 | 2 | SUMMONS Returned Executed by Ibukun Ogunbekun. Brighton Police Department served on 6/2/2015, answer due 6/23/2015; Town of Brighton served on 6/2/2015, answer due 6/23/2015. (TF) (Entered: 06/05/2015) |
| 06/05/2015 | 3 | DECISION AND ORDER. Ibukun Ogunbekun cannot legally present a complaint on behalf of his daughter. Ms. O. must sign the complaint on her own. Of course, she may appear by counsel of her own |

| | | |
|---|---|---|
| | | choosing, and counsel can sign the complaint for her, but her Guardian and father cannot. Ms. O. may have until June 30, 2015, to either sign the complaint, to obtain counsel and file a complaint signed by counsel, or to discontinue the action. Signed by Hon. Charles J. Siragusa on 6/5/15. (KAP) (Entered: 06/05/2015) |
| 06/05/2015 | | Remark: Mailed NEF and copy of ECF #3 to pro se plaintiff, Ibukun Ogunbekun,12697 Victory Lakes Loop, Bristow, VA 20136 (KAP) (Entered: 06/05/2015) |
| 06/29/2015 | 4 | SIGNED AMENDED COMPLAINT against All Defendants, filed by Oluwatosin Ogunbekun. (Attachments: # 1 Envelope)(TF) (Entered: 06/30/2015) |
| 07/15/2015 | 5 | ANSWER to 4 Complaint by Brighton Police Department, Town of Brighton. (Attachments: # 1 Certificate of Service)(Welch, Eugene) (Entered: 07/15/2015) |
| 07/15/2015 | 6 | NOTICE of Appearance by Letty L. Laskowski on behalf of Brighton Police Department, Town of Brighton (Attachments: # 1 Certificate of Service)(Laskowski, Letty) (Entered: 07/15/2015) |
| 07/17/2015 | 7 | CERTIFICATE OF SERVICE by Oluwatosin Ogunbekun re 4 Amended Complaint (TF) (Entered: 07/20/2015) |
| 08/27/2015 | 8 | TEXT ORDER REFERRING CASE to Magistrate Judge Hon. Jonathan W. Feldman. The Magistrate Judge is hereby designated to act in this case as follows: Pursuant to 28 U.S.C. Section 636(b)(1)(A) and (B), all pre-trial matters in this case are referred to the above-named United States Magistrate Judge, including but not limited to: (1) conduct of a scheduling conference and entry of a scheduling order pursuant to Fed. R. Civ. P. 16, (2) hearing and disposition of all non-dispositive motions or applications, (3) supervision of discovery, and (4) supervision of all procedural matters involving the aforementioned or involving the preparation of the case or any matter therein for consideration by the District Judge. All non-dispositive motions or applications shall be filed with the Clerk and made returnable before the Magistrate Judge. The parties are encouraged to consider the provisions of 28 U.S.C. Section 636(c) governing consent to either partial or complete disposition of the case, including trial if necessary, by the Magistrate Judge. Consent forms are available from the office of the Magistrate Judge or the office of the Clerk of Court. IT IS SO ORDERED. Copy of Text Order mailed to pro se plaintiff, Oluwatosin Ogunbekun, at 12697 Victory Lakes Loop, Bristow, VA 20136. Signed by Hon. Charles J. Siragusa on 8/27/15. (KJA) (Entered: 08/27/2015) |
| 08/28/2015 | 9 | ORDER Scheduling Conference set for 10/7/2015 12:00 PM before Hon. Jonathan W. Feldman. Copy of order mailed to plaintiff. Signed by Hon. Jonathan W. Feldman on 8/28/15. (NNR) (Entered: 08/28/2015) |
| 09/30/2015 | 10 | DISCOVERY PLAN by Brighton Police Department, Town of Brighton.(Laskowski, Letty) (Entered: 09/30/2015) |
| 09/30/2015 | 11 | CERTIFICATE OF SERVICE by Brighton Police Department, Town of Brighton re 10 Discovery Plan (Laskowski, Letty) (Entered: 09/30/2015) |
| 10/02/2015 | 12 | TEXT ORDER per request submitted by the plaintiff Scheduling Conference reset for 11/25/2015 10:00 AM before Hon. Jonathan W. Feldman. Copy of text order mailed to plaintiff. Plaintiff is also advised that pursuant to this Court's order (Docket # 9) he may submit a letter requesting to participate in the Rule 16 conference by telephone if he wishes to do so. Signed by Hon. Jonathan W. Feldman on 10/2/15. (NNR) (Entered: 10/02/2015) |
| 11/25/2015 | 13 | NOTICE of Appearance by Oluyomi Faparusi, Sr on behalf of Oluwatosin Ogunbekun (TF) (Entered: 11/25/2015) |
| 11/25/2015 | 14 | SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Stipulation of Selection of Mediator due by 12/23/2015. Mandatory Disclosures due by 2/29/2016. Motions to Join Parties/Amend Pleadings due by 3/31/2016. Discovery completed by 9/30/2016. Dispositive Motions due by 11/30/2016. Signed by Hon. Jonathan W. Feldman on 11/25/15. (WGC) (Entered: 11/25/2015) |
| 11/25/2015 | | Minute Entry for proceedings held before Hon. Jonathan W. Feldman: Scheduling Conference held on 11/25/2015. Scheduling Order issued. (WGC) (Entered: 11/25/2015) |

| | | |
|---|---|---|
| 02/02/2016 | 15 | AMENDED SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) The parties are relieved of the mediation requirement pending further Order of the Court. Signed by Hon. Jonathan W. Feldman on 2/2/2016. (WGC) (Entered: 02/02/2016) |
| 10/17/2016 | 16 | TEXT ORDER, pursuant to defendants' letter request of 10/14/16, Telephonic Status Conference set for 11/4/2016 10:30 AM before Hon. Jonathan W. Feldman to discuss unsealing issue. Counsel for all parties are directed to call the conference center at 703-724-3100. When prompted for the number you wish to dial, enter 4000019#. When prompted for the security pin, enter 9999#. Signed by Hon. Jonathan W. Feldman on 10/17/16. (BJJ) (Entered: 10/17/2016) |
| 11/04/2016 | | Minute Entry for proceedings held before Hon. Jonathan W. Feldman: Status Conference held on 11/4/2016. Parties to submit stipulation/order. (BJJ) (Entered: 11/04/2016) |
| 11/22/2016 | 17 | STIPULATION AND ORDER unsealing records from Brighton Town Court. Signed by Hon. Jonathan W. Feldman on 11/22/2016. (BJJ) (Entered: 11/22/2016) |
| 03/03/2017 | 18 | TEXT ORDER. The Court is in receipt of defendant's letter regarding the status of discovery. The parties are directed to contact this Court once they obtain the criminal court transcripts. The Court will then issue a new scheduling order. Signed by Hon. Jonathan W. Feldman on 3/2/2017. (BJJ) (Entered: 03/03/2017) |
| 08/22/2017 | 19 | SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Mandatory Disclosures due by 9/22/2017. Stipulation of Selection of Mediator due by 9/30/2017. First Mediation Session due by 11/30/2017. Motions to Join Parties/Amend Pleadings due by 1/15/2018. Mediation To End by 1/31/2018. Plaintiff Expert Witness ID due by 5/15/2018. Defendant Expert Witness ID due by 6/15/2018. Discovery completed by 7/15/2018. Dispositive Motions due by 9/15/2018. (BJJ) (Entered: 08/22/2017) |
| 09/28/2017 | 20 | Stipulation-Selection of Mediator by Town of Brighton(Laskowski, Letty) (Entered: 09/28/2017) |
| 11/27/2017 | 21 | Mediation Certification by Joseph B. Rizzo(AGB) (Entered: 11/27/2017) |
| 06/22/2018 | 22 | TEXT ORDER: The Court received defendants' letter dated June 12, 2018, regarding a discovery dispute. Defendants shall file a motion to compel regarding the discovery dispute. Plaintiff will then be provided with an opportunity to respond to defendants motion. Signed by Hon. Jonathan W. Feldman on 6/22/2018. (BJJ) (Entered: 06/22/2018) |
| 06/28/2018 | 23 | TEXT ORDER: Due to recent correspondence, the Court will hold a telephone conference on 7/2/2018 at 02:00 PM before Hon. Jonathan W. Feldman. Counsel for all parties are directed to call the conference center at 703-724-3100. When prompted for the number you wish to dial, enter 4100019#. When prompted for the security pin, enter 9999#. Plaintiff and her father may attend the telephone conference as well by using this call in information. Signed by Hon. Jonathan W. Feldman on 6/28/18. (BJJ) (Entered: 06/28/2018) |
| 06/29/2018 | 24 | ORDER re 23 : Telephone conference set for 7/2/2018 is cancelled. Motion to withdraw due by 7/13/2018. Responses due by 7/20/2018. Oral Argument set for 7/27/2018 at 02:00 PM before Hon. Jonathan W. Feldman. Signed by Hon. Jonathan W. Feldman on 6/29/18. (BJJ) (Entered: 06/29/2018) |
| 07/13/2018 | 25 | Sealed Document, Motion to withdraw as counsel. (TF) (Entered: 07/16/2018) |
| 07/31/2018 | 26 | ORDER re 25 Sealed Document: Attorney Faparusi's motion to withdraw as counsel for plaintiff will be granted upon new counsel filing notice of appearance. Plaintiff's legal guardian shall provide certified copy of order appointing him guardian by 8/29/2018. Plaintiff shall retain new counsel and such counsel shall file a notice of appearance by 9/13/2018. Attorney Faparusi, who is still counsel of record until relieved by this Court, is responsible for plaintiff receiving notice of this order. Signed by Hon. Jonathan W. Feldman on 7/31/18. (BJJ) (Entered: 07/31/2018) |
| 08/17/2018 | 27 | NOTICE of Appearance by Rafael O. Gomez on behalf of All Plaintiffs (Attachments: # 1 Certificate of Service)(Gomez, Rafael) (Entered: 08/17/2018) |
| 08/21/2018 | 28 | TEXT ORDER: Mr. Faparusi's motion to withdraw as counsel for plaintiff (Docket # 25 ), is granted. Signed by Hon. Jonathan W. Feldman on 8/21/18. (BJJ) |

| | | |
|---|---|---|
| | | -CLERK TO FOLLOW UP- Clerk is directed to terminate Mr. Faparusi as counsel of record. (Entered: 08/21/2018) |
| 08/21/2018 | 29 | TEXT ORDER re 27 Notice of Appearance filed by Oluwatosin Ogunbekun, 28 : Status Conference set for 10/4/2018 at 10:30 AM before Hon. Jonathan W. Feldman. All counsel should appear in person. The parties should file a proposed discovery plan at least four business days before the conference. Signed by Hon. Jonathan W. Feldman on 8/21/18. (BJJ) (Entered: 08/21/2018) |
| 10/04/2018 | 30 | Minute Entry for proceedings held before Hon. Jonathan W. Feldman: Appearances: R. Gomez, Esq. L. Laskowski, Esq. Scheduling Conference held on 10/4/2018. Scheduling order to be issued. (NNR) (Entered: 10/05/2018) |
| 10/05/2018 | 31 | SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.)Signed by Hon. Jonathan W. Feldman on 10/4/18. (NNR) (Entered: 10/05/2018) |
| 12/15/2018 | 32 | PROPOSED ORDER re Amended Complaint by Oluwatosin Ogunbekun. (Attachments: # 1 Exhibit Exhibit A)(Gomez, Rafael) Modified on 12/17/2018 (TF). (Entered: 12/15/2018) |
| 12/15/2018 | 33 | Letter filed by Oluwatosin Ogunbekun as to John Does, Brighton Police Department, Town of Brighton . (Attachments: # 1 Text of Proposed Order)(Gomez, Rafael) (Entered: 12/15/2018) |
| 12/15/2018 | 34 | STIPULATION re 32 Stipulation *to Amend Complaint* by Oluwatosin Ogunbekun. (Gomez, Rafael) (Entered: 12/15/2018) |
| 12/17/2018 | | E-Filing Notification: Document contains so ordered line and should be submitted via e-mail to the assigned judge. Refer to the Administrative Guide for e-mail addresses. No action required RE 32 STIPULATION. Clerk to modify entry. (TF) (Entered: 12/17/2018) |
| 12/28/2018 | 35 | NOTICE of Appearance by Brett D. Tokarczyk on behalf of Oluwatosin Ogunbekun (Tokarczyk, Brett) (Entered: 12/28/2018) |
| 12/31/2018 | 36 | MOTION to Amend/Correct by Oluwatosin Ogunbekun. (Attachments: # 1 Declaration Tokarczyk Declaration, # 2 Exhibit Exhibits to Tokarczyk Declaration, # 3 Memorandum in Support Memo of Law in Support)(Tokarczyk, Brett) (Entered: 12/31/2018) |
| 01/02/2019 | 37 | TEXT ORDER re 36 MOTION to Amend/Correct filed by Oluwatosin Ogunbekun: Responses due by 1/16/2019. Replies due by 1/23/2019. Oral Argument set for 2/21/2019 02:00 PM before Hon. Jonathan W. Feldman. Signed by Hon. Jonathan W. Feldman on 1/2/19. (BJJ) (Entered: 01/02/2019) |
| 01/16/2019 | 38 | RESPONSE in Opposition re 36 MOTION to Amend/Correct filed by Brighton Police Department, Town of Brighton. (Attachments: # 1 Exhibit Declaration Exhibit A, # 2 Exhibit Declaration Exhibit B, # 3 Memorandum in Support Memorandum of Law in Opposition to Motion to Amend)(Laskowski, Letty) (Entered: 01/16/2019) |
| 01/23/2019 | 39 | REPLY to Response to Motion re 36 MOTION to Amend/Correct filed by Oluwatosin Ogunbekun. (Attachments: # 1 Memorandum in Support)(Tokarczyk, Brett) (Entered: 01/23/2019) |
| 02/01/2019 | 40 | TEXT ORDER re 37 : Due to a scheduling conflict, Oral Argument rescheduled for 4/12/2019 at 02:00 PM before Hon. Jonathan W. Feldman. Signed by Hon. Jonathan W. Feldman on 2/1/19. (BJJ) (Entered: 02/01/2019) |
| 04/12/2019 | 41 | Minute Entry for proceedings held before Hon. Jonathan W. Feldman: Appearances: Brett Tokarczyk, Esq./pl. and Eugne Welch, Esq./defs. Motion Hearing held on 4/12/2019 re 36 MOTION to Amend/Correct filed by Oluwatosin Ogunbekun. Court reserves decision. (Digital Recording.) (LMD) (Entered: 04/12/2019) |
| 07/31/2019 | 42 | REPORT AND RECOMMENDATIONS re 36 MOTION to Amend filed by Oluwatosin Ogunbekun. Objections due fourteen days from receipt. Objections to R&R due by 8/19/2019. Signed by Hon. Jonathan W. Feldman on 7/31/19. (TF) (Entered: 07/31/2019) |
| 08/21/2019 | 43 | ORDER ADOPTING REPORT AND RECOMMENDATIONS for 42 Report and Recommendations, 36 Motion to Amend/Correct filed by Oluwatosin Ogunbekun. ORDERED, that the Report and Recommendation [#42] denying Plaintiffs motion [#36] is affirmed and adopted in all respects, and Plaintiffs motion [#36] is denied; and it is furtherORDERED, that Plaintiffs second amended complaint |

| | | |
|---|---|---|
| | | [#32-1] shall be the operative pleading in this action. Signed by Hon. Charles J. Siragusa on 8/21/19. (KAP) (Entered: 08/21/2019) |
| 09/10/2019 | 44 | *Answer to 2nd Amended Complaint* ANSWER to Complaint by Town of Brighton.(Welch, Eugene) (Entered: 09/10/2019) |
| 11/14/2019 | 45 | TEXT ORDER REFERRING CASE to Hon. Mark W. Pedersen, United States Magistrate Judge for all pretrial matters excluding dispositive motions. Hon. Jonathan W. Feldman no longer assigned to case. Signed by Mary C. Loewenguth, Clerk of Court, on 11/14/19. (JHF) (Entered: 11/14/2019) |
| 07/28/2020 | | NOTICE of Hearing: Status Conference set for 9/9/2020 10:00 AM before Hon. Mark W. Pedersen. Copy of this NEF mailed to pro se plaintiff at 12697 Victory Lakes LoopBristow, VA 20136 (KAP) (Entered: 07/28/2020) |
| 09/09/2020 | 46 | Minute Entry for proceedings held before Hon. Mark W. Pedersen: Status Conference held on 9/9/2020. Appearances; Rafael O. Gomez, Esq. for plaintiff; Eugene Welch, Esq. for defendants. Parties willing to reopen settlement discussions, defense indicates they are moving towards Summary Judgement. A new Scheduling Order will be issued. (Court Reporter AT&T Conference.) (JB) (Entered: 09/09/2020) |
| 12/18/2020 | 47 | AMENDED SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Motions to Compel Discovery due by 10/30/2020. Discovery completed by 11/30/2020. Dispositive Motions due by 1/15/2021. Signed by Hon. Mark W. Pedersen on 12/18/2020 *nunc pro tunc 9/9/2020*. Copy of NEF and Order mailed to Plaintiff.(JB) (Entered: 12/18/2020) |
| 12/22/2020 | 48 | Letter filed by Brighton Police Department as to John Does, Brighton Police Department, Town of Brighton *Letter Request for Adjournment*. (Welch, Eugene) (Entered: 12/22/2020) |
| 12/23/2020 | | E-Filing Notification: 48 Letter: this document contains a request for relief and should be filed as a motion. ACTION REQUIRED: Re-file document using the motion event. (JLV) (Entered: 12/23/2020) |
| 12/23/2020 | 49 | MOTION for Extension of Time to File *Motion for Summary Judgment* by Brighton Police Department. (Mitchell, Matthew) (Entered: 12/23/2020) |
| 12/28/2020 | 50 | AMENDED SCHEDULING ORDER granting 49 Motion for Extension of Time to File. Discovery is due 3/29/21. Motions to compel discovery due 2/26/21. Dispositive motions due 5/17/21. (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Signed by Hon. Mark W. Pedersen on 12/28/20. (KAP) (Entered: 12/28/2020) |
| 12/28/2020 | | Set/Reset Scheduling Order Deadlines: Motions to Compel Discovery due by 2/26/2021. Discovery completed by 3/29/2021. Motions due by 5/17/2021. (KAP) (Entered: 12/28/2020) |
| 02/18/2021 | 51 | MOTION to Withdraw as Attorney *by Rafael O. Gomez* by Ibukun Ogunbekun, Oluwatosin Ogunbekun. (Attachments: # 1 Affidavit, # 2 Memorandum in Support, # 3 Certificate of Service) (Gomez, Rafael). Added MOTION for Extension of Time to Complete Discovery on 2/19/2021 (SG). (Entered: 02/18/2021) |
| 02/19/2021 | | E-Filing Notification: 51 MOTION to Withdraw as Attorney modified to add MOTION for Extension of Time to Complete Discovery (SG) (Entered: 02/19/2021) |
| 02/19/2021 | | CALENDAR EVENT: Motion Hearing re ECF 51 set for 3/10/2021 at 2:30 PM before Hon. Mark W. Pedersen. The Hearing will take place by Zoom, counsel of record will receive connection information from the Court within 24 hours of the proceeding. Plaintiffs Ibukun Ogunbekun and Oluwatosin Ogunbekun are directed to contact Chambers, either by email at pedersen@nywd.uscourts.gov or by telephone at 585-613-4360, in order to provide to the Court an email address in which to distribute Zoom information. Copy of this NEF mailed to plaintiff Ibukun Ogunbekun at 12697 Victory Lakes Loop Bristow, VA 20136. (JB) (Entered: 02/19/2021) |
| 03/04/2021 | 53 | DECLARATION re E-Filing Notification, Set/Reset Hearings,, 51 MOTION to Withdraw as Attorney *by Rafael O. Gomez* MOTION for Extension of Time to Complete Discovery filed by Town of Brighton . (Welch, Eugene) (Entered: 03/04/2021) |
| 03/10/2021 | 56 | Minute Entry for proceedings held before Hon. Mark W. Pedersen: Motion Hearing held on 3/10/2021 re 51 MOTION to Withdraw as Attorney by Rafael O. Gomez. Appearances: Rafael O. Gomez, Esq. by |

| | | |
|---|---|---|
| | | video; Eugene Welch, Esq. by video; Ibukun Ogunbekun, *pro se* by video. The Court will issue a written order regarding the proceedings that took place. Further Status Conference set for 5/12/2021 at 1:00 PM before Hon. Mark W. Pedersen in order to address Plaintiff's renewed search for counsel. The Conference will take place by Zoom, counsel of record will receive connection information from the Court within 24 hours of the proceeding. Connection information will also be distributed to plaintiff Ibukun Ogunbekun. (Court Reporter Diane Martens.) (JB) (Entered: 03/11/2021) |
| 03/11/2021 | 54 | TEXT ORDER: Rafael O. Gomez's motion to withdraw (ECF No. 51 ) is granted based upon the motions papers submitted and discussions on the sealed record of the 3/10/21 court appearance. SO ORDERED.. Signed by Hon. Mark W. Pedersen on 3/11/21. Copy of this NEF mailed to pro se plaintiff at 12697 Victory Lakes Loop, Bristow, VA 20136(KAP)<br><br>-CLERK TO FOLLOW UP- (Entered: 03/11/2021) |
| 03/11/2021 | 55 | TEXT ORDER:. All deadlines contained in the current scheduling order (ECF No. 50 ) are hereby stayed until further notice. SO ORDERED. Signed by Hon. Mark W. Pedersen on 3/11/21. Copy of this NEF mailed to pro se plaintiff at 12697 Victory Lakes Loop, Bristow, VA 20136 (KAP) (Entered: 03/11/2021) |
| 05/12/2021 | 57 | Minute Entry for proceedings held before Hon. Mark W. Pedersen: Status Conference held on 5/12/2021. Appearances: Eugene Welch, Esq. by video. Plaintiff not present, the Court notes Plaintiff's lack of appearance on the record. The Clerk of Court is directed to issue an Order to Show Cause for failure to prosecute. Plaintiff will respond to the order within 30 days. Failure to respond to the Order to Show Cause will result in a Report and Recommendation to the District Court recommending the case be dismissed, with prejudice. Copy of this Minute Entry mailed to 12697 Victory Lakes Loop, Bristow, VA 20136. (Court Reporter FTR Gold.) (JB) (Entered: 05/12/2021) |
| 05/12/2021 | 58 | ORDER TO SHOW CAUSE Show Cause Response due by 6/14/2021.. Signed by Mary C. Loewenguth, Clerk of Court on 5/12/2021. (TF) (Entered: 05/12/2021) |
| 05/19/2021 | 59 | RESPONSE TO ORDER TO SHOW CAUSE by Ibukun Ogunbekun, Oluwatosin Ogunbekun. (JB) (Entered: 05/19/2021) |
| 05/19/2021 | 60 | ORDER re 59 Response to Order to Show Cause filed by Oluwatosin Ogunbekun, Ibukun Ogunbekun: Mr. Ogunbekun has demonstrated good cause for his failure to appear. The Court admonishes Mr. Ogunbekun to appear for all future scheduled Court appearances. Signed by Hon. Mark W. Pedersen on 5/19/2021. Copy of NEF and Order mailed to Plaintiff.(JB) (Entered: 05/19/2021) |
| 05/19/2021 | | CALENDAR EVENT: Status Conference set for 6/3/2021 at 3:00 PM before Hon. Mark W. Pedersen. The Conference will take place by Zoom, parties will receive connection information from the Court via email within 24 hours of the proceeding. Copy of NEF mailed to Plaintiff. (JB) (Entered: 05/19/2021) |
| 07/29/2021 | | CALENDAR EVENT: Status Conference reset for 8/25/2021 at 1:00 PM before Hon. Mark W. Pedersen. The Conference will take place by Zoom, parties will receive connection information from the Court, via email, within 24 hours of the proceeding. Copy of NEF mailed to Plaintiff. (JB) (Entered: 07/29/2021) |
| 08/03/2021 | 61 | NOTICE of Appearance by Anna Marie Richmond on behalf of Oluwatosin Ogunbekun (Attachments: # 1 Certificate of Service)(Richmond, Anna) (Entered: 08/03/2021) |
| 08/24/2021 | 62 | MOTION for Extension of Time to File *to serve complaint upon Defendants Stickles and Kuntowicz* by Oluwatosin Ogunbekun. (Attachments: # 1 Affidavit of Ibukun Ogunbekun, # 2 Exhibit to Ogunbekun Affidavit, # 3 Affidavit of Attorney, # 4 Memorandum in Support, # 5 Certificate of Service) (Richmond, Anna) (Entered: 08/24/2021) |
| 08/25/2021 | 63 | Minute Entry for proceedings held before Hon. Mark W. Pedersen: Status Conference held on 8/25/2021. Appearances: Anna Marie Richmond, Esq. by phone; Eugene Welch, Esq. by phone. Ms. Richmond notes her appearance on the record, requests entry of an Amended Scheduling Order. Defense does not object to an Amended Scheduling Order, but does object to the length of time requested. The Court will grant Plaintiff's request for a longer schedule. Amended Scheduling Order to be issued. (Court Reporter FTR Gold.) (JB) (Entered: 08/26/2021) |
| 08/30/2021 | 64 | AMENDED SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this |

| | | |
|---|---|---|
| | | Order.) Motions to Compel Discovery due by 10/30/2021. Discovery completed by 11/30/2021. Dispositive Motions due by 1/31/2022.. Signed by Hon. Mark W. Pedersen on 8/30/21. (KAP) (Entered: 08/30/2021) |
| 09/09/2021 | 65 | MOTION for Extension of Time to File Response/Reply *to Plaintiff's Motion for Permission to Serve Defendants* by Town of Brighton.(Mitchell, Matthew) (Entered: 09/09/2021) |
| 09/10/2021 | 66 | TEXT ORDER: Granting (ECF No. 65 ) Motion for Extension of Time to File Response/Reply to Plaintiff's Motion for Permission to Serve Defendants. Responses due by 9/10/2021. Replies due by 9/22/2021. SO ORDERED. Signed by Hon. Mark W. Pedersen on 9/10/2021. (VSG) (Entered: 09/10/2021) |
| 09/10/2021 | 67 | AFFIDAVIT *of Matthew Mitchell, Esq.* in Opposition re 62 MOTION for Extension of Time to File *to serve complaint upon Defendants Stickles and Kuntowicz* filed by Town of Brighton. (Attachments: # 1 Exhibit Knutowicz Depo. Trans., # 2 Exhibit Fischer Depo. Trans.)(Mitchell, Matthew) (Entered: 09/10/2021) |
| 09/10/2021 | 68 | MEMORANDUM in Opposition re 62 MOTION for Extension of Time to File *to serve complaint upon Defendants Stickles and Kuntowicz* filed by Town of Brighton. (Mitchell, Matthew) (Entered: 09/10/2021) |
| 09/22/2021 | 69 | REPLY to Response to Motion re 62 MOTION for Extension of Time to File *to serve complaint upon Defendants Stickles and Kuntowicz* filed by Oluwatosin Ogunbekun. (Attachments: # 1 Certificate of Service)(Richmond, Anna) (Entered: 09/22/2021) |
| 01/27/2022 | 70 | MOTION for Extension of Time to File by Town of Brighton.(Welch, Eugene) (Entered: 01/27/2022) |
| 02/02/2022 | 71 | TEXT ORDER granting 70 Motion for Extension of Time to File. Signed by Hon. Mark W. Pedersen on 2/2/22. (KAP) (Entered: 02/02/2022) |
| 02/16/2022 | 72 | DECISION AND ORDER granting 62 Motion for Extension of Time to File. The Court grants Plaintiff's motion for extension of time to serve Officers Knutowicz and Stickles. Plaintiff has thirty (30) days from the date of entry of this Decision and Order to effect proper service and file proofs of such service with the Court. If, within thirty (30) days from the date of this Decision and Order, Plaintiff fails to properly serve Officers Knutowicz and Stickles, or fails to file proofs of service, the Court will enter an order dismissing Plaintiff's complaint as to Officers Knutowicz and Stickles without prejudice. Signed by Hon. Mark W. Pedersen on 2/15/22. (KAP) (Entered: 02/16/2022) |
| 02/17/2022 | 73 | Original Summons Filed. (Attachments: # 1 Supplement for Stickles & Knutowicz)(Richmond, Anna) (Entered: 02/17/2022) |
| 02/22/2022 | 74 | STIPULATION *to Amend Caption* by Ibukun Ogunbekun, Oluwatosin Ogunbekun. (Richmond, Anna) (Entered: 02/22/2022) |
| 02/24/2022 | 75 | STIPULATION AND ORDER AMENDING CAPTION so ordering Stipulation (ECF No. 74 ).Signed by Hon. Mark W. Pedersen on 2/24/2022. (VSG) (Entered: 02/24/2022) |
| 02/28/2022 | 76 | Summons Issued as to Renee (Stickles) Fischer, Julie Knutowicz. (TF) (Entered: 02/28/2022) |
| 03/10/2022 | 77 | AFFIDAVIT of Service for Summons and Amended Complaint *Item 32-1* served on Julie Knutowicz and Renee (Stickles) Fischer on March 10, 2022, filed by Ibukun Ogunbekun. (Richmond, Anna) (Entered: 03/10/2022) |
| 03/10/2022 | 78 | STIPULATION *to modify case management order* by Ibukun Ogunbekun. (Richmond, Anna) (Entered: 03/10/2022) |
| 03/11/2022 | 79 | STIPULATION AND ORDER AMENDING SCHEDULING ORDER. Signed by Hon. Mark W. Pedersen on 3/11/22. (KAP) (Entered: 03/11/2022) |
| 03/11/2022 | | Set/Reset Scheduling Order Deadlines: Motions due by 6/30/2022. (KAP) (Entered: 03/11/2022) |
| 03/23/2022 | 80 | ANSWER to 4 Complaint by Renee (Stickles) Fischer.(Welch, Eugene) (Entered: 03/23/2022) |
| 03/23/2022 | 81 | ANSWER to 4 Complaint by Julie Knutowicz.(Welch, Eugene) (Entered: 03/23/2022) |
| 06/27/2022 | 82 | MOTION for Summary Judgment dismissing Plaintiffs Second Amended Complaint by Renee (Stickles) Fischer, Brighton Police Department, Julie Knutowicz, Town of Brighton. (Attachments: # 1 Exhibit Incident Report, # 2 Exhibit Criminal Deposition Transcript, # 3 Exhibit Mental Hygiene Form, |

| | | |
|---|---|---|
| | | # 4 Exhibit Incident Report, # 5 Exhibit Supporting Deposition, # 6 Exhibit Fischer Transcript Pages, # 7 Exhibit Brighton General Order, # 8 Exhibit Brighton General Order, # 9 Exhibit Criminal Supporting Deposition, # 10 Exhibit Criminal Supporting Deposition, # 11 Exhibit Police Addendum, # 12 Exhibit Knutowicz Transcript Pages, # 13 Exhibit Criminal Supporting Deposition, # 14 Exhibit Police Report, # 15 Exhibit Subject Resistance Report, # 16 Exhibit Criminal Information, # 17 Exhibit Criminal Cert. of Disposition, # 18 Exhibit Medical Records, # 19 Memorandum in Support MOL, # 20 Declaration Declaration in Support, # 21 Statement of Undisputed Facts Rule 56 Statement)(Welch, Eugene) Modified on 7/8/2022 (TF). (Entered: 06/27/2022) |
| 07/01/2022 | 83 | Joint MOTION for Extension of Time to File Response/Reply as to 82 MOTION to Dismiss by Ibukun Ogunbekun.(Richmond, Anna) (Entered: 07/01/2022) |
| 07/06/2022 | 84 | MOTION SCHEDULING ORDER granting 83 Motion for Extension of Time to File Response/Reply re 83 Joint MOTION for Extension of Time to File Response/Reply as to 82 MOTION to Dismiss , 82 MOTION to Dismiss Responses due by 8/31/2022. Replies due by 10/14/2022.. Signed by Hon. Charles J. Siragusa on 7/6/22. (KAP) (Entered: 07/06/2022) |
| 07/08/2022 | | E-Filing Notification: Incorrect relief used. For future reference, use Motion for Summary Judgment event/relief. No action required re 82 MOTION to Dismiss. Clerk to modify entry. (TF) (Entered: 07/08/2022) |
| 08/31/2022 | 85 | RESPONSE in Opposition re 82 MOTION to Dismiss filed by Ibukun Ogunbekun. (Attachments: # 1 Declaration of Plaintiff, # 2 Declaration Authenticating Exhibits, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Declaration Authenticating Exhibits, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Memorandum in Support of opposition to motion, # 18 Certificate of Service)(Richmond, Anna) (Entered: 08/31/2022) |
| 10/13/2022 | 86 | MEMORANDUM in Support re 82 MOTION to Dismiss filed by Town of Brighton. (Welch, Eugene) (Entered: 10/13/2022) |
| 10/26/2022 | 87 | Letter filed by Ibukun Ogunbekun as to Brighton Police Department, Julie Knutowicz, Town of Brighton, Renee (Stickles) Fischer, John Does *requesting oral argument*. (Richmond, Anna) (Entered: 10/26/2022) |
| 10/27/2022 | 88 | TEXT ORDER re 87 Letter request filed by Ibukun Ogunbekun denying request for oral argument at this time. Court may sua sponte schedule oral argument at a later time if the Court deems it necessary. Signed by Hon. Charles J. Siragusa on 10/27/22. (KAP) (Entered: 10/27/2022) |
| 10/27/2022 | 89 | Letter filed by Brighton Police Department as to Brighton Police Department, Julie Knutowicz, Town of Brighton, Renee (Stickles) Fischer, John Does *in response to Letter of A. Richmond, Esq.*. (Welch, Eugene) (Entered: 10/27/2022) |
| 05/15/2025 | 90 | ORDER granting 82 Motion for summary judgment. The Clerk is directed to enter judgment for Defendants and close this case. Signed by Hon. Charles J. Siragusa on 5/15/2025. (MJK)<br><br>Clerk to Follow up (Entered: 05/15/2025) |
| 05/16/2025 | 91 | JUDGMENT in favor of Brighton Police Department, Town of Brighton, Julie Knutowicz, Renee (Stickles) Fischer against Ibukun Ogunbekun. Signed by Clerk of Court on 5/16/2025. (TF) (Entered: 05/16/2025) |
| 06/13/2025 | 92 | NOTICE OF APPEAL as to 90 Order on Motion to Dismiss, 91 Judgment by Ibukun Ogunbekun. Filing fee $ 605, receipt number ANYWDC-5507283. Appeal Record due by 5/27/2025. (Richmond, Anna) (Entered: 06/13/2025) |
| 06/16/2025 | 93 | Within 14 days of filing the Notice of Appeal, the appellant is required to electronically file with the District Court an index of filed documents it wishes the Court of Appeals to consider, called Designation of Record on Appeal. After receipt, the Clerks Office will certify and transmit the index to the Circuit.<br><br>Pursuant to Local Rule 12.1 of the US Court of Appeals for the Second Circuit, Forms C and D must be completed within 14 days after the filing of a notice of appeal. Forms C and D can be obtained at www.ca2.uscourts.gov. (DMK) (Entered: 06/16/2025) |

| | | |
|---|---|---|
| 12/11/2025 | 94 | MANDATE of USCA as to 92 Notice of Appeal filed by Ibukun Ogunbekun. The Appeal is dismissed. (TF) (Entered: 12/11/2025) |
| 05/13/2026 | 95 | Consent MOTION to Withdraw as Attorney by Oluwatosin Ogunbekun. (Attachments: # 1 Affidavit of ATtorney in support of motion, # 2 Exhibit USCA Order, # 3 Certificate of Service)(Richmond, Anna) (Entered: 05/13/2026) |
| 05/15/2026 | 96 | MOTION to Vacate 90 Order on Motion to Dismiss, 91 Judgment by Ibukun Ogunbekun. (Attachments: # 1 Exhibits and Affidavit of Service)(TF) (Entered: 05/15/2026) |
| 05/15/2026 | 97 | NOTICE by Ibukun Ogunbekun re 95 Consent MOTION to Withdraw as Attorney and pro se status. (TF) (Entered: 05/15/2026) |
| 05/20/2026 | 98 | DECISION and ORDER granting 95 Motion to Withdraw as Attorney. Attorney Anna Marie Richmond terminated; denying 96 Motion to Vacate. Signed by Hon. Charles J. Siragusa on 05/20/2026. (MJK)<br><br>This was mailed to: Ibukun Ogunbekun.<br><br>Clerk to Follow up (Entered: 05/20/2026) |
| 05/20/2026 | 99 | NOTICE of Appearance by Jared Kimball Cook on behalf of All Defendants (Cook, Jared) (Entered: 05/20/2026) |
| 06/17/2026 | 100 | NOTICE OF APPEAL as to 98 Order on Motion to Vacate, by Ibukun Ogunbekun. (Filing fee $605 returned, check was missing information, plaintiff to resubmit check). (TF) (Entered: 06/18/2026) |
| 06/22/2026 | 101 | Letter from Ibukun Ogunbekun, dated 6/17/26, to Clerk. (JHF) (Entered: 06/22/2026) |
| 06/22/2026 | | Filing fee received: $605.00, receipt number 600001859. (JHF) (Entered: 06/22/2026) |
| 06/22/2026 | 102 | CLERK'S CERTIFICATE/INDEX filed and electronically sent to Court of Appeals. (JHF) (Entered: 06/22/2026) |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IBUKUN OGUNBEKUN, ET AL.,

Plaintiffs, Index No. 15-CV-06332 (CJS-JWF)

v. **NOTICE OF APPEAL**

BRIGHTON POLICE DEPARTMENT, ET AL.,

Defendants,

---

Notice is hereby given that, Ibukun Ogunbekun et al., plaintiffs in the above-named case, hereby appeal to the United States Court of Appeals for the Second Circuit from an order denying vacatur of summary judgment, entered in this action on the 20th day of May, 2026.

06/16/2026
Date

Dr. Ibukun Ogunbekun
Plaintiff, Pro se
12697 Victory Lakes Loop
Bristow, VA 20136
P: 585-737-8880
ibukun.ogunbekun@yahoo.com

cc: Eugene Welch, Esq.
Tully Rinckey, PLLC
400 Linden Oaks, Suite 100
Rochester, NY 14625
ewelch@tullylegal.com

Matthew E. Mitchell, Esq.
Ohrenberger, De Lisi & Harris, LLP
28 New Driftway
Scituate, MA 02066
mmitchell@tullylegal.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IBUKUN OGUNBEKUN ET AL.,

Plaintiffs,

v.

BRIGHTON POLICE DEPARTMENT, ET AL.,

Defendants,

**CERTIFICATE OF SERVICE**

Index No. 15-CV-06332 (CJS-JWF)

I, Ibukun Ogunbekun, hereby certify under penalty of perjury that on June 16, 2026, I served a copy of Notice of Appeal by United States Mail, on the following parties:

i) Eugene Welch, Esq., Tully Rinckey, 400 Linden Oaks, Ste.110, Rochester, NY 14625

ii) Matthew E. Mitchell, Esq., Ohrenberger, De Lisi & Harris, LLP, 28 New Driftway, Scituate, MA 02066.

06/16/2026
Date

Signature

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IBUKUN OGUNBEKUN, *as limited Conservator for the Estate of Oluwatosin Ogunbekun*,

Plaintiff,

15-CV-6332 -CJS-MJP

vs

TOWN OF BRIGHTON, et al.,

DECISION and ORDER

Defendants.

## INTRODUCTION

Now before the Court are two post-judgment motions: A motion to withdraw as counsel, ECF No. 95, and a motion for relief from judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 60(b)(2)&(3), ECF No. 96. The motion to withdraw is granted, and the motion for relief from judgment is denied.

## BACKGROUND

The reader is presumed to be familiar with the facts of this action. Briefly, in May 2015, Ibukun Ogunbekun ("Ogunbekun") commenced this action pursuant to 42 U.S.C. § 1983, alleging that two police officers employed by the Town of Brighton violated the Fourth Amendment rights of his daughter, Oluwatosin Ogunbekun ("Oluwatosin"), an adult with mental disabilities, by subjecting her to excessive force during a mental hygiene arrest on May 29, 2012. By Decision and Order (ECF No. 90) issued on May 15, 2025, this Court granted summary judgment for Defendants, finding as a matter of law that

Defendants had not subjected Oluwatosin to excessive force. (ECF No. 90). On May 16, 2025, the Clerk entered judgment for Defendants.

Ogunbekun's attorney, Anna Marie Richmond ("Richmond"), filed a notice of appeal, but indicated that she would not represent Ogunbekun on the appeal. Ogunbekun then filed a motion for appointment of pro bono appellate counsel, but on November 13, 2025, the United States Court of Appeals for the Second Circuit denied the motion and dismissed the appeal as lacking any arguable basis either in law or in fact. Mandate, ECF No. 94.

On May 13, 2026, Richmond, who is still listed as attorney of record for Ogunbekun on the District Court's docket, filed the subject motion to withdraw as counsel. (ECF No. 95). Richmond's application indicates that she filed the motion at the request of Ogunbekun, who told her that he needed her to file it, since he intended to file a motion for relief from judgment *pro se*. ECF No. 95-1 at ¶¶ 13-14.

On May 15, 2026, Ogunbekun, purporting to proceed *pro se*, filed the subject motion to vacate judgment (ECF No. 96), pursuant to Federal Rule of Civil Procedure 60(b)(2)&(3). Ogunbekun's motion contends that the judgment should be vacated for the following reasons: 1) the "HVAC Technician" witnesses who gave statements to the police fabricated their statements and committed fraud when describing their observations of Oluwatosin prior to her arrest; 2) Officer Stickles lied concerning her observations of Oluwatosin to support probable cause for the arrest; 3) there is no evidence that Oluwatosin threatened anyone; 4) the officers were grossly incompetent in how they handled the arrest; and 5) Stickles lied about the training she had received.

The motion is supported primarily by statements from Ogunbekun, explaining why he believes that the evidence submitted by Defendants in support of their summary judgment motion was not credible or consistent with what actually occurred (even though he admittedly was not present when many of the key interactions between Oluwatosin and the other witnesses were taking place); photos of the arrest scene obtained from Google Maps and Google Earth; and two documents from defendant Stickle's personnel file unrelated to this action, namely, a Notice of Discipline dated November 18, 2013, charging Stickles with misconduct, and a performance review from December 2012, opining in pertinent part that Stickles had "shown an inability to keep calm under pressure."

DISCUSSION

Richmond's Motion to Withdraw is Granted

Richmond's application to withdraw as Ogunbekun's attorney, which was filed at Ogunbekun's request, is granted. The Court sees no just reason not to grant the request, since Richmond indicates that she and Ogunbekun mutually agreed to end their attorney-client relationship a year ago. ECF No. 95-1 at ¶ 15.

The Court Already Ruled that Ogunbekun Cannot Represent Oluwatosin

Regarding Ogunbekun's Rule 60(b) motion, the Court finds, first, that the application is not properly before the Court, since, as Ogunbekun admits in the motion, the Court has already ruled that, since he is not an attorney, he cannot represent his daughter's estate *pro se* in this action.[1] That was the reason he retained Richmond in the first place, and the law on that point has not changed. *See, e.g., Tindall v. Poultney*

[1] *See*, Ogunbekun's memo of law, ECF No. 96 at p. 5 ("On June 5, 2015, Judge Charles Siragusa ruled that Dr. Ogunbekun could not represent his daughter since he was not an attorney.").

*High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) ("Although litigants in federal court have a statutory right to choose to act as their own counsel, an individual who is not licensed as an attorney may not appear on another person's behalf in the other's cause. It is thus a well-established general rule in this Circuit that a parent not admitted to the bar cannot bring an action *pro se* in federal court on behalf of his or her child.") (citations and internal quotation marks omitted). Nor has Ogunbekun shown that any exception to that rule applies. Consequently, the motion is denied for this reason.

The Rule 60(b) Motion Lacks Merit

Alternatively, the motion is denied as lacking merit. Ogunbekun has moved for relief from judgment pursuant to Fed. R. Civ. 60(b)(2)&(3), which rule states, in pertinent part:

> (b) **Grounds for Relief from a Final Judgment, Order, or Proceeding.** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> ***
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

Fed. R. Civ. P. 60 (Westlaw 2026).[2]

It is quite difficult for a movant to make the showing required by either Rule 60(b)(2) or Rule 60(b)(3).

> Rule 60(b)(2) imposes "an onerous standard" where [a] "movant must demonstrate that (1) the newly discovered evidence was of facts that

[2] The rule further provides that motions under Rule 60(b) "must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of judgment or order or the date of the proceeding." *Id.*

> existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching." *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001).

*Pistilli v. First Unum Life Ins. Co.*, No. 24 CIV. 5266 (AKH), 2026 WL 836647, at *1 (S.D.N.Y. Mar. 26, 2026). Meanwhile,

> [t]o prevail on a motion for a new trial pursuant to Fed.R.Civ.P. 60(b)(3), the movant must show that (1) the adverse party engaged in fraud, misrepresentation or misconduct by clear and convincing evidence and that (2) such misconduct substantially interfered with the movant's ability to fully and fairly present its case. *See Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 286 F.Supp.2d 309, 312 (S.D.N.Y.2003) (citations omitted). The final question is whether substantial justice outweighs the goal of preserving the finality of judgments. *Id.* (citing *Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir.1986)).
>
> Whether to grant a 60(b) motion for relief from a judgment is "committed to the sound discretion of the district court," *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir.2012) (citation and internal quotation marks omitted), and are generally granted only upon a showing of "exceptional circumstances," *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 126 (2d Cir.2009) (citations omitted). "To grant relief from a final order pursuant to Rule 60(b), a court must find that (1) the circumstances of the case present grounds justifying relief and (2) the movant possesses a meritorious claim in the first instance." *Cobos v. Adelphi Univ.*, 179 F.R.D. 381, 385 (E.D.N.Y.1998).

*Thomas v. City of New York*, 293 F.R.D. 498, 503 (S.D.N.Y. 2013), *aff'd sub nom. Thomas v. McAullife*, 691 F. App'x 671 (2d Cir. 2017).

Even assuming that Ogunbekun could properly bring the motion on behalf of Oluwatosin, the motion clearly lacks merit. The application fails under 60(b)(2), since it fails to adduce any newly discovered evidence calling into question the Court's grant of

summary judgment to Defendants. Rather, it relies on evidence that is largely cumulative and/or merely impeaching.

The application also fails under 60(b)(3), since it does not show that Defendants committed fraud, misrepresentation or misconduct at all, let alone by clear and convincing evidence. The application also fails to show that substantial justice outweighs the goal of preserving the finality of judgments, that exceptional circumstances exist, or that Ogunbekun possesses a meritorious claim in the first instance. Consequently, the motion is denied.

CONCLUSION

The motion to allow Richmond to withdraw as attorney (ECF No. 95) is granted, and the Clerk is directed to terminate Richmond as counsel. Additionally, and for the reasons discussed above, Ogunbekun's Rule 60(b) motion (ECF No. 96) for relief from judgment is denied.

IT IS SO ORDERED.

DATED: May 20 2026
Rochester, New York

CHARLES J. SIRAGUSA
United States District Judge

UNITED STATES DISTRICT COURT FILED
MAY 15 2026
ANDREW W. MOELLER, CLERK
WESTERN DISTRICT OF NY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IBUKUN OGUNBEKUN, as Limited Conservator for
the Estate of Oluwatosin Ogunbekun,
an Incapacitated Person
Plaintiff,

Index No. 15-CV-06332 (CJS-JWF)

NOTICE OF MOTION

OLUWATOSIN OGUNBEKUN,
Plaintiff,

v.

TOWN OF BRIGHTON, BRIGHTON POLICE DEPARTMENT,
Defendants,
JOHN DOES
Defendant.

PLEASE TAKE NOTICE, hereby given, that upon the declaration and memorandum of Ibukun Ogunbekun together with the other documents submitted herewith, Plaintiff will move this Court, at a time and date to be selected by the Court, for an Order pursuant to Fed. Rule 60(b)(2) and 60(b)(3): (i) vacating the decision and order for summary judgment in favor of Defendants entered May 15, 2025; (ii) scheduling the matter for trial on the merits; and for other and further relief as the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE, that Plaintiff intends to serve reply papers.

Dated: May 15, 2026

Sincerely,

Dr. Ibukun Ogunbekun
Plaintiff, Pro se
12697 Victory Lakes Loop
Bristow, VA 20136
P: 585-737-8880
ibukun.ogunbekun@yahoo.com

CC: Eugene Welch, Esq.
Tully Rinckey, PLLC
400 Linden Oaks, Suite 100
Rochester, NY 14625

Matthew E. Mitchell, Esq.
Ohrenberger, De Lisi & Harris, LLP
28 New Driftway
Scituate, MA 02066

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

IBUKUN OGUNBEKUN, as Limited Conservator for
the Estate of Oluwatosin Ogunbekun,
an Incapacitated Person

Plaintiff, Index No. 15-CV-06332 (CJS-JWF)

OLUWATOSIN OGUNBEKUN,

Plaintiff,

v.

TOWN OF BRIGHTON, BRIGHTON POLICE DEPARTMENT,

Defendants,

JOHN DOES

Defendant.

---

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE
SUMMARY JUDGMENT DECISION AND ORDER

Dr. Ibukun Ogunbekun
Plaintiff, Pro se
12697 Victory Lakes Loop
Bristow, VA 20136
P: 585-737-8880
ibukun.ogunbekun@yahoo.com

## BACKGROUND INFORMATION

Oluwatosin ("Tosin") Ogunbekun is a survivor of a rare genetic disorder and medical errors that predisposed her to seizures and mental incapacitation. She has mild-to-moderate intellectual disability; is non-violent, not suicidal or para-suicidal, and has no criminal record.

Tosin is Black, 5'3" (five feet, three inches tall) and in May of 2012, weighed 150-160 pounds. She lives with both parents. Her father, Ibukun Ogunbekun ("Dr. Ogunbekun") is a medical doctor – he coordinates Tosin's complex medical care needs and social supports.

On May 28, 2015, Dr. Ogunbekun filed a civil rights complaint in the Western District Court of New York ("WDNY") alleging that on May 29, 2012, Tosin was the victim of illegal seizure and excessive use of force by officers of the Brighton Police Department ("Brighton PD"), violating her Fourth Amendment rights. (Docket #1).

During the encounter involving Officer Renee Stickles ("Ofc. Stickles"), Officer Julie Knutowicz ("Ofc. Knutowicz") and others, Tosin was subjected to Mental Hygiene Arrest (MHA); she suffered deep laceration to the forehead, contusion, concussion, and body aches arising from two police officers and an Emergency Medical Technician (EMT) piling on top of her on a concrete porch at 84 Wintergreen Way in Brighton, NY.

Tosin was charged with resisting arrest and harassment in the 2nd degree. An Adjournment in Contemplation of Dismissal (ACD) was ordered by Brighton Town Court and case was disposed of in December 2014. For the record, Tosin did not request ACD. The court used its discretion and dismissing the spurious charges filed by erring police officers was in the interest of justice. The action, however, does not invalidate or impede Plaintiff's probable cause argument in the matter before this Court (WDNY).

On June 5, 2015, Judge Charles Siragusa ruled that Dr. Ogunbekun could not represent his daughter since he was not an attorney. (Docket #3). An amended complaint signed by Tosin was filed on June 29, 2015 (Docket #4). Defendants' reply was filed by their Attorneys on July 15, 2015. (Docket #5). After Dr. Ogunbekun was named limited conservator for Tosin, both parties stipulated to a Second Amended Complaint on December 15, 2018, which is the operative complaint. (Docket #32-1).

Following discovery, Defendants filed a motion for summary judgment on June 27, 2022. Plaintiff's reply followed on August 31, 2022. On May 15, 2025, Hon. Charles J. Siragusa granted summary judgment in favor of Defendants and dismissed the lawsuit in its entirety. (Case 6:15-CV-6332-CJS-MJP Document 90 Filed 05/15/25). The order of dismissal was entered on May 16, 2025. In June 2025, Plaintiff filed a notice of appeal with the Court of Appeals for the Second Circuit ("Second Circuit"), followed in July 2025, by application for court-appointed counsel to represent Tosin. The Second Circuit denied Plaintiff's application and dismissed the appeal in November 2025.

Plaintiff, hereby, moves to vacate the order of the District Court entered May 16, 2025, on grounds of newly discovered evidence [Federal Rule 60(b)(2)], which support allegations of fraud, misrepresentation and other misconduct of an opposing party [Federal Rule 60(b)(3)]. The motion comes less than one year after entry of the order of dismissal hence, it is timely. Please, take note that Plaintiff intends to serve reply papers.

## LEGAL ARGUMENT

### A. Fraudulent Misrepresentation by Key Eyewitnesses – HVAC Technicians

Plaintiff respectfully submits that the decision of the Court dated May 15, 2025, is anchored on fraud and misrepresentation by Defendants and key eyewitnesses, notably, HVAC

technicians, who claimed to have been installing an air-conditioner at 84 Wintergreen Way, Rochester, NY. First on the scene was Nicholas Viglino ("Viglino"), at around 11:30AM. His colleagues, Nate Lenz ("Lenz") and Michael Rozzi ("Rozzi"), arrived at 1:55PM. All three gave depositions to the police. (Case 6:15-cv-06332-CJS-MJP Document 82-5; 82-9; 82-10 Filed 06/27/22). Lenz (falsely) claimed that:

> "WHILE OUTSIDE SERVICING THE AIR CONDITIONER UNIT, A STRANGE BLACK WOMAN CAME UP TO ME AND WAS TALKING CRAZY STUFF. SHE KEPT SAYING STUFF LIKE 'I AM WATCHIN YOU, I SEE YOU'. SHE WAS DANCING IN THE RAIN IN THE STREET WHILE TALKING TO HERSELF. I TOLD MY CO-WORKER NICK BIGLINO, 'LET'S GO INSIDE' BECAUSE I WAS AFRAID SHE WAS GOING TO GO CRAZY ON US. WE WENT INSIDE FOR LUNCH FOR ABOUT 20 MINS. THEN CAME BACK OUTSIDE."

(Case 6:15-cv-06332-CJS-MJP Document 82-5 Filed 06/27/22)

Rozzi arrived at the same time as Lenz (1:55PM). He observed that two police officers were already on scene. He did not report seeing Tosin dancing in the rain, talking to herself or accosting HVAC technicians but wasted no time concluding that the Black female was *"high on some drug"*. (Case 6:15-cv-06332-CJS-MJP Document 82-9 Filed 06/27/22 Page 3 of 3). Police radio log showed that the MHA was well under way when Lenz and Rozzi arrived – Tosin was cornered on the front porch of 84 Wintergreen Way by Defendants Stickles and Knutowicz. Dr. Ogunbekun and EMTs were close by. (Case 6:15-cv-06332-CJS-MJP Document 82-14 Filed 06/27/22).

The rain had stopped by 1:15PM. How then did Lenz who arrived at 1:55PM see Tosin *"dancing in the rain in the street"* or hear her say *"I'm watchin (sic) you, I see you"* but the two police officers and others around the porch did not. Neither did his colleague, Rozzi. How did Tosin escape from the front porch to accost Lenz who did not arrive until 1:55PM? Lenz stated that after arrival, he went inside the house with colleagues to have lunch for 20 minutes. All three

would have reemerged by 2:15PM. The radio log confirmed that Tosin was in police custody as at 2:09PM. *Id.* The conclusion is inescapable – Lenz fabricated the story narrated to the police.

Viglino's testimony equally warrants scrutiny. Viglino claimed that he observed Tosin around 11:30AM, kicking basketball, and dancing *"in the middle of the Wintergreen Way in the middle of the rain"* from where he was installing air-conditioner, 60-70ft. away. He claimed to have witnessed Ofc. Stickles arrive, at 1:28PM. It was raining on May 29, 2012, until around 1:15PM. Was Viglino installing a major electrical appliance in the rain for almost two hours?

Ofc. Stickles stated that on arrival, she found Tosin in front of 84 Wintergreen Way; she did not report seeing Viglino, whose whereabout was unknown. Viglino continued: '*I turned around and saw the Officer and her back in front of #84. The African American girl kept telling me "I see you, I see you."* This pre-supposed that the alleged encounter with Tosin occurred after 1:44PM, when Ofc. Stickles followed Tosin from #32 to 84 Wintergreen Way. It is proof that there was no interaction between Tosin and HVAC technicians prior to police arrival at 1:28PM.

Exhibit A (Google Maps captured July 2025) shows the frontal view of 84 Wintergreen Way. Note that the air-conditioner on the side of the house is not visible from the middle of the street, hence, Tosin could not have seen Viglino where he was supposedly installing the appliance. Likewise, Viglino could not have seen Tosin if she was in front of 84 Wintergreen Way. He did not have the field of view. To see Tosin, Viglino would have had to come to the front porch where Tosin was standing with Ofc. Stickles (with Dad nearby), in which case, it was Viglino that accosted Tosin, not the converse. Saying *"I see you"* to someone in plain sight, is a factual expression, not a threat. Like Lenz, Viglino fabricated claims made in his deposition.

The Google images here presented as Exhibit A, B and C (see below) were available to the public after 08/31/22, when Plaintiff's reply to summary judgment motion was filed,

representing new evidence that controvert Defendants' claim that Tosin was in the roadway or in front of 84 Wintergreen Way blocking traffic.

That Lenz and Viglino's false testimonies significantly impacted the summary judgment granted Defendants and prevented the case from being fully litigated, is not in doubt. (Case 6:15-CV-6332-CJS-MJP Document 90 Filed 05/15/25; p.3, ¶1; p.5, ¶1; p.6, line 1; p.8, footnote #4). Tosin deserves her day in court and justice will be well served by vacating the order of dismissal entered May 16, 2025, pursuant to Federal Rule 60(b)(2) and 60(b)(3).

**B. Fraudulent Misrepresentations by Defendants**

Defendants' fraudulent misrepresentations eclipse those of Lenz and Viglino. Right off the bat, Ofc. Stickles makes a dishonest claim in a bid to establish probable cause. Regarding the 911 call, Defendant Stickles (Fischer) attested that the call was to:

> "check-the-welfare for a female standing – female, black, standing in the roadway for 45 minutes that appeared mentally challenged in the rain."

(Case 6:15-cv-06332-CJS-MJP Document 90 Filed 05/15/25, p.4, footnote #1).

Fact is, 911 caller never said anything about Black female "standing in the roadway"; he simply said that female was "standing in the rain". Those are two different situations. Ofc. Stickles claimed further that on arrival, she found Tosin at 84 Wintergreen Way, in the middle of the road blocking traffic. Officer reported that she spent significant amount of time with Tosin, coaxing her to come out of the roadway:

> "I asked her if we can just get out of the roadway, because we were in the middle of the roadway, if we could walk over to the side and talk, and she didn't want to do that initially … I was there for an extended period of time"

(Stickles Depo. Trans., 11/19/19, p41, at 8-10; 20-21).

The following are reasons why Tosin could not have been at 84 Wintergreen Way or in the middle of the road ("roadway") prior to or on Ofc. Stickles' arrival:

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (29 of 151)

(a) Wintergreen Way, excluding side-walk, is 27ft. wide at 84 Wintergreen Way. (Exhibit B: Google Earth image captured 08/28/23). A mid-size vehicle is roughly 15ft. long, more than half the width of Wintergreen Way. Kim DeCastro could not have pulled out of or into the driveway at 84 Wintergreen Way without knocking down Tosin, if she were standing in the middle of the street. Ms. Decastro would have called 911 but did not because there was no threat to public safety. She did not report seeing Tosin at 84 Wintergreen Way, playing basketball or blocking traffic before Ofc. Stickles' arrived. (Case 6:15-cv-06332-CJS-MJP Document 82-13 Filed 06/27/22).

(b) Jonathan Roberson made the 911 call at 1:21PM (13:21) from a landline at 76 Wintergreen Way. Mr. Roberson did not put Tosin in the roadway and did not report seeing her dancing or kicking basketball; all he observed was a Black female standing in the rain for 45 minutes. Mr. Roberson could not have seen Tosin if she were in front of 84 Wintergreen Way; his protruding garage obstructed the field of view. (Exhibit C: Google Maps Street View captured July 2025).

(c) There would have been multiple 911 calls from motorists and traffic would have backed-up if someone was in the roadway for 45 minutes but nobody, not even Ofc. Stickles nor eyewitnesses reported seeing vehicles backed up, honking or swerving to avoid two females standing in the roadway – recall that Officer claimed to have stood with Tosin *"in the middle of roadway ... for an extended period of time."*

(d) Perhaps, the most compelling evidence comes from Ofc. Stickles herself – someone dancing and playing basketball in the middle of the road, and blocking traffic for 45 minutes would qualify as an "Emergency" but Ofc. Stickles drove leisurely to Wintergreen Way with no lights flashing or siren blaring. In fact, Officer declared:

Case: 26-1671, 09/24/2026, DktEntry: 33.1, Page 30 of 151

*"This is not an emergency."* (Stickles Depo. Trans., 11/19/19; p. 39, at10-12, 15). It explains why Plaintiff was not immediately aware of Officer's arrival on the scene.

Ms. DeCastro reported seeing Tosin walk up and down Wintergreen Way when she was leaving home and on return 45 minutes later, consistent with Plaintiff's submission. (Case 6:15-cv-06332-CJS-MJP Document 82-13 Filed 06/27/22 Page 2 of 3 at 5-6). Plaintiff also drove in his car to check on Tosin and found her on the sidewalk at the end of Wintergreen Way, an important detail overlooked by the Court. (Ogunbekun Depo. Trans., 10/16/19, p.41, at 1-16; Case 6:15-CV-6332-CJS-MJP Document 90 Filed 05/15/25, p.12, ¶1).

Defendants had to situate Tosin in front of #84 rather than the 76 Wintergreen Way mentioned by 911 caller to make Lenz and Viglino's story appear credible. Next, they altered the police radio log to project an impression not given by 911 caller. Though barely legible, the words *"Playing ... basketball 5'.... blue jeans ... shirt"* were scribbled after the first entry at 1:21PM (13:21). (Case 6:15-cv-06332-CJS-MJP Document 82-14 Filed 06/27/22).

The police radio log was altered with intent to mislead the Court into believing that the 911 caller also witnessed Tosin playing basketball in the roadway, and so align it with false depositions given by Lenz and colleagues. That is fraud; there is no mention of "basketball" in the computer-generated (original) radio log. At discovery, dashcam footage from Ofc. Stickles patrol car was requested but Brighton PD did not accede to the request.

When a party deliberately alters official records to fabricate evidence that misleads the court, such conduct constitutes fraud on the court; it corrupts the judicial system and warrants vacatur. In *Plastech Holding Corp. v. WM GreenTech Automotive Corp.*, 257 F. Supp. 3d 867 (E.D. Mich. 2017), the court held that a party commits fraud on the court when it "fabricates evidence and submits that evidence to the court to support the party's claims," explaining that

"[f]alsifying evidence to secure a court victory … undermines the most basic foundations of our judicial system." Similarly, in *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 2020 WL 2348079 (N.D. Ala. May 8, 2020), the court imposed the ultimate sanction of default judgment where defendants "altered the content of the evidentiary documents" with intent to mislead, stating that fabricating or falsifying evidence violates every "principle implicit in any concept of ordered liberty" and merits the "highest degree of sanction."

Here, the insertion by hand, of the words "Playing … basketball …" in the police radio log after the original entry and contrary to the 911 caller's actual statement, is precisely the type of alteration that courts regard as fraud, particularly where the alteration is designed to corroborate false depositions and deceive judge and jury into believing that Tosin was playing basketball in the roadway, which the original record did not state or imply. The court's probable cause finding relied on the false location claim by Ofc. Stickles, and eyewitness Lenz and Viglino. Besides, the destruction, alteration, or falsification of court records is a felony under federal law. (18 U.S. Code § 1512 3(C)(1); 18 U.S.C. § 1506). The above constitute grounds for vacatur of summary judgment order entered May 16, 2025, pursuant to Rule 60(b)(3).

**C. Victim of Police Brutality Did Not Threaten to Harm Anyone**

There is no evidentiary proof to back up claims that Tosin threatened to harm anyone; not her Dad nor Police Officers – no audio, no video, and certainly no eyewitness affirmation. All we have are <u>uncorroborated</u> statements made by two White police officers accused of brutalizing an unarmed, disabled, Black female. Officers' words do not equate "evidentiary proof"; they are bald assertions that have not and cannot be authenticated.

Ofc. Stickles presents major credibility problem. Submissions made in incident reports filed in May 2012 contradict statements made at deposition in November 2019, in multiple

instances. One example is the dialogue that ensued between Rafael Gomez, Esq. (Plaintiff's attorney) and Ofc. Stickles at deposition in 2019:

> Q: Well, what happens next?
>
> A: So I'm -- at this point, like I said, she is -- she is highly agitated. She is not agreeing to -- you know, I'm asking her to stop. She won't -- she won't do that. She's making, you know, statements out loud. She's yelling. She seems very upset. During that time is when she -- she made the first statement to me, which now changed it in my mind, and that's when she said, "I want to kill my dad."
>
> Q: Where did this happen?
>
> A: Outside. So she's proceeding back further · · into the complex. So if she lives at 32, she's heading back toward the 76, where, you know, the initial job was sent to.

(Stickles Depo. Trans., 11/19/19, p57, at 4-18).

Officer implied that Tosin and herself were the only ones present when the alleged threat to kill her Dad was made, somewhere between #32 and 84 Wintergreen Way, a distance of 240ft. or one-minute walk (Source: Google Maps). The Court alluded to this claim by Defendant Stickles in the summary judgment decision. (Case 6:15-CV-6332-CJS-MJP Document 90 Filed 05/15/25, pp.5-6, ¶4; p.28, ¶2). Problem is, Defendant Stickles reported back in May 2012, that:

> "AS OFFICER KNUTOWICZ ARRIVED, (S) TOSIN HAD GONE UP UNTO THE PORCH OF 84 WINTERGREEN WAY … AT THIS TIME, (S) TOSIN WAS BECOMING MORE AGITATED AND WAS IGNORING VERBAL COMMANDS. (S) TOSIN SAID THAT SHE WAS GOING TO KILL HER DAD AND ALSO STATED THAT SHE WANTED R/O (STICKLES) TO DIE."

(Exhibit D: Brighton Police Department Addendum Report dated 05/29/2012, p.3 of 5, lines 22-26 and p.4 of 5, lines 1-2).

Officer affirmed that Tosin did not repeat the threat to kill Dad, meaning that it was allegedly made once, on arrival of Ofc. Knutowicz at 84 Wintergreen Way, by which time, Dr. Ogunbekun was on the scene (Knutowicz Depo. Trans., 11/19/19, p.16 at 10-13). Dr. Ogunbekun swore on oath that he did not hear the alleged threat to his life or the Officers'. Ofc. Knutowicz likewise swore on oath that she did not hear Tosin threaten to kill her Dad but was so informed

by Ofc. Stickles after the MHA. Asked if she heard Tosin make other threats besides alleged wish for officers to die, Ofc. Knutowicz replied: "Not in my presence". (Knutowicz Depo. Trans., 11/19/19, p.15 at 10).

The question then arises: If Tosin did not make the alleged threat to kill her Dad until 1:50PM when Ofc. Knutowicz arrived, on what grounds did Ofc. Stickles initiate MHA at 1:44PM? The obvious answer here is "None"; probable cause did not exist for MHA. Use of force in such situation (that is, without probable cause) is a violation of Fourth Amendment rights. Defendants knew that and got creative after the botched MHA.

When police officers' sworn statements in incident reports materially differ from deposition testimony, such inconsistencies create genuine disputes of material fact that defeat summary judgment and may constitute fraud under Rule 60(b)(3). In *Jones v. City of Mt. Vernon*, 2025 WL 320981 (S.D.N.Y. Feb. 3, 2025), the court held that even where police reports and depositions conflict, if plaintiff's testimony is not self-contradictory, there is a factual dispute that must be resolved by a jury and not on summary judgment.

The summary judgment standard places burden of proof on the movant. *Fed. R. Civ. P. 56(a)*. In determining whether that burden is met, "the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962) (per curiam); *Tolan v. Cotton*, 572 U.S. 650, 651, (2014) (citing *Anderson v. Liberty Lobby, Inc.* 477 US 242, 255 (1986316 f 3d 324).

The allegation that Tosin wanted to kill Officers lacks evidentiary support. Brighton PD Officers are supposedly trained to assess credibility of threats. As such, they are able to ascertain if a subject has both the <u>intent</u> and <u>capacity</u> to carry out a violent act. Tosin was wearing T-shirt and jeans. She was obviously unarmed; even the basketball was no longer on her at that point.

With what then was she going to kill two armed police officers – her bare hands? Tosin's build was such that the 911 caller mistook her for a 13-year-old (recorded as "B/F 13YO STANDING IN THE RAIN FOR 45 MIN)."(Case 6:15-cv-06332-CJS-MJP Document 82-14 Filed 06/27/22 at 13:21 hrs.).

There were at least, six (6) witnesses around the porch where the MHA took place: 2 EMTs, 3 HVAC technicians and Dr. Ogunbekun. Defendants described Tosin as being totally disorganized and yelling but none of the six witnesses heard Tosin threatening to harm police officers or her Dad. By contrast, Lenz, Viglino and Dr. Ogunbekun reported that Tosin yelled *"Jesus Christ, Jesus Christ"* multiple times, in frantic plea for help.

The claim that Dr. Ogunbekun was *"admittedly not present when the threat was made"* is simply inaccurate, likewise the assertion that *"... it is similarly undisputed that Tosin stated she wished both Stickles and Knutowicz were dead."* (Case 6:15-CV-6332-CJS-MJP Document 90 Filed 05/15/25, p.28, ¶2). Plaintiff disputed these claims in the summary judgment reply. (Case 6:15-cv-06332-CJS-MJP Document 85-1 Filed 08/31/22 Page 7 of 12 at 69-75, 86-88; Document 85-17 Filed 08/31/22 Page 15 of 23, ¶1). He was at 84 Wintergreen Way within five (5) minutes of Ofc. Stickles exiting his home with Tosin, around 1:44PM. Plaintiff witnessed Ofc. Knutowizc's arrival at 1:50PM and stayed at location until the ambulance departed with Tosin.

Even assuming that Tosin *"wished"* the Officers were dead, that is just a "wish", not a threat. Must anyone who says to another "drop dead" or "I hope you get runover by a train" be deemed dangerous and thus, subject to arrest? An expressed "wish" or hyperbolic statement made by an unarmed individual who objectively lacks the capacity to carry out violence does not constitute a "true threat"; Defendants must prove subjective recklessness, not merely objective reasonableness.

The Supreme Court clarified in *Counterman v. Colorado*, 600 U.S. 66 (2023) that while "true threats of violence are outside the bounds of First Amendment protection," the State must prove the defendant "consciously disregarded a substantial risk that his communications would be viewed as threatening violence"—a recklessness standard requiring subjective awareness.

This mens rea requirement ensures that protected speech is not stifled solely on the basis of how a reasonable person might interpret ambiguous statements. Reinforcing this principle, the Kansas Supreme Court in *State v. Boettger*, 449 P.3d 834 (Kan. 2019) held that a "true threat" requires the speaker to "mean to communicate a serious expression of an intent to commit an act of unlawful violence" with "the intent of placing the victim in fear," rejecting lower standards that would criminalize hyperbole.

Where, as in this case, officers already determined that the individual making the threat was *"out of touch with reality"*[1], unarmed, 5'3" tall with the physique of a 13-year-old (per 911 caller), no reasonable person could have objectively concluded that she posed a credible threat to armed police officers, making her alleged "wish", protected free speech rather than a true threat. Plaintiff respectfully submits that arresting Tosin on the basis of expressed "wish", violates the First Amendment to the Constitution and is another reason why the summary judgment order warrants vacatur.

**D. Defendants' Questionable Training and Experience Credentials**

In escalating rather than defusing conflict, Defendants showcased gross incompetence during standoff with Tosin. That would have been obvious to anyone claiming to be trained and experienced in interfacing with emotionally disturbed persons and individuals with intellectual disability. How Defendants went from "welfare check" to MHA in sixteen (16) minutes is mind-

---

[1] Case 6:15-cv-06332-CJS-MJP Document 82-1 Filed 06/27/22 Page 3 of 6, at 11-12.

boggling. Ofc. Stickles arrived at 1:28PM and initiated MHA at 1:44PM. That was no welfare check; it was an evacuation. More confounding is how they managed to transform a harmless, joyful individual supposedly dancing in the rain, to potential "cop-killer", in just 16 minutes.

The Court accepted at face value, Defendants' claim that as at May 29, 2012: "Stickles was a member of the Monroe County Emotionally Disturbed Persons Response Team, and, as such, had received training on how to interact with mentally-disturbed subjects." (Case 6:15-cv-06332-CJS-MJP Document 82-21 Filed 06/27/22 Page 5 of 17 at 29; Document 90 Filed 05/15/25; pp.3-4, ¶2). Officer declared on oath that she took a 40-hour Emotionally Disturbed Persons Response Team (EDPRT) course in 2009. (Case 6:15-cv-06332-CJS-MJP Document 82-6 Filed 06/27/22 Page 3 of 32; Document 82-19 Filed 06/27/22 Page 7 of 20, ¶2). However, there is no evidentiary proof to support either claim by Defendants.

Defendants presented an untitled, 145-page document listing training completed by all officers in the Brighton PD. This was condensed to 60 pages, that included the 40-hour training Ofc. Stickles reportedly completed in 2009. (Case 6:15-cv-06332-CJS-MJP Document 85-12 Filed 08/31/22 Page 22 of 60). The document is in table format and can easily be altered by inserting additional rows to input false information.

Plaintiff sought verification from Monroe County government, which administered the EDPRT program. (Exhibit E). The response is self-explanatory:

> "… the Monroe County Sheriff's Office was unable to locate documents in our files responsive to your request after a diligent search." (Exhibit F).

In short, the County has no record to support claims made by Ofc. Stickles and the Town of Brighton. The inescapable conclusion, in the absence of original, verifiable proof of EDPRT training and membership prior to May 30, 2012, is that Defendant Stickles fraudulently misrepresented under oath.

The Second Circuit opined that police officers who "falsify police reports, affidavits, and memorandum books" and "fabricate evidence" violate clearly established constitutional rights (*Coggins v. County of Nassau*, 988 F. Supp. 2d 231, 244 (E.D.N.Y. 2013)), and that such fabrication amounts to unacceptable 'corruption of the truth-seeking function of the trial process'" (*Manganiello v. City of New York*, 612 F.3d 149, 160 (2d Cir. 2010)). The disparities between Defendants' incident reports and depositions, the false claim about Tosin's location on police arrival, and suspected forgery of radio log and training records, collectively point to a pattern of fraud and deceit. The newly uncovered evidence would explain why Defendant Stickles' response to real-life situation was sub-par.

Rule 60(b)(3) requires proof that "the adverse party engaged in fraud or other misconduct that prevented the movant from fully and fairly presenting its case." *(See Armstrong v. Cadle Co.*, 239 F.R.D. 688 (S.D. Fla. 2007)). That burden also, has been met here. The summary judgment granted Defendants was undoubtedly influenced, among other things, by the questionable credentials brandished by Ofc. Stickles. (Case 6:15-CV-6332-CJS-MJP Document 90 Filed 05/15/25, pp3-4, ¶2). Respectfully, the order of dismissal warrants vacatur pursuant to Fed. Rule 60(b)(2) and 60(b)(3).

Defendant Stickles' Supervisors are well aware of Officer's credibility issues. In November 2013, Officer was disciplined in connection with a search she conducted a month prior. Internal investigation concluded that Officer was in violation of Section 1.8-INCOMPETENCE of Brighton PD's manual of rules. (Exhibit G). She was deemed:

> "Incapable of the satisfactory performance of occupational duties by failing to demonstrate honesty and sound judgment"

Excerpt of Ofc. Stickles' performance evaluation for the period Jan. 1, 2012 – Dec. 31, 2012, is presented herewith as Exhibit H. Item numbered #5 reads:

> "Officer Stickles has shown an inability to keep calm under pressure. She fails to exhibit proper decision making when encountering high stress situation".

Such was the case on May 29, 2012. Everything that went wrong that afternoon, did so after the police intervened. They must not be shielded from accountability.

Defendants' mishandling of a benign situation (lone Black female venting to herself in the rain) and letting it to spiral into an arrest with potential for loss of life (Tosin's and Dr. Ogunbekun's), may have prompted Brighton PD to send Ofc. Stickles on a 16-hour course titled "Responding to Emotionally Disturbed Persons Curriculum Orientation", held on January16-17, 2013; basically, an entry-level course. (Case 6:15-cv-06332-CJS-MJP Document 85-11 Filed 08/31/22 Page 3 of 3).

Defendants exploited Tosin's intellectual disability and absence of body cameras in cruel and perverse ways. Having botched the MHA, they resorted to spurious claims of dangerousness and recruited eyewitnesses of questionable integrity to back up the claims, engineering probable cause where none existed. Defendant Stickles invariably confirmed Plaintiff's assertion that the only time Tosin attempted to enter a neighbor's home was after 1:50PM, that is, while MHA was in progress and not before. Officer affirmed that Tosin:

> "… went up onto the porch, front porch of 84, and she was like on the porch, and she was actually at one point wiggling the door handle trying to get into this house. We could see -- because Julie had come at this point. She had arrived as well. And she – when Julie got there …".

(Stickles Depo. Trans., 11/19/19; p65 at 9-15).

"Julie", of course, is Ofc. Knutowicz who arrived at 1:50PM. There is no other report of Tosin being on anyone's property before or after the police intervened, contrary to impressions created by opposing party and to which the Court subscribed.

The US Supreme Court determined that "… whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio,

392 U.S. 1 (1968); Michigan v. Summers, 452 U.S. 692 (1981); *Id.* at 696 n.5 (quoting *Terry*, 392 U.S. at 16). Put another way, the seizure of a person is a "meaningful interference, however brief, with an individual's freedom of movement." *United States v. Jacobsen*, 466 U.S. 109, 114 (1984). Accordingly, Tosin was illegally seized at 1:44PM, when she was cornered on the porch of 84 Wintergreen Way by Defendants and not 2:09PM, when she was reportedly in police custody. (Case 6:15-cv-06332-CJS-MJP Document 82-14 Filed 06/27/22 at 13:21 hrs.). The distinction is important.

Tosin repeatedly pleaded with Officers to leave her alone, as she had done nothing wrong. (Ogunbekun Depo. Trans., 10/16/19, p.46 at 22-25). In refusing to back-off, even for a little while, Defendants left her no safe alternative but to attempt to flee inside 84 Wintergreen Way. That is what any rational being would do, faced with mortal danger, as with two armed police officers closing-in on her and barking-out orders (aggressive, rapid-fire commands) to get into the ambulance. Such actions are counter-productive when dealing with this demographic – special needs persons. It shows a disconnect between Officer's purported training and conduct in the field. Besides, Tosin had seen Lenz and colleagues attempt to exit via the same portal just moments before.

Defendants confirmed that it took only five (5) minutes to subdue Tosin. (Case 6:15-cv-06332-CJS-MJP Document 82-15 Filed 06/27/22 Page 3 of 4, line 5). That meant Officers had twenty (20) minutes (from 1:44PM to 2:04PM) to pursue alternate course of action that included "releasing" Tosin and letting her walk away from 84 Wintergreen Way, unharassed. Plaintiff's car was parked a few feet away with such exigency in mind.[2] Defendants could have worked with him to bring the situation under control but they pressed on with the illegal seizure (MHA).

---

[2] Ogunbekun Depo. Trans., 10/16/19, p.40 at 12-25.

By contrast, Ofc. David Montes, the Reporting Officer for the 911 incident of April 5, 2012, worked with Tosin's parents, and handled the situation with poise and tact, averting MHA. Defendant Stickles was little more than an observer on that occasion. (Case 6:15-cv-06332-CJS-MJP Document 82-4 Filed 06/27/22 Page 2 of 2).

Plaintiff contends that the MHA executed on May 29, 2012, was reckless and did not conform with § 9.41 of New York State Mental Hygiene Law. Tosin did not pose a threat to herself or public safety. She was not a vagrant nor was she the junkie that witness Rozzi concluded was "high on some drug". (Case 6:15-cv-06332-CJS-MJP Document 82-9 Filed 06/27/22 Page 3 of 3). As a resident, Tosin had every right to be on Wintergreen Way, whether or not she talked to herself or was in the rain for some time. Strange, perhaps or even embarrassing but not illegal and certainly not cause for MHA.

**E. Threshold for Vacatur on Grounds of Fraud and Misrepresentation Exceeded**

Plaintiff respectfully submits that the threshold for fraudulent misrepresentation was reached in this case on multiple fronts:

(a) A representation was made – by Defendants Stickles and Knutowicz, and eyewitness Lenz, Viglino and Rozzi (Case 6:15-cv-06332-CJS-MJP Document 82-5, 82-9, 82-10, and 82-19 Filed 06/27/22);

(b) The representation was false – as narrated above and supported by new evidence;

(c) Defendants knew at the time that the representation was false – including alleged forgery of police radio log and Defendants' EDPRT training record;

(d) The representation was made by Defendants with the intention that the court would rely on it – the alleged fraud and misrepresentations were the foundation on which Defendants' motion for summary judgment rested;

(e) The court did rely on the false representation – in decision dated May 15, 2025, the Court liberally quoted the fraudulent claims made by Defendants, and competency assessment relied on Ofc. Stickles' training credential, which remains unverifiable;

(f) Plaintiff suffered harm as a result of the false representation – trial court dismissed the claim in its entirety while the Second Circuit denied Plaintiff's request for court-appointed attorney and dismissed the appeal.

Defendants will argue that this is a frivolous motion and that facts presented herein were already considered by the Second Circuit in the motion for reconsideration filed November 2025. Neither is valid. Whereas, some of the facts tabled here appeared in that motion, no new exhibit or recently discovered evidence was tabled as they were not part of the filing in the lower court.

As a matter of procedural law, a Rule 60(b) motion for relief from judgment must be filed in the district court, not the court of appeals, even when an appeal is pending. The Fourth Circuit established in *Fobian v. Storage Technology Corp.*, 164 F.3d 887 (4th Cir. 1999): "As a general matter, the district court is the proper forum in which to bring Rule 60(b) motions for relief from that court's own judgments. 'It is obvious that a motion under Fed.R.Civ.P. 60(b)(1) or (3) ... should be filed in the district court.... The district court is the proper forum to determine in the first instance whether there is sufficient basis to overturn the judgments.'"

Similarly, in *Ellington v. Vance*, 2022 WL 886046 (D. Del. Mar. 28, 2022), the court explained that "the timely filing of a notice of appeal is an event of jurisdictional significance, immediately conferring jurisdiction on a Court of Appeals and divesting a district court of its control," but the district court retains authority to adjudicate Rule 60(b) motions filed within 28 days. Because the Second Circuit lacks jurisdiction to grant Rule 60(b)(3) relief in the first instance, its denial of the motion for reconsideration was procedural,

not substantive, confirming that this district court is the proper venue to adjudicate the fraud and misrepresentation claims. Plaintiff not being an attorney, was unaware of this procedural error.

## CONCLUSION

The law regarding judgment procured by fraud is settled in federal and state courts. Pursuant to Federal Rule of Civil Procedure 60(b)(2) [newly discovered evidence] and 60(b)(3) [fraud, misrepresentation and other misconduct of an opposing party], Plaintiff, hereby, moves this honorable court for an order (i) vacating the summary judgment order entered May 16, 2025, and (ii) scheduling this matter for trial on the merits; and for other and further relief as the Court deems just and proper.

Dated: May 15, 2026

Respectfully submitted,

Dr. Ibukun Ogunbekun
Plaintiff, Pro se
12697 Victory Lakes Loop
Bristow, VA 20136
P: 585-737-8880
ibukun.ogunbekun@yahoo.com

Enclosures: Affidavit of Service
Notice of Motion
Plaintiff's Declaration in Support of Motion
Exhibits

CC: Eugene Welch, Esq.
Tully Rinckey, PLLC
400 Linden Oaks, Suite 100
Rochester, NY 14625

Matthew E. Mitchell, Esq.
Ohrenberger, De Lisi & Harris, LLP
28 New Driftway
Scituate, MA 02066

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

IBUKUN OGUNBEKUN, as Limited Conservator for
the Estate of Oluwatosin Ogunbekun,
an Incapacitated Person
Plaintiff, Index No. 15-CV-06332 (CJS-JWF)

OLUWATOSIN OGUNBEKUN,
Plaintiff,

v.

TOWN OF BRIGHTON, BRIGHTON POLICE DEPARTMENT,
Defendants,
JOHN DOES
Defendant.

---

PLAINTIFF'S DECLARATION IN SUPPORT OF MOTION TO VACATE SUMMARY JUDGMENT DECISION AND ORDER

I, IBUKUN OGUNBEKUN ("Dr. Ogunbekun"), hereby declare under penalty of perjury, that:

1. I am the Father and Limited Conservator of the Estate of Oluwatosin ("Tosin") Ogunbekun.

2. I am a medical doctor and graduate of the University of Lagos (Nigeria), University of Leeds (England), and University of Rochester (NY, USA).

3. I am Plaintiff, Pro se in the above-captioned matter and am familiar with the case having filed the initial complaint on May 28, 2015, and been actively involved in the matter thereafter;

4. I submit this declaration in support of Plaintiff's Motion to Vacate the Decision and Order Granting Summary Judgment in favor of Defendants and entered on May 15, 2025;

5. Attached herewith as Exhibit A, is a copy of original and annotated image (Google Maps Street View) showing front entrance at 84 Wintergreen Way, Rochester, NY 14618, as captured July 2025;

6. Filed herewith as Exhibit B, is a copy of Google Earth image showing aerial view of 84 Wintergreen Way, Rochester, NY 14618, distributed 8/28/2023;

7. Attached herewith as Exhibit C, is a copy of original and annotated image (Google Maps Street View) of 76 Wintergreen Way, Rochester, NY, captured July 2025;

8. Attached herewith as Exhibit D, is a copy of Rule 26(a)(1) Initial Mandatory Disclosures Addendum prepared and signed by Officer Renee Stickles;

9. Attached herewith as Exhibit E, is a copy of Monroe County, NY, Freedom of Information Law (FOIL) request dated 04/21/26;

10. Attached herewith as Exhibit F, is a copy of Monroe County, NY, FOIL Reply dated 05/01/26;

11. Attached herewith as Exhibit G, is a copy of Town of Brighton Police Department Notice of Discipline and Charges dated 11/18/13;

12. Attached herewith as Exhibit H, is a copy of Ofc. Renee Stickles' Performance Evaluation Report for the period Jan. 1, 2012 to Dec. 31, 2012, released by Brighton Police Department;

13. I certify that records submitted herewith are true and accurate copies of documents received from the sources identified above and from Defendants during discovery in this matter, and can be authenticated by appropriate custodians of records, if the matter proceeds to trial;

14. I certify further that the Google Earth and Google Maps Street View submitted are accurate depictions of the street and neighborhood, with which I am familiar, having lived on Wintergreen Way from 2004 to 2012.

Dated: May 15, 2026

Respectfully submitted,

Dr. Ibukun Ogunbekun
Plaintiff, Pro se
12697 Victory Lakes Loop
Bristow, VA 20136
P: 585-737-8880
ibukun.ogunbekun@yahoo.com

CC: Eugene Welch, Esq.
Tully Rinckey, PLLC
400 Linden Oaks, Suite 100
Rochester, NY 14625

Matthew E. Mitchell, Esq.
Ohrenberger, De Lisi & Harris, LLP
28 New Driftway
Scituate, MA 02066

Google Maps: Showing front entrance and middle of street at
84 Wintergreen Way, Rochester, NY.



# EXHIBIT A

Google Maps showing front entrance and middle of street at
84 Wintergreen Way, Rochester, NY





84 Wintergreen Way, Rochester, NY



Google Earth: Aerial View of 84 Wintergreen Way, Rochester, NY. Page 1 of 2

# EXHIBIT B

Google Earth: Aerial view of 84 Wintergreen Way, Rochester, NY.





Google Maps: Street view of 76, 80 & 84 Wintergreen Way, Rochester, NY. Page 1 of 3

# EXHIBIT C

Google Maps: Street view of 76, 80 & 84 Wintergreen Way, Rochester, NY.



Annotated Google Maps: Street View of 76, 80 & 84 Wintergreen Way, Rochester, NY. 



Case: 26-1671, 09/24/2026, DktEntry: 33.1 (54 of 151)



# EXHIBIT D

# ADDENDUM

A CONTINUATION OF A RESISTING ARREST REPORT

2. CR # 212202

3. VICTIM'S NAME (LAST, FIRST, MIDDLE) OR FIRM NAME IF BUSINESS: STATE OF NEW YORK

4. LOCATION OF INCIDENT (HOUSE NO., STREET, C/T/V): 84 WINTERGREEN WY

SEC. B

5. DATE OF INCIDENT: 5-29-12

BLOCK NO. INDICATE BLOCK LETTER OR NUMBER IN LEFT MARGIN.

71 CALL (PK3) IBUKUN TOLD R/O THAT HE WAS AT HOME, AND THAT (S) TOSIN WANDERED OUT OF THE HOUSE BECAUSE SHE DIDN'T WANT TO GO TO HER NEUROLOGIST APPOINTMENT LIKE SHE WAS SUPPOSE TO. (PK3) IBUKUN TOLD R/O THAT (S) TOSIN'S MENTAL HEALTH CONDITION HAS BEEN DETERIORATING LATELY, AND SHE WON'T DO ANYTHING SHE IS TOLD. USING A PRE-ESTABLISHED RAPPORT THAT R/O HAS WITH (S) TOSIN, R/O WAS ABLE TO CONVINCE (S) TOSIN TO WALK HOME. HOWEVER UPON REACHING THE DRIVEWAY (S) TOSIN REFUSED TO GO INSIDE, STATING THAT SHE WANTED TO DRIBBLE HER BASKETBALL OUT FRONT INSTEAD. (PK3) IBUKUN TOLD (S) TOSIN THAT SHE CAN'T STAND IN THE ROADWAY BLOCKING TRAFFIC, AND SHE CAN INSTEAD DRIBBLE HER BASKETBALL IN THE BACK PATIO BEHIND THE TOWNHOUSE. (S) TOSIN AGREED TO GO OUT BACK, BUT UPON REALIZING THAT HER FATHER (PK3) IBUKUN HAD PUT A PAD LOCK ON THE FENCED IN BACK PATIO, (S) TOSIN BLEW BY (PK3) IBUKUN AND WENT OUT THE FRONT DOOR AND BACK INTO THE ROADWAY. (S) TOSIN BEGAN WALKING FASTLY ALL OVER THE NEIGHBORHOOD AS R/O FOLLOWED ON FOOT. R/O INSTRUCTED (S) TOSIN TO STOP RUNNING AWAY, BUT SHE KEPT GOING UNTIL SHE CAME TO A STOP IN THE YARD OF 84 WINTERGREEN WAY. R/O CALLED OUT WITH SAID LOCATION AT 1344 HRS. AND REQUESTED ANOTHER PATROL UNIT RESPOND. AS OFFICER KNUTOWICZ ARRIVED, (S) TOSIN HAD GONE UP ONTO THE PORCH OF 84 WINTERGREEN WAY INSISTING THAT HER EX-HUSBAND LIVED THERE. AT THIS TIME, (S) TOSIN WAS BECOMING MORE AGITATED AND WAS IGNORING VERBAL COMMANDS. (S) TOSIN

BRIGHTON POLICE department addendum report

ADMINISTRATIVE

6. Inquiries ☑ DMV ☑ Want/Warrant ☑ Scofflaw ☐ Crim. Hist ☐ Stolen Property ☐ Other ☑ Tech. By. KARCH / HOFFMAN

7. NYSPIN Message #

8. Working Incident No.

9. Date of Supp/A Report

10. Reporting Officer's Signature (Include Rank): OFC. Renee E. Stickles

11. ID No. 9560

12. Supervisor's Signature: Sgt [signature] SUMMERCOTY

13. ID No. 9575

14. Status: ☐ Field ☐ Cleared by: (check box to right) ☐ Incident ☐ CBI ☒ Warrant Advised

Cleared By: ☐ Arrest-Adult ☐ Death of Offender ☐ Extradition Denied ☐ Arrest-Juv ☐ Vict. Refused Coop ☐ Unfounded ☐ Pros Declined ☐ Juv No Court

15. Review Date: 5/29/12

16. Notified/Turned Over To

Page 3 of 5

9

Addendum to Rule 26(a)(1) Initial Mandatory Disclosures

Page 3 of 3

# ADDENDUM

A CONTINUATION OF A RESISTING ARREST REPORT

CR # 212202

| 3. VICTIM'S NAME (LAST, FIRST, MIDDLE) OR FIRM NAME IF BUSINESS | 4. LOCATION OF INCIDENT (HOUSE NO., STREET, CITY) | SEC. | 5. DATE OF INCIDENT |
|---|---|---|---|
| STATE OF NEW YORK | 84 WINTERGREEN WY | B | 5-29-12 |

BLOCK NO. INDICATE BLOCK LETTER OR NUMBER IN LEFT MARGIN.

71 SAID THAT SHE WAS GOING TO KILL HER DAD, AND ALSO STATED THAT SHE WANTED R/O TO DIE. R/O CALLED FOR AN AMBULANCE FOR AN M.H.A, AND SAID AMBULANCE ARRIVED WHILE R/O AND OFC. KNUTOWICZ WERE TALKING TO (S) TOSIN NEAR ~~ON~~ THE FRONT DOOR OF 84 WINTERGREEN WAY. (S) TOSIN WAS RANTING AND NOT MAKING SENSE STATING THAT SHE IS A PRINCESS, SUPER-VILLAIN, AND MOTHER OF THREE KIDS. (S) TOSIN ALSO TOLD PATROLS THAT SHE IS GETTING MARRIED TODAY, AND WILL BE LEAVING FOR HER HONEYMOON. R/O TOLD (S) TOSIN THAT SHE WAS GOING TO BE TAKEN INTO CUSTODY FOR A MENTAL HYGIENE ARREST, AND ASKED HER TO WALK TO THE AMBULANCE. AT ONE POINT, WHILE (S) TOSIN WAS STANDING NEAR THE FRONT DOOR OF 84 WINTERGREEN WY (S) TOSIN ATTEMPTED TO GAIN ENTRY BY OPENING THE DOOR (TURNING DOOR KNOB). THIS ACTION PROMPTED THE RESIDENT OF 84 WINTERGREEN WAY TO LOCK THE DOOR AND WINDOW. AFTER (S) TOSIN REFUSED TO COMPLY WITH R/O'S AND OFC. KNUTOWICZ'S DIRECTIONS TO WALK TO THE AMBULANCE R/O GRABBED (S) TOSIN'S ARM TO ESCORT HER TO THE AMBULANCE. (S) TOSIN BEGAN ~~FLAILEN~~ FLAILING HER ARMS ATTEMPTING TO STRIKE & HIT PATROLS. (S) TOSIN ALSO INTENTIONALLY GRABBED R/O'S HAIR (PONYTAIL) AND STARTED TO TWIST AND PULL IT AS R/O TOOK (S) TOSIN TO THE GROUND ALONG WITH OFC. KNUTOWICZ. ONCE ON THE GROUND, (S) TOSIN CONTINUED TO ACTIVELY RESIST ARREST, BY TRYING TO PUNCH, KICK, AND BITE R/O AND OFC. KNUTOWICZ. R/O APPLIED A WRIST LOCK TO (S) TOSIN'S RIGHT WRIST AND OFC. KNUTOWICZ WAS ABLE TO APPLY

BRIGHTON POLICE department addendum report

ADMINISTRATIVE

| 8. Inquiries ☑ DMV ☑ Want/Warrant ☑ Scofflaw ☐ Crim. Hist ☐ Stolen Property ☐ Other ☑ Tech. By: KARCH/HOFFMAN | 7. NYSPIN Message # | 8. Working Incident No. | 9. Date of Supp/IA Report |
|---|---|---|---|

| 10. Reporting Officer's Signature (Include Rank) | 11. ID No. | 12. Supervisor's Signature | 13. ID No. |
|---|---|---|---|
| OFC. Renee E. Strickland | 9560 | Sgt [signature] SWANCOTT | 7575 |

| 14. Status: ☐ Field ☐ Cleared by: (check box to right) ☐ Incident ☐ CBI ☒ Warrant Advised | Cleared By: ☐ Arrest-Adult ☐ Death of Offender ☐ Extradition Denied ☐ Arrest-Juv ☐ Vict. Refused Coop ☐ Unfounded ☐ Pros Declined ☐ Juv No Court | 15. Review Date: 5/29/12 | 16. Notified/Turned Over To |
|---|---|---|---|

Page 4 of 5

Ogunbekun HC000016

# EXHIBIT E

*Department of* **Communications**
Monroe County, New York

**Adam J. Bello**, County Executive

April 21, 2026

Ibukun Ogunbekun
12697
Victory Lakes Loop
Bristow, VA 20136

**RE: Freedom of Information Request # 26-1133**

**Details of Original Online FOIL Request:**

Phone: **585-737-8880**
Email: **ibukun.ogunbekun@yahoo.com**
Firm/Company:
Representing:
Request: **Training and memebership records**

**Request Details**
I am seeking to verify training and membership information for officers of the Brighton Police Department, Brighton, NY, who served on the Monroe County Emotionally Disturbed Persons Response Team (EDPRT). The reference period is January 2008 to December 2012. Officersâ€™ names are:
1. Renee Stickles (now Fischer)
2. Jeffrey Ruffalo
For each Officer, kindly confirm the following:
3. Date of EDPRT training (Month/Year) â€“ list ALL dates, if more than one training event
4. Duration of training (# of days or hours) â€“ indicate for each, if more than one training event
5. Certificate awarded to trainee (Yes/No) â€“ indicate for each, if more than one event
6. Membership of EDPRT â€“ Start/End dates
7. Reported incidents or interventions in which the Officer participated â€“ indicate Month/Year (Jan. 2008 to Dec. 2012 only).
Also, do confirm if 911 audio recordings for 2012 are available. If so, how do I obtain a copy for a specific date in May 2012?
Please, treat with dispatch. For additional information, do not hesitate to contact by phone or email.
Thank you.

Monroe County
Department of Communications

# EXHIBIT F

**MONROE COUNTY SHERIFF'S OFFICE**
Monroe County, New York

**Adam J. Bello**, County Executive **Todd K. Baxter**, Sheriff

May 1, 2026

Ibukun Ogunbekun
12697
Victory Lakes Loop
Bristow, VA 20136

**RE: Freedom of Information Request # 26-1133**

Dear Dr. Ogunbekun,

Pursuant to your request for information under the Freedom of Information Law (F.O.I.L.), the Monroe County Sheriff's Office was unable to locate documents in our files responsive to your request after a diligent search. This request should be directed to the Town of Brighton.

At this time the Monroe County Department of Communications considers this request closed. You may submit a written appeal regarding this decision within 30 days via mail to Amy Grower, Appeals Officer for Monroe County, 39 W. Main Street, Suite 110, Rochester, NY 14614.

Sincerely,

Todd K. Baxter
Monroe County Sheriff

Case: 26-1071, 09/24/2026, DktEntry: 33.1, (61 of 151)



# EXHIBIT G

# Town of Brighton

**POLICE DEPARTMENT**
2300 Elmwood Avenue
Rochester, New York 14618-2196

**Mark T. Henderson**
Chief of Police

**Emergency 911**
**Administrative (585) 784-5150**
**Fax: (585) 784-5151**

November 18, 2013

Officer Renee Fischer
Brighton Police Department
2300 Elmwood Avenue
Rochester, New York 14618

## NOTICE OF DISCIPLINE & CHARGES

Officer Fischer:

This letter is to inform you that you will be disciplined as a result of your conduct on October 26, 2013.

On that date you were involved in a search of a motor vehicle that you conducted and documented in an official written document as being "*subject to the arrest*" and that you obtained verbal consent to search the subject vehicle from the owner. As a result of the review of the facts and circumstances of your search, the manner in which you reported your actions to your supervisor on that date, your official written record of your actions and a determination that no consent was obtained prior to you searching the vehicle you are being charged with violating the following provisions of the Brighton Police Department Manual of Rules:

**Section 1.8 – INCOMPETENCE**
*Incapable of the satisfactory performance of occupational duties by failing to demonstrate honesty and sound judgment.*

**Section 2.19- FALSE REPORTS**
*Members shall not falsely make nor submit any type of official report, nor knowingly enter nor cause to be entered any inaccurate, false or improper information on the books or records of the department.*

**Section 10.4- TRUTHFULNESS**
*Members and employees are required to be truthful at all times, whether under oath or not.*

In accordance with the collective bargaining agreement between the Town of Brighton and the Brighton Police Patrolman's Association, you have twenty four (24) hours from the time of this letter to elect one of the following courses:

1. Proceed under the Grievance and Arbitration Procedure specified in the agreement between the Town of Brighton and the Brighton Police Patrolman's Association.

2. Proceed under New York State Town Law Section 155.

3. Request Summary Discipline as specified in Section 3.39 of the Brighton Police Department Manual of Rules.

Please do not hesitate to contact me if you have any questions regarding this matter. Otherwise I will be awaiting your timely written response.

Respectfully,

Mark T. Henderson
Chief of Police

xc: Supervisor William W. Moehle
Gary Brandt, Director of Personnel

# EXHIBIT H

# BRIGHTON POLICE DEPARTMENT



## POLICE PERFORMANCE EVALUATION

| Stickles, Renee | Police Officer | Patrol / 3rd Platoon |
|---|---|---|
| Name (Last, First, Initial) | Rank | Assignment |

EVALUATION DATE: Jan. 1, 2012 - Dec. 31, 2012

ADDITIONAL COMMENTS:

1. Officer Stickles has a general understanding of the penal law, vehicle and traffic law, etc, but it would be beneficial for her to expand on this knowledge. See area #4, Judgement, on page 1 which goes hand in hand with this area.

2. Her reports are neat with few, if any errors. Renee is also a Department Technician and is always ready and willing to help out whenever she is needed. On CR# 12-21796/217921 Ofc Stickles did an excellent job investigating a series of larcenies from vehicles at Corbetts Glenn Park. Renee's persistence on this case resulted in the suspects arrest and the clearance of numerous felonies.
As for productivity, Renee came in well below the platoon average in the areas of UTT's issued and calls for service. She came in right at the shift average for Criminal Arrests.
Ofc. Stickles had 2 sick occurrances for a total of 10 days of sick time used.

3. She tends to over explain herself on things that only require a simple explanation. She needs to work on completing her jobs and reports in a more timely fashion.

5. Officer Stickles has shown an inability to keep calm under pressure. She fails to exhibit proper decision making when encountering high stress situations. In an incident during this rating period which involved a Subject Resistance Report, Renee allowed the suspect to control her and did not properly use her command presence, DT training or any of the tools provided to her on her gun belt. Renee needs to work on remaining calm and in control of herself while demonstrating a command presence.

6. One example of this would be an incident that occurred during this rating period in which the SMART trailer was damaged. This rater believes Ofc. Stickles would be well served by acknowledging her mistakes and learning from them versus consistently providing excuses in an attempt to explain them away. This effort would go along way to establish greater credibility.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IBUKUN OGUNBEKUN ET AL.,

Plaintiffs,

**AFFIDAVIT OF SERVICE**

v.

Index No. 15-CV-06332 (CJS-JWF)

BRIGHTON POLICE DEPARTMENT, ET AL.,

Defendants,

I, Anthony Curry , being duly sworn state that, I am over eighteen (18) years of age and not a party to this action.

On May 15 , 2026, I mailed a true and correct copy of Plaintiff's Notice of Motion, Memorandum of Law, Declaration in Support of Motion and accompanying Exhibits, enclosed and properly sealed in a postpaid envelope, which I deposited for Overnight Delivery in an official depository under the exclusive care and custody of UPS in the State of New York, County of Monroe and addressed to: (i) Tully Rinckey, PLLC, Counsel for the Defendants, Eugene Welch, Esq., of counsel, who maintains offices for the practice of law at 400 Linden Oaks, Suite 110, Rochester, NY 14625; and (ii) Matthew Elder Mitchell, Esq., of counsel, who maintains offices for the practice of law at Ohrenberger, De Lisi & Harris, LLP, 28 New Driftway, Scituate, MA 02066.

AMY M. OWENS
Notary Public, State of New York
Qualified in Monroe County
Reg. #01OW6261443
Commission Expires 06/04/2028

[signature]
(Sign in presence of Notary Public)

Notary Stamp & Signature: State of New York
County of Monroe
Subscribed and sworn before me,
Anthony P. Curry personally
appeared on the 15 day of May ,2026
Amy M. Owens
(Notary)

(12)

13:28 Onscene

12-212202

#BRIP1797 1/CKWLA BRI /772 /1222 (E)
76 WINTERGREEN WY ,BRI
btwn EDGEWOOD AV & DEAD END <000>
IN FRNT OF LOC
P1:RES,P2:5854734101,
N:JONATHAN ROBERSON,
A:76 WINTERGREEN WY ,BRI

/1437 NEWLOC 770C [2300 ELMWOOD AV]
/1437 NEWLOC 772B [2300 ELMWOOD AV]
/1437 ONSCNE 770C
/1437 CHGLOC 770C [2200 ELMWOOD AV]
/1437 NEWLOC 772B [2200 ELMWOOD AV]
/1431 CLEAR 752C
/1426 CHGLOC 774C [STRONG]
/1423 ASST 771C [84 WINTERGREEN WY] #837255 HOFFMAN, JEFFREY
/1411 ONSCNE 752C
/1411 ASST 752C [84 WINTERGREEN WY]
/1409 OK 782C
/1409 OK 774C
/1409 OK 772B
/1409 OK 770C
/1409 OK 766C
/1409 MISC 774C ,OFCR IS OK
/1409 CLEAR 616C
/1409 ONSCNE 782C
/1409 CLEAR 617C
/1409 ASST 782C #838100 LIBERATORE, MARK
/1409 ONSCNE 774C
/1409 MISC 770C ,1 IN CUST
/1404? SUPP LOC: 84 WINTERGREEN WY ,BRI, NAM: 770C, ADR: 2021 WINTON RD S ,ROC,
PHO2: 5852615610, TXT: EMT IS HOLDING F'S LEGS DWN
/1407 MISC 617C ,77
/1407 CHGLOC 617C [84 WINTERGREEN WY]
/1407 CHGLOC 616C [84 WINTERGREEN WY]
/1407 CHGLOC 774C [84 WINTERGREEN WY]
/1407 CHGLOC 766C [84 WINTERGREEN WY]
/1406 ASSTER 616C [76 WINTERGREEN WY ,BRI] #823251 REALE, ANDREW
/1406 ASNCAS 617C $MCOP12087023
/1406 ASSTER 617C [76 WINTERGREEN WY ,BRI] #823597 WILLIAMS, ERIC
/1404? SUPP LOC: 84 WINTERGREEN WY ,BRI, NAM: 770C, ADR: 2021 WINTON RD S ,ROC,
PHO2: 5852615610, TXT: CLR SAYS F OFCRS ARE CALLING FOR MORE HELP ON RADIO
/1404? SUPP LOC: 84 WINTERGREEN WY ,BRI, NAM: 770C, ADR: 2021 WINTON RD S ,ROC,
PHO2: 5852615610, TXT: OFCRS HAVING PROB HANDLING THE F . THINKS F IS OVER POWER
ING OFCR
/1405 ASST 774C #837375 FLORA, CALE #839590 TUMBIOLO, JAMES
/1405 ASST 766C #839575 SWANCOTT, DAVID
/1404 REBID LAT: +043.105921 LONG: -077.579849 CONF: 100
/1404 SUPP LOC: 84 WINTERGREEN WY ,BRI, NAM: 770C, TXT: STATES OFCR IN TRB
/1350 CROSS #BRIE121501913
/1350 ONSCNE 772B
/1344 ASST 772B [84 WINTERGREEN WY] #837110 KNUTOWICZ, JULIE
/1344 CHGLOC 770C [84 WINTERGREEN WY] ,W F FROM 32
/1328 ONSCNE 770C
/1325 MISC 770C ,W/A
/1322 PRIU 770C
/1322 PREDSP 774B 770C
/1322 DISPER 770C #839560 STICKLES, RENEE
/1322 PREMPT 774B
/1322 ASNCAS 774B $BRIP12212202
/1322 DISPER 774B #839375 SKIDMORE, MARK
/1321 ENTRY B/F 13YO STANDING IN THE RAIN FOR 45 MIN POSS MENTALLY CHALLENGED Playing
w/ basketball 5'0 150 blue jeans maroon shirt

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Ibukun Ogunbekun, *as limited conservator for the estate of Oluwatosin Ogunbekun*,

Plaintiff,

v.

Town of Brighton, Brighton Police Department, Julie Knutowicz and Renee (Stickles) Fisher,

Defendants.

---

DECISION and ORDER

No. 15-CV-6332-CJS-MJP

APPEARANCES

| | |
|---|---|
| For Plaintiff: | Anna Marie Richmond, Esq.<br>Buffalo, NY |
| For Defendants: | Eugene Welch<br>Tully Rinckey, PLLC<br>Rochester, NY |

INTRODUCTION

**Siragusa, J.** Plaintiff Ibukun Ogunbekun ("Ogunbekun") commenced this action on behalf of his disabled adult daughter, Oluwatosin Ogunbekun ("Tosin"), alleging violations of her civil rights under 42 U.S.C. § 1983. The operative Second Amended Complaint ("SAC") (ECF No. 32-1) alleges that on May 29, 2012, the defendant police officers, Julie Knutowicz ("Knutowicz") and Renee Stickles Fischer ("Stickles"), falsely arrested Tosin, and subjected her to excessive force, in violation of her rights under the Fourth Amendment to the United States Constitution. SAC, ECF No. 32-1 at ¶ 3. Before the

Court is Defendants' motion for summary judgment as to all claims, ECF No. 82. For the reasons that follow, Defendants' motion is granted.

## FACTUAL BACKGROUND

Unless otherwise noted, the following are the undisputed facts of the case, viewed in the light most favorable to Plaintiff. Tosin is a "intellectually disabled adult female," SAC at ¶ 9, who suffers from seizure disorder, refractory epilepsy, and other mental disabilities. ECF No. 82-21 at ¶ 5; ECF No. 85-1 at ¶¶ 13, 16. At all relevant times, Tosin was twenty-five (25) years of age, standing approximately five feet three inches tall, and weighing approximately one hundred sixty pounds.

Tosin had previously resided in a group home for disabled adults, but at all relevant times herein was residing at her parents' home, located at 32 Wintergreen Way, Brighton, New York. ECF No. 82-21 at ¶ 4; ECF No. 82-2 at 23:18–23.

As of May 2012, Tosin's mental health had been declining for several months, such that Ogunbekun, a medical doctor, had determined that she "could no longer stay at home by herself." *Id*. at ¶ 6 (quoting ECF No. 82-2 at 23:3–11). On this point, Ogunbekun states:

> Tosin had on-going behavioral problems[.] . . . I observed that her mental acuity had diminished; her mental status was very severely compromised; she became more easily agitated by strangers, especially law enforcement. Tosin's mother and I determined that Tosin was not able to independently distinguish risks, and that she required constant supervision.

ECF No. 85-1 at ¶ ¶ 31-34.

On the day of the subject arrest, May 29, 2012, Tosin became "extremely upset" after Ogunbekun informed her that she had a neurology appointment that day, which she did not want to attend. ECF No. 85-1 at ¶ ¶ 39-40. According to Ogunbekun, Tosin

"flipped and she said no, she wasn't going anywhere; we had no right to make such appointments for her, and she went out of the house and took [a] basketball to let off steam." ECF No. 82-21 at ¶ 17 (quoting ECF No. 82-2 at 34:13–16). After leaving the house, Tosin talked to herself while walking up and down Wintergreen Way in the rain, holding and bouncing the basketball. *Id*. at ¶¶ 18–19. In this regard, Wintergreen Way was a street ending in a cul-de-sac, lined with Townhouse-style homes, with a sidewalk on just one side of the street. Because of this design, Ogunbekun maintains, residents of Wintergreen Way frequently walked in the street.

While Tosin was "letting off steam" on Wintergreen Way, as Ogunbekun maintains, contractors were working outside a neighboring home at 84 Wintergreen Way. ECF No. 82-21 at ¶ 21. Tosin approached one of the workers, Nate Lenz ("Lenz"), who later recalled, in a sworn statement to police, that Tosing was "talking crazy stuff" and making remarks to him, such as, "I'm watchin' you, I see you." ECF No. 82-5 at 1. Lenz further indicated that Tosin was dancing in the rain and talking to herself. *Id*. Lenz's co-worker, Nicholas Viglino ("Viglino"), indicated in an affidavit that Tosin was "dancing in the middle of Wintergreen way" in the rain, and kicking a basketball in the street. ECF No. 82-10. According to Lenz, Tosin's behavior toward him and Viglino was alarming enough to convince them to move inside, to get away from her. ECF No. 82-5 at 1 ("I told my co-worker Nick [V]iglino, 'let's go inside' because I was afraid [that] she was going to go crazy on us.")).

By this same time, Tosin's behavior had prompted another neighbor to place a call to the 911 operator, in which she described Tosin as an apparently mentally-disturbed

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (71 of 151)

woman who was standing in the rain talking to herself. ECF No. 82-21at ¶¶ 26-27.[1] In response to the neighbor's 911 call, Stickles, an officer with the Brighton Police Department, was dispatched to the scene. *Id*. at ¶ 28. Stickles was a member of the Monroe County Emotionally Disturbed Persons Response Team, and, as such, had received training on how to interact with mentally-disturbed subjects. *Id*. at ¶ 29.

When Stickles arrived, she saw Tosin standing in the street, in the rain, with a basketball. *Id*. at ¶ ¶ 36-37. Stickles recognized Tosin from a prior encounter, in April 2012, in which Stickles and another officer had been dispatched to the Ogenbekun residence, after Tosin had placed a 911 call to complain about what she perceived as mistreatment by parents, after they had asked her to vacate her bedroom to make room for a visiting houseguest.[2]

Stickles approached Tosin and asked why she was standing in the street. ECF No. 82-21 at ¶ 40. Tosin did not respond to Stickles' questions, and instead spoke, as if hallucinating, to people who were not there. *Id*. at ¶ 41. In a subsequent police report, Stickles stated: "The female seemed out of touch with reality and was ranting, and talking to people who were not there." ECF No. 82-1 at p. 3. Tosin refused Stickle's request to get

---

[1] *See also*, Plaintiff's Memo of Law, ECF No. 85-17 at p. 4 ("At 1:22 p.m., in response to a call from the resident at 76 Wintergreen Way, Defendant Stickles (Fischer) was dispatched to Wintergreen Way to respond to a call of "B/F 13YO standing in the rain for 45 min poss mentally challenged playing w/ basketball." Defendant Stickles (Fischer) testified that the call was to "check-the-welfare for a female standing – female, black, standing in the roadway for 45 minutes that appeared mentally challenged in the rain.") (footnotes omitted).

[2] This was not Tosin's only prior encounter with the police. Previously, in January 2012, Ogunbekun had called 911 after Tosin had gone 36 hours without food, sleep or drink. The responding police officers made a mental hygiene arrest and took Tosin to the hospital, where she subsequently received two months of inpatient treatment. Ogunbekun maintains that following this encounter with police, Tosin's "mental status" became "severely compromised," and she was fearful of police officers. ECF No. 82-2 at 14:13–14. Ogunbekun admits, however, that as previously discussed, Tosin herself placed the 911 call in April to 2012 to complain about her parents.

out of the roadway, and stated that she was angry at her father. ECF No. 82-1 at p. 3. Nevertheless, Stickles was able to obtain Ogunbekun's phone number from Tosin, and telephoned Ogunbekun, who told her that Tosin's mental health had been deteriorating lately, and that she would not do anything he told her to do. ECF No. 82-1 at p. 4 ("Ibukun told [this Officer] that Tosin's mental health condition has been deteriorating lately, and she won't do anything she is told."). Stickles, though, successfully convinced Tosin to return home. ECF No. 82-21 at ¶ 42.

Ogunbekun did not witness of any of foregoing incidents outside 84 Wintergreen Way, since he had been at home. In that regard, Ogunbekun indicates that when Tosin left home that day, he "checked on" her "periodically," by looking out a window of his house. ECF No. 85-1 at ¶ 52. However, he admits that he did not see any of Tosin's interactions with Lenz, Viglino, or Stickles, prior to Stickles escorting Tosin home. ECF No. 82-2 at p 34.

Once back at the Ogunbekun residence, Stickles and Ogunbekun suggested that Tosin take her basketball into the back yard. ECF No. 82-21 at ¶ 44. However, Tosin refused and went back out to Wintergreen Way. *Id*. In particular, Ogunbekun indicates that Tosin walked out the door in a leisurely manner. ECF No. 82-6 at 56:2–5; ECF No. 82-2 at 39:17–22.

Stickles followed after Tosin, but Ogunbekun remained inside because, according to Ogunbekun, "Tosin was angry with me, so I did not follow them immediately. I remained inside the house for a few minutes to allow the Officer to handle the situation, and to defuse the tension between Tosin and myself." ECF No. 85-1 at ¶ ¶ 70-72.

Stickles, meanwhile, followed Tosin and asked her to stop, but Tosin refused and

ran away, stopping again at 84 Wintergreen Way, where she had earlier spoken to Lenz and Viglio. Stickles followed Tosin and placed a radio call requesting that another patrol unit come to the scene. ECF No. 82-1 at p. 4. Tosin, meanwhile, told Stickles that she wanted "to kill her Dad," and wanted Stickles "to die." ECF No. 82-1 at p. 4.

As Stickles and Tosin were standing outside 84 Wintergreen Way, Ogunbekun arrived, having driven there in his car. Okunbegun Dep., ECF No. 82-2 at p. 47; *see also*, ECF No. 85-1 at ¶ ¶ 73-75 ("About five minutes later, I got into my car and followed in the direction Tosin and Defendant Stickles (Fischer) had gone. I found [them] outside of 84 Wintergreen Way. [They] were on the concrete porch of 84 Wintergreen Way."). Ogunbekun admits that he did not witness anything that had transpired between Tosin and Stickles between the time they left the house and the time he arrived at 84 Wintergreen Way. ECF No. 82-2 at p. 43 ("I don't know, you know, what transpired between the time that Tosin left the home with the officer and the time that I got there.").

Defendant officer Knutowicz arrived shortly thereafter and joined Stickles in conversing with Tosin. According to Knutowicz, Tosin "was rambling, she was talking about different things[, such as] that she believed she was a princess and a super villain," and, more significantly, "that she wanted to kill" Stickles and Knutowicz. ECF No. 82-12 at p. 3; *see also*, Knutuwicz Dep., ECF No. 82-12 at p. 3 ("She did make a statement that she wanted to kill us.").

Ogunbekun acknowledges that Tosin, who was agitated to begin with, became increasingly agitated throughout the entire confrontation between the officers and Tosin at 84 Wintergreen Way, though he blames the officers for that. ECF No. 85-1 at ¶ ¶ 81 ("I could see that Tosin was becoming more and more agitated."); 98 ("Tosin appeared to

be becoming more agitated; the Defendants continued to escalate rather than defuse the situation, giving Tosin repeated orders in strong, loud voices."). Ogunbekun further acknowledges that Tosin was "hallucinating" during the confrontation. ECF No. 82-2 at p. 48 ("By this time she had started hallucinating again, because, like I said, her mental state was unstable.").

Stickles then radioed for an ambulance, for a mental hygiene arrest. *Id*. In that regard, Stickles indicated that she believed the criteria were met for a mental hygiene arrest, since Tosin was both exhibiting signs of mental illness and making threats of harm toward others:

> She was exhibiting signs of mental illness, in my estimation, and she is now making verbal threats. Verbal threats of being either homicidal, suicidal, wanting to cause injury to somebody else, statements wanting to hurt me, statements about wanting to hurt her father. That is now enough criteria [for a mental hygiene arrest]. The person doesn't have to be swinging a bat around for you – you know what I mean – to have that element of dangerousness. The element has been raised, so now I'm going to have an ambulance come[.]

Stickles Dep., ECF No. 82-6 at p. 66.

As Stickles and Knutowicz stood with Tosin at 84 Wintergreen Way, awaiting the arrival of an ambulance, Tosin, who was never-married and childless, "was ranting and not making sense[,] stating that she is a princess, super-villain, and mother of three kids[, and that] she is getting married today and will be leaving for her honeymoon." ECF No. 82-1 at p. 4. Tosin was also "wiggling the door handle trying to get into" the residence, where she claimed her ex-husband resided. ECF No. 82-6 at 63:18–20, 65:9–12. Ogunbekun admits that Tosin was trying to gain entry to the neighbor's home, but insists that she was only trying "to get away from the officers." ECF No. 82-2 at 48:6–7.

Once an ambulance arrived, Stickles and Knutowicz told Tosin that she was going to be taken to the hospital for a mental hygiene arrest, and asked her to walk to the ambulance, but Tosin refused. ECF No. 82-1 at p. 4. Stickles then grabbed Tosin's arm, but Tosin immediately began flailing her arms and attempting to strike the officers. *Id*. at 5. Tosin hit Stickles, and also grabbed Stickles' ponytail "and started to twist and pull it." *Id*. Stickles then "yelled[,] for Tosin to let go of her hair and stop resisting[,] ten or more times." ECF No. 85 at p. 17, ¶ 63.

Stickles, Tosin, and Knutowicz then fell together to the ground, with Tosin still gripping Stickle's hair, where Tosin attempted to hit and bite both officers. ECF No. 82-1 at p. 5; *see also*, Stickles Dep., ECF No. 82-6 at p. 21 ("So now I touch her to escort her on her elbow, and she hauls off and hits me. She did make contact with a punch. And then she grabbed my hair and we both went to the ground at this point.").

Stickles indicates that she used a "forearm stun" and "empty handed" punches to force Tosin to release her ponytail. ECF No. 82-15 at p. 2. However, Tosin continued attempting to bite, choke, and pull Stickles' hair, while refusing to be handcuffed. *Id*.[3] Stickles eventually "applied a wrist lock" to Tosin's right wrist, while an ambulance attendant sat on Tosin's legs, which enabled Knutowicz to apply handcuffs. ECF No. 82-1 at pp. 5-6. [4]

---

[3] In addition to having her hair pulled by Tosin, Stickles also suffered minor injuries to her face, arm, and leg during the altercation. ECF No. 82-21 at ¶ 104. Tosin was consequently charged with assault and resisting arrest, but those charges were eventually dismissed after Tosin was granted an adjournment in contemplation of dismissal.

[4] Officers later took the following sworn statement from Lenz: "On 5/29/12 at about 1:55 pm, I was at 84 Wintergreen Way installing HVAC equipment for my company, American Climatech. While outside servicing the air conditioner unit, a strange Black woman came up to me and was talking crazy stuff. She kept saying stuff like, "I'm watchin you, I see you." She was dancing in the rain in the street while talking to herself. I told my coworker Nick Biglino, "Let's go inside" because I was afraid she was going to go crazy

Ogunbekun offers no additional or contrary facts about the struggle leading up to the handcuffing, except to say: "All three women were yelling; there was a lot of commotion on the porch. I saw Defendant Knutowicz punch Tosin several times on the head with her fist." ECF No. 85-1 at ¶ ¶ 113-114. That is, Obunbekun maintains, contrary to what the officers and other witnesses have stated, that he saw Knutowicz, and not Stickles, punching Tosin.[5] At the same time, Ogunbekun, despite having stood only a few feet away from the scuffle, maintains that he could not see what Tosin was "doing with her hands" during the scuffle, ECF No. 85-1 at ¶ 103, and that he could not see whether Tosin had ahold of Stickles' ponytail. ECF No. 82-2 at p. 50 ("Honestly, I can't say. . . . There's an allegation of that. It is possible. I don't know for sure.").

In any event, by the time Stickles and Knutowicz had Tosin handcuffed, other officers had arrived at the scene, who, because Tosin was unable or unwilling to stand, assisted in lifting her onto an ambulance gurney, where she continued to flail about, striking her head on the metal hand railing of the gurney. *Id*. at 6; *see also*, Stickles Dep., ECF No. 82-6 at p. 25-26.

In this regard, it is undisputed that at some point between the start of Tosin's struggle with Stickles and Knutowicz, and Tosin being placed on the gurney, Tosin sustained

---

on us. We went inside for lunch for about 20 mins. Then came back outside. A uniformed police officer was at the front door and told us not to come out the front so we went out the back. When we walked around to the front of the building, I saw 2 female officers talking with the Black female trying to calm her down. The Black female was still screaming, yelling, and going nuts. It was getting worse. The officers then tried to grab the B/F's arms, but she flailed her arms and resisted. She screamed "Jesus Christ" numerous times then the fight went to the ground. I began to back away. I did see the ambulance crew on scene." ECF No. 82-5 at pp. 2-3.

[5] For purposes of this Decision and Order the Court accepts that it was Knutowicz who punched Tosin. However, both Stickles and Viglino indicate that it was Stickles who punched Tosin. *See, e.g.*, Viglino Affidavit ECF No. 82-10 at p. 2 ("The African American girl had the younger longer Blonde hair[ed officer] by her hair. . . . The younger officer was punching the African American girl in the head trying to get her to let go of her hair."); *see also*, Stickle's Use of Force Report (ECF No. 82-15 at p. 2) (Indicating that only Stickles punched Tosin).

a laceration to her forehead that required three stitches. ECF No. 85-1 at ¶ 137. The parties dispute, however, how that injury occurred. Ogunbekun contends that Tosin sustained the laceration initially from hitting the concrete porch floor, though he does not specifically dispute that she also later struck her head against the gurney, while Knutowicz and Stickles each deny having seen any such injury prior to Tosin striking her own head against the gurney railing. *See, e.g., Knutowicz Dep*., ECF No. 82-12 at p. However, in addition to the fact that Ogunbekun's version is entitled to be accepted as true for purposes of this Decision and Order, the report of an emergency medical technician ("EMT") indicates that Tosin was bleeding before she was placed on the gurney, and that after being placed on the gurney she hit her own head against it, which resulted in additional bleeding. ECF NO. 85-14 at p. 3. Accordingly, the Court accepts as true that Tosin's head injury was related to both making contact with the concrete porch and striking the ambulance gurney.

Apart from Tosin's head injury, Ogunbekun maintains that officers were unnecessarily rough when moving Tosin from the ground to the ambulance gurney, and, indeed, that such transfer was "the most traumatic thing that [he] witnessed" that day. ECF No. 82-2 at p. 54; *see also*, ECF No. 85-1 at ¶ ¶ 119, 121-122 ("There were at least five police officers and at least two ambulance crews on the scene by that time. . . . As I observed the officers moving Tosin to the gurney, it appeared to me that they were intentionally being rough with her. They slammed her onto the gurney, which was absolutely unnecessary.").

However, Ogunbekun admits that he is not sure which of the many officers who were present at the time actually placed Tosin onto the gurney:

Q. Then what happened?

A. More officers arrived on the scene.

Q. And what if anything did they do?

A. It was – when the officers arrived on the scene they moved her from the ground and put her on the gurney.

***

Q. Okay. They you said. Who is "they"?

A. The officers and Tosin – where Tosin was at this time

Q. You said they moved her to a gurney. Who moved her to the gurney?

A. The officers I believe.

Q. Female officers or the male officers?

A. The EMT were already there.

Q. Okay.

A. *Now, I don't recall exactly who did what precisely, at that point who moved her on to the gurney*. All I remember is this: The police officers assisted – the male officer and the female assisted in putting her on the gurney[.]

***

Q. I know it's difficult, but I need to know about the gurney incident.

A. Yeah.

Q. So you have male police officers putting her on the gurney?

A. Yes, because I believe – yes, I believe the officers assisted the EMT. By this time there was a rowdy scene.

Q. Rowdy scene?

> A. Rowdy scene, yes. There were like about four or five police officers. They arrived in three different cars – no. Stickles was the first person to arrive then the other female officer then I believe that another two arrived in a separate car – male – then the most senior officer arrived. So you had like, you know, four police – four or five police officers, two ambulance crews already on the scene at that time. It was very rowdy. So there was a lot going on. I cannot tell you that I took in everything or what perspective or what order, but what I recall is this: That I recall the officers assisted in putting her on the gurney and I recall that when they were doing that it was like intentional, you know, like you have given us so much trouble this is what you get. They slammed her on the gurney.
>
> ***
>
> Q. Were the EMTs in the area?
>
> A. The EMTs were there.
>
> Q. It was the EMTs' gurney, correct?
>
> A. Yes, it was the EMTs', correct.
>
> Q. Were the EMTs trying to get her on the gurney?
>
> A. Were they trying to—
>
> Q. Put her on the gurney.
>
> A. I believe that they assisted.

ECF No. 82-2 at pp. 52-56 (emphasis added); *see also*, Plaintiff's Counterstatement of Facts, ECF No. 85 at ¶ 69 (Indicating that unspecified "officers" were "intentionally rough" when placing Tosin on the gurney); *see also*, SAC at ¶ 18 ("Additional police officers arrived on the scene – ***they*** lifted [Tosin] (now handcuffed) from the ground and slammed her on the stretcher provided by the Emergency Medical Technicians[.]") (emphasis added).

Knutowicz and Stickles also expressly deny that they were involved in physically placing Tosin on the gurney. Knutowicz testified that she was not involved in lifting and placing Tosin onto the ambulance gurney, ECF No. 82-12 at p. 11. Stickles' report indicated that she, as well as officers "Tumbiolo and Flora" had "attempted" to lift Tosin onto the gurney, ECF No. 82-1 at p. 6, but her deposition testimony clarifies that she did not actually lift Tosin onto the gurney:

> Q. [You] could not get her up because she was 'dead weight,' as you've described it?
>
> A. Yeah, we – I mean, they got there, and we were trying to let her stand up so that she could then, you know, walk to the gurney or try to escort her to the gurney. And so, you know, at that point like I said, the male officers, they came in and they had to physically almost pick her up and try to pick – I was there. I was close by, but I didn't really – I wasn't overly involved in that, lifting up, that process. I mean, I remember being there, but I don't remember hoisting her up.
>
> Q. Okay. But you did make an observation of the two male officers physically picking her up and taking her to—
>
> A. Having to pick her up because she wouldn't stand. She wouldn't put any weight on her – on her feet, so they had no option but to lift her up, to get her up onto the gurney[.]
>
> ***
>
> Q. Did you observe her actually being physically put into the gurney?
>
> A. I did. I was – I was within arm's – I was – I was there. I just wasn't doing the – the hoisting.

ECF No. 82-6 at pp. 25-26.

The record indicates that Tosin was arrested pursuant to New York Mental Hygiene Law § 9.41, and pursuant to New York Penal Law § § 240.26[1] (Harassment in the

Second Degree) and 205.30 (Resisting Arrest).[6]

## PROCEDURAL HISTORY

On May 28, 2015, Ogunbekun filed a *pro se* complaint on behalf of Tosin, which the Court dismissed *sua sponte* since Ogunbekun is not an attorney. Tosin later refiled the same complaint in her own name. ECF No. 4. Thereafter, the parties stipulated to the filing of the SAC, listing Ogunbekun as the "Limited Conservator for the Estate of Oluwatosin Ogunbekun, Incapacitated Person as Plaintiff." ECF No. 34. Count One of the SAC purported to state claims for false arrest and excessive force in violation of the Fourth Amendment under Section 1983 and 42 U.S.C. § 1988. Count Two of the SAC purported to state a claim based on the "policies and practices" of the Town of Brighton and Brighton Police Department, which allegedly caused the alleged Fourth Amendment violations, under 42 U.S.C. § § 1983 & 1988. The SAC indicated that defendants Knutowicz and Stickles were being sued in their individual and official capacities, SAC at ¶ 7, and that the Town of Brighton and Brighton Police Department were being sued under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

The SAC alleges that Stickles and Knutowicz had no basis to make a mental hygiene arrest, since Tosin was not a threat to herself or anyone else. SAC at ¶ 31. The SAC further contends that Stickles and Knutowicz used excessive force during the arrest, since they banged Tosin's forehead on concrete, punched her several times, and "slammed" her onto an ambulance stretcher. SAC at ¶ ¶ 33-35. Finally, the SAC alleges that Stickles and Knutowicz later maliciously prosecuted Tosin by charging her with

---

[6] See, Stickles Arrest Report, ECF No. 82-1 at p. 1 (arrest was pursuant to PL 240.26-1 PL 205.30).; *see also, id*. at p. 5 ("called for an ambulance for an MHA"); Stickles Subject Resistance Report, ECF No. 82-15 at p. 1 (arrest was pursuant to "MHA 9.41 PL 240.26-1 PL 205.30).

assault and resisting arrest. SAC at ¶ ¶ 22-26.

However, Plaintiff subsequently withdrew her *Monell* claims against the Town of Brighton and Brighton Police Department and disclaimed any intent to pursue a claim for malicious prosecution. *See*, ECF No. 85-17 at p. 19 ("Plaintiff withdraws the claims against the Town and the Brighton Police Department. Plaintiff has not raised a claim of malicious prosecution under state law."). Consequently, the claims against the Town of Brighton and Brighton Police Department, and any claims relating to malicious prosecution, are dismissed. The remaining claims in this action are pursuant to Section 1983, for false arrest and excessive force in violation of the Fourth Amendment, against Stickles and Knutowicz in their individual capacities.

On June 27, 2022, following the completion of discovery, Defendants filed the subject summary judgment motion. On August 31, 2022, Plaintiff filed opposition papers, ECF No. 85. On October 13, 2022, Defendants filed a reply, ECF No. 89.

## LEGAL STANDARDS

Rule 56

Defendants have moved for summary judgment, pursuant to Fed. R. Civ. P. 56, which may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the

movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

Additionally, the movant must demonstrate, and not merely assert, that he is entitled to judgment under the relevant principles of law. *See, Baker v. Anschutz Expl. Corp.*, 68 F. Supp. 3d 368, 373 (W.D.N.Y. 2014) ("While the absence of any genuine dispute of material fact is a precondition for summary judgment, the crux of a summary judgment analysis is whether the movant has established entitlement to judgment as a matter of law.") (quoting 11–56 MOORE'S FEDERAL PRACTICE—CIVIL § 56.20 (Matthew Bender 2014)), adhered to on reconsideration, No. 11-CV-6119 CJS, 2016 WL 981858 (W.D.N.Y. Mar. 15, 2016); *see also*, *Darley v. U.S.*, No. 22-CV-00714 (PMH), 2025 WL 1159518, at *3 (S.D.N.Y. Apr. 21, 2025) ("Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. Simply put, the movant must separately establish that the law favors the judgment sought.") (citations omitted).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[7] To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at

---

[7] "The substantive law governing the case will identify those facts which are material and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)." *Heard v. City of New York*, 319 F.Supp.3d 687, 692 (S.D.N.Y. 2018).

249. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, “after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.” *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

“[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion[, but, rather,] [t]he nonmoving party must go beyond the pleadings, and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.” *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (citations and internal quotation marks omitted).

Moreover, the party opposing summary judgment may not create a triable issue of fact “merely by submitting an affidavit that disputes his own prior sworn testimony.” *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) (citations omitted).

## DISCUSSION

### <u>Section 1983 Claims for False Arrest and Excessive Force</u>

“To state a claim under § 1983, a plaintiff must allege (1) the deprivation of a right secured by the Constitution or laws of the United States (2) which has taken place under color of state law.” *McCloud v. Jackson*, 4 F. App'x 7, 9 (2d Cir. 2001) (citation omitted).

> [Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. ... [For

> example, i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right.

*Graham v. Connor*, 490 U.S. 386, 393–94, 109 S. Ct. 1865, 1870–71, 104 L. Ed. 2d 443 (1989) (citations omitted).

To establish liability under Section 1983, a plaintiff must show that each defendant was personally involved in the alleged constitutional violation. *See, Ganek v. Leibowitz*, 874 F.3d 73, 92 (2d Cir. 2017) ("As the Supreme Court has instructed, because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff bringing [either type of claim] must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.") (citation and internal quotation marks omitted).

For example, a police officer is not personally involved in an allege constitutional violation merely because he was present at the scene of an arrest.[8] However, in actions involving multiple police-officer defendants, a defendant officer may be personally involved either because he directly violated the plaintiff's rights or because he failed to intervene to prevent another officer from violating such rights.[9]

> It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from

---

[8] *See, Snead v. City of New York*, 463 F. Supp. 3d 386, 398 (S.D.N.Y. 2020) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. An officer's mere presence at the scene of a stop or arrest generally does not constitute sufficient personal involvement for § 1983 liability.") (citation and internal quotation marks omitted, collecting cases), *reconsideration denied sub nom*. *Snead v. LoBianco*, No. 16-CV-09528 (AJN), 2021 WL 861060 (S.D.N.Y. Mar. 8, 2021).

[9] *See, e.g., Harris v. City of New York*, No. 15-CV-8456 (CM), 2017 WL 6501912, at *3 (S.D.N.Y. Dec. 15, 2017) ("To be held liable under § 1983 for false arrest or failure to intervene, an officer must be "personally involved" in an unlawful arrest. An officer can be personally involved in one of two ways: He can directly participate in the arrest, or he can fail to intervene to stop an unlawful arrest when the evidence establishes that he would have been able to do so.") (citations omitted).

> infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

*Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted).

*Fourth Amendment False Arrest*

Plaintiff's first Section 1983 claim is for false arrest in violation of the Fourth Amendment. In this regard, the SAC contends that it was unreasonable for Stickles and Knutowicz to seize Tosin under the Mental Hygiene Law, since at the time of the arrest Tosin was merely "letting-off steam" and "not threaten[ing] anybody." SAC at ¶ 13. The SAC further implies that Tosin was not a realistic threat in any event, since she was "a 5 ft 3 in female weighing approximately 160 lbs and armed with nothing but a basketball." SAC at ¶ ¶ 21, 37. Rather, the SAC characterizes the arrest as having been unreasonably made, based merely on Tosin's "non-compliance" with Stickles' orders to return home. *Id*. at ¶ 14 ("She decided to [arrest Tosin under the Mental Hygiene Law], apparently for non-compliance."); *see also, id*. at ¶ 31 (accord).

Defendants maintain that they are entitled to summary judgment on the false-arrest claim, because there was probable cause for the arrest, in which case there was no Fourth Amendment violation, or, alternatively, because there was arguable probable cause, which entitles them to qualified immunity. Defendants further argue that since Plaintiff accepted an adjournment in contemplation of dismissal regarding her criminal

Case: 26-1671, 09/21/2026, DktEntry: 33.1, (87 of 151)

charges, she is collaterally estopped from now claiming that there was no probable cause for the arrest.

Plaintiff opposes the motion, purportedly since there are triable issues of fact as to whether Stickles and Knutowicz had probable cause to conduct a mental hygiene arrest. More specifically, Plaintiff primarily maintains that "there is a genuine issue as to whether the Defendants had probable cause to arrest Tosin pursuant to Mental Hygiene Law § 9.41," since Tosin was not doing anything "seriously harmful" by standing in the rain or talking to the contractors at 84 Wintergreen Way. As part of this argument, Ogunbekun maintains that there is a triable issue of fact as to whether Tosin threatened to kill anyone, since he did not personally hear her make such threats. In particular, Obunbekun argues that Stickles is the only person who claims to have heard Tosin say she wanted to kill her father, ECF No. 85-17 at pp. 14, 15, and, therefore, "there is a genuine issue of material fact as to whether Tosin actually uttered those words[.]" ECF No. 85-17 at pp. 15-16; *see also, id*. ("Ogunbekun did not hear those words, and was not aware that Tosin had been accuse of uttering them until informed by a doctor at the hospital.").

Alternatively, Ogenbekun maintains that, "even if Tosin did utter [threats to kill], the words in and of themselves cannot be said to have evinced a danger that Tosin was conducting herself in a manner likely to result in serious harm to herself or others." ECF No. 85-17. Indeed, Ogunbeken faults Stickles for not informing him of the threats, stating that if she had done so, he "would have pointed out that children often express hyperbolic 'threats' such as were attributed to Tosin that day, without truly intending to harm their parents." ECF No. 85-17 at p. 9; *see also, id*. at p. 20 ("Tosin's alleged 'threat' against her father amounts to nothing more than childish expostulations that were not entitled to

credence.”).

Ogunbekun further contends that there is a triable issue of fact regarding probable cause, since the defendant officers were acting under the influence of “implicit racial bias.” As evidence of this, Ogunbekun maintains that Tosin was 5 feet 3 inches tall and 160 pounds, while Stickles estimated, in her police report, that Tosin was 5 feet 6 inches tall and 200 pounds. Plaintiff insists that this alleged discrepancy is significant, since it illustrates the unwitting racism of the arresting officers: “The white witnesses’ implicit bias against Blacks is evident in their descriptions of Tosin, including but not limited to Defendant Stickles’ (Fischer’s) inflating Tosin’s height by 3 inches, and her weight by 40 pounds[.]” ECF No. 85-17 at p. 16.

Lastly, Ogunbekun argues that any arrest and any accompanying use of force against Tosin was necessarily improper and unnecessary, since it was Stickles’ fault that Tosin left the Ogunbekun residence after being returned there. In this regard, Ogunbekun testified at deposition that when Tosin began walking “leisurely” out of the house (after being returned there by Stickles), he felt powerless to stop her from leaving again, since Stickles was “in charge”:

> A. Personally, what I would have done on that date, I would have made sure that Tosin did not go out of the house once she was already inside. She would let off steam inside of the house.
>
> Q. How would you have kept her from going outside?
>
> A. I would have locked the door- period – *but the officer was there. She was in charge*.
>
> Q. So then what happened?
>
> A. *The officer allowed her* to go back into the street.

ECF No. 82-2 at p. 39 (emphasis added). Ogunbekun reiterates this belief -- that Stickles is to blame for the arrest and use of force—stating, in his opposition affidavit: "Based upon my years of living with Tosin, I believed at the time and continue to believe that *if Defendants Stickles (Fischer) had simply directed Tosin to stay inside our home, and allowed me to lock the door*, that no harm would have come to my daughter or anyone else." ECF No. 85-2 at ¶ 143 (emphasis added).

Defendants, in their reply papers, maintain that Plaintiff has not raised any triable issue of fact. Particularly regarding the false arrest claim and the existence of probable cause, Defendants point out that not only had Tosin made threats toward Obunbekun, Stickles, and Knutowicz, but she also was a danger to herself, since she

> was apparently not being supervised in any way by her father. . . . [H]e was apparently supervising Tosin only intermittently. Dr. Ogunbekun failed to observe many of Tosin's actions, including the fact that she was dancing in the middle of Wintergreen Way while it was raining and she was kicking a basketball in the road. . . . He was completely unaware that Officer Stickles had arrived on the scene and had been talking to Tosin for some time until Stickles call him on the phone. She not only called Tosin's father, but she brought Tosin back to the house so that she would be safe. However, Dr. Ogunbekun did nothing to keep his daughter at the house.

ECF No. 86 at pp. 4-5; *see also, id*. at p. 7 ("When Officer Stickles arrived on-scene she found an individual who had mental disabilities, in the rain, in the middle of the public road, talking to people who were not there, and who was unsupervised."). As further evidence of the danger Tosin posed to herself, Defendants note that at the time of arrest, Tosin was attempting to enter a stranger's home at 84 Wintergreen Way, due to her delusional belief that her nonexistent ex-husband live there. *Id*. at 5.

Having considered the parties' arguments, the Court finds that Defendants are

entitled to summary judgment on the false arrest claim. The law applicable to Fourth Amendment claims for false arrest under Section 1983 is well settled:

> The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. This protection "adheres whether the seizure is for purposes of law enforcement or due to an individual's mental illness." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016). Probable cause to arrest "exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks and citation omitted). To handcuff and detain a person for mental-health reasons, an officer must have "probable cause to believe that the person presented a risk of harm to himself or others." *Kerman v. City of New York*, 261 F.3d 229, 237 (2d Cir. 2001) (citation omitted).
>
> Even if there was no probable cause, "an arresting officer is entitled to qualified immunity so long as arguable probable cause was present when the arrest was made." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (internal quotation marks and citation omitted). Arguable probable cause exists if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id*. (internal quotation marks and citation omitted). In other words, qualified immunity will protect an arresting officer unless "no reasonably competent officer could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Id*. (internal quotation marks and citation omitted).

*Mercedes v. City of New York*, No. 22-1776-CV, 2023 WL 8594055, at *1–2 (2d Cir. Dec. 12, 2023).

The existence of probable cause is an objective determination, and therefore, the arresting officer's subjective beliefs or intentions are irrelevant to a court's inquiry:

> [T]he [defendant officers'] subjective beliefs [that plaintiff was innocent] are irrelevant, since the existence of probable cause is an objective determination. *See, e.g., Roberts v. Azize*, 767 F. App'x 196, 198 (2d Cir. 2019)

> ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). This inquiry is an objective one: "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Id*. at 153, 125 S.Ct. 588 (emphasis added).); *see also, Nzegwu v. Friedman*, 605 F. App'x 27, 30 (2d Cir. 2015) ("[T]he state of mind of the arresting officer—that is, his subjective reason for believing there to be probable cause to arrest—is irrelevant to the probable cause determination, even if the officer's subjective reason is foolish or based on improper factors. For this reason, Nzegwu's allegations that Defendants arrested him, at least in part, because of his national origin and race, are irrelevant to the legal inquiry: they go to the officers' subjective reason for arresting him, not to the facts before Defendants at the time of his arrest.") (citation omitted).

*Newsome v. Miller*, No. 18-CV-6756 CJS, 2024 WL 3415363, at *11 (W.D.N.Y. July 15, 2024).

In the instant case, Tosin was arrested pursuant to, *inter alia*, New York's Mental Hygiene Law § 9.41,[10] which states, in pertinent part, that,

> [a]ny peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 of this article, or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40 of this article, or pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place, in which event, such officer shall immediately notify the director of community services or, if there be none, the health officer of the city or county of such action.

---

[10] *See*, ECF No. 82-15 at p. 2 (referencing that arrest was pursuant to "MHA 9.41").

N.Y. Mental Hyg. Law § 9.41(a) (McKinney 2025) (emphasis added).

> New York law defines "likelihood to result in serious harm" as: "(i) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (ii) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." [Mental Hygiene Law] § 22.09(a)(3).

*Accardi v. Cnty. of Suffolk*, No. 24-903, 2025 WL 88281, at *1 (2d Cir. Jan. 14, 2025).

In this context, "[t]he Fourth Amendment requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Lurch v. Chaput*, No. 16 CIV. 2517 (AT), 2022 WL 889259, at *7 (S.D.N.Y. Mar. 25, 2022) (citation and internal quotation marks omitted), *aff'd*, No. 22-798-PR, 2023 WL 2469943 (2d Cir. Mar. 13, 2023).

A threat of homicide or other violence, in conjunction with other circumstances, may be sufficient to satisfy this standard:

> On September 11, 2018, when Mrs. Accardi arrived home, she observed [her husband,] Plaintiff, to be disoriented and acting irrationally. . . . Plaintiff yelled at her for taking their son to the doctor without him. He threatened to stab her, and even though he was not holding a knife, this scared her. . . . When Mrs. Accardi woke up, Plaintiff confronted her and was acting irrationally. Mrs. Accardi did not want to stay in the house with Plaintiff as she did not feel safe. Plaintiff told Mrs. Accardi that if she left, he would kill himself. . . . [T]here is an abundance of undisputed evidence in the record which would allow a reasonable officer to believe Plaintiff was a danger to himself or to Mrs. Accardi. Specifically, Mrs. Accardi recounted in her sworn statement that she observed Plaintiff in an agitated and erratic state for over two days, which involved him screaming and "not really making any sense." When Mrs. Accardi left the home, Plaintiff called her and told her he knew where she was. Plaintiff also threatened to stab Mrs. Accardi and threatened to kill himself. . . . Given the significant record of Plaintiff's erratic behavior over the course of the events on September 11-12, 2018, Plaintiff's argument that a jury could find that the phrase "... maybe I should just kill

> myself" as "nothing more than rhetoric between spouses," is unpersuasive. Rather, Mrs. Accardi's sworn statement to the SCPD indicates that Plaintiff had threatened suicide and threatened to harm his wife. The eyewitnesses who encountered Plaintiff on those days observed that he was acting erratically as if he was under the influence. These specific observations and information support a finding that there was "a probability or substantial chance of dangerous behavior" by Plaintiff, specifically, that he might hurt himself or his wife. The Court therefore finds that Defendant Manfredonia had probable cause to transport Plaintiff to CPEP.

*Accardi v. Cnty. of Suffolk*, No. 21-CV-05051 (HG), 2024 WL 1345233, at *2 (E.D.N.Y. Mar. 29, 2024) (footnotes and citations to record omitted), *aff'd*, No. 24-903, 2025 WL 88281 (2d Cir. Jan. 14, 2025).

However, this standard may also be met even in the absence of threats or explicitly violent behavior. *See, e.g., Aouatif v. City of New York*, No. 07CV1302RRMJO, 2019 WL 2410450, at *10 (E.D.N.Y. May 31, 2019) ("Aouatif argues that she did not pose a risk of harm to herself or others, emphasizing that she displayed no violent behavior. The Fourth Amendment, however, requires only a 'probability or substantial chance of dangerous behavior, not an actual showing of such behavior' to support a seizure for involuntary transport. It was reasonable for Kotbi to conclude that Aouatif exhibited a "probability or substantial chance" of dangerous behavior, in light of her mental conditions, even absent explicitly violent behavior.") (citations omitted), *aff'd*, 811 F. App'x 711 (2d Cir. 2020).

For example, probable cause was found for a mental hygiene arrest where an adult woman with Down's Syndrome was found hallucinating and unattended by family members:

> Viewing the facts that were available to the officers, even in the light most favorable to Anthony, the officers had probable cause to seize Anthony. Given that Anthony has Down's Syndrome and had [falsely] reported to an emergency operator less than twenty minutes before the police arrived that

> she was being beaten by a "husband" who had a knife and a gun, and given that there was no one present who could provide the officers with assurance that Anthony would not suffer another episode of terror or who could provide for Anthony's safety in their absence, it was reasonable to believe that Anthony might, if left alone, conduct herself in a manner likely to result in serious harm to herself. In reaching this conclusion, the officers were entitled to consider the likelihood that Anthony would experience another hallucination and might cause serious injury to herself during that episode even though she appeared calm to them. Accordingly, there was probable cause to seize Anthony.

*Anthony v. City of New York*, No. 00 CIV. 4688 (DLC), 2001 WL 741743, at *5 (S.D.N.Y. July 2, 2001) (footnote and citation omitted), *aff'd*, 339 F.3d 129 (2d Cir. 2003).

Here, the facts known to the defendant officers at the time of the arrest were that Tosin was a twenty-five year old woman with mental disabilities which had reportedly been worsening in recent months, to the point where she would not do anything her father told her to do, and who, because she was angry with her father, had left home and was walking and dancing in a public roadway in the rain, talking to herself and holding and bouncing a basketball. Tosin was angry, hallucinating, speaking with persons who were not there, claiming to be a princess and a supervillain, and bothering contractors. After Stickles returned Tosin to her home, Tosin left again, without any interference from her father, who, despite claiming that Tosin was hallucinating and required "constant supervision," left her unsupervised outside for stretches long enough for her to suffer serious harm.[11] Tosin had further attempted to enter a stranger's home, after claiming that her

---

[11] *Compare, e.g.*, Ogunbekun Deposition, ECF No. 82-2 at pp. 34-35 ("I was watching her. I was watching her from the house. So I saw what was going on *to a large extent. I didn't see everything that was happening. I wasn't too worried* for several reasons. One, in the past Tosin had been allowed to go for short walks in the community by herself, you now, minimal oversight. I would just drive by and just make sure she was safe. She would not see me or anything. We wanted her to live as independently as possible and she was prior to 2012 able to do that *to some degree. So when she wandered out of the house I was not worried—especially as she was not going on to the main road*. She was going to the end of the cul de

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (95 of 151)

non-existent ex-husband lived there. Except for agreeing to return to her home the first time, Tosin disregarded every command given to her by Stickles. Additionally, Tosin stated that she wanted to kill her father, and that she wanted Stickles and Knutowicz to die.

These facts objectively establish probable cause for an arrest under the Fourth Amendment and New York Mental Hygiene Law § 9.41, pursuant to the legal standards set forth earlier.

Plaintiff's contrary arguments lack merit. For example, Plaintiff's contention, that there is a triable issue of fact about whether Tosin threatened to kill Ogunbekun, since Stickles is the only person who heard the threat, is simply an incorrect statement of the law. Stickles has indicated, in sworn statements, that Tosin made the threat, and Ogunbekun, who admittedly was not present when the threat was made, has not come forward with any evidentiary proof to the contrary. Consequently, there is no triable issue of fact on that point. And, in any event, it is similarly undisputed that Tosin stated she wished both Stickles and Knutowicz were dead.

Nor is there any merit to Plaintiff's assertion that Stickles and Knutowicz lacked probable cause, since they were influenced by "implicit racial bias." To begin with, there is not a shred of actual evidence of any improper racial motive, but rather, only Ogunbekun's subjective beliefs, which are insufficient to create a triable issue of fact. Additionally, even assuming that Ogunbekun had evidence of such a bias by the officers, it

---

sac.") (emphasis added), *with Id*. at 47 ("By this time she had started hallucinating again because, like I said, her mental state was unstable.") *and id*. at 23 (Testifying that as of May 2012, Tosin "could no longer stay at home by herself. She was no longer competent to stay at home by herself. . . . [I]t was not safe for her to do that – not that she posed a risk to herself, but she just was not able to distinguish risk from – she was no longer mentally competent to do that.").

would still not raise a triable issue of fact, since an arresting officer's subjective beliefs or motives are irrelevant to a court's objective inquiry into the existence of probable cause.

Finally, Plaintiff's assertion, that the arrest was unreasonable because Stickles was to blame for "allowing" Tosin to leave her home again after being returned there, is utterly unsupported, and, frankly, ridiculous. In particular, Ogunbekun's contentions, that he was somehow powerless to attempt to stop his disabled daughter from leaving the house because Stickles was "in charge," and that Stickles somehow did not "allow" him to lock his own door to keep Tosin inside, are contrary not only to common sense, but also to the record. Specifically, Ogunbekun's sworn deposition testimony admits that he purposely let Tosin go back outside because Tosin was angry with him, and he wanted Stickles to handle the problem. *See*, Ogunbekun Dep., ECF NO. 82-2 at p. 41 ("I left them briefly because she was mad at me, mind you. . . . Tosin was mad at me. So I stepped back[,] [t]o allow the officer to do her job and defuse the situation and bring her back home.").[12] Ogunbekun's related contention, that the need for an arrest would have been obviated if only *Stickles* had ordered Tosin to remain inside,[13] is similarly preposterous, as shown by the record,[14] and legally meritless.

In sum, the Court finds that Stickles and Knutowicz are entitled to summary

---

[12] Ogunbekun's decision in this regard is also quite puzzling, considering his insistence that Tosin became especially agitated around police officers. *See*, ECF No. 85-1 at ¶ ¶ 31-34 ("[H]er mental acuity had diminished; her mental status was very severely compromised; she became more easily agitated by strangers, especially law enforcement.").

[13] Again, *see*, Ogunbekun Aff., ECF No. 85-2 at ¶ 143 ("[I]f Defendants Stickles (Fischer) *had simply directed Tosin to stay inside our home*, and allowed me to lock the door, that no harm would have come to my daughter or any-one else."). (emphasis added); see also,

[14] Ogunbekun told Stickles that Tosin would not do anything he told her to do, and Tosin similarly disregarded Stickles' orders.

judgment on the false arrest claim, since there was probable cause for the arrest under Mental Hygiene Law § 9.41 and the Fourth Amendment. Alternatively, the Court finds that Defendants had at least arguable probable cause, and are therefore entitled to qualified immunity, since a reasonably competent officer could have concluded, based on the facts known at the time of arrest, that probable cause existed.

*Fourth Amendment Excessive Force*

Plaintiff's second claim is that Stickles and Knutowicz violated the Fourth Amendment by using excessive force during the arrest. According to the SAC, the excessive force consisted of Stickles and Knutowicz "banging" Tosin's head on concrete, Knutowicz landing "several blows" to Tosin's head, and "additional police officers" "slamming" Tosin onto an ambulance stretcher. SAC at ¶ ¶ 16-18, 33-35.

Defendants maintain that they are entitled to summary judgment either because the force used was objectively not excessive under the circumstances, or because they are entitled to qualified immunity. More specifically, movants contend that Tosin's injury was *de minimis*, and, alternatively, that the degree of force used was necessary, and not excessive, in relation to Tosin's actions in fighting the officers:

> The alleged injuries of a small head laceration do "not rise to the level of objective excess that reasonable police officers would consider to be unlawfil conduct in an arrest situation." *Wilder v. Viil. of Amityville*, 288 F. Supp.2d 341, 344 (E.D.N.Y. 2003). This is especially true where it was the result of Tosin's own conduct in resisting arrest by fighting, kicking, and grabbing Officer Stickle's ponytail and yanking Officer Stickle's head about so violently that they both went to the ground. Even if Tosin could show an injury sufficient to maintain her claim, summary judgment should still be granted because Officer Stickles and Knutowicz acted reasonably in the situation in question.

Defendant's Memo of Law, ECF No. 82-19 at pp. 10-11.

Plaintiff agrees that Tosin actively resisted the efforts by Stickles and Knutowicz to arrest her, but nevertheless contends that the degree of force used was objectively unreasonable, primarily since "<u>all</u> of Tosin's alleged physical actions were in response to Defendants' unjustified use of force against her." ECF No. 85-17 at p. 19 (emphasis in original). That is, Plaintiff contends that there was no probable cause for the arrest, and that therefore any use of force to effect the arrest was unjustified.

Alternatively, Plaintiff maintains that the force used was excessive, since Tosin was intellectually comparable to a child, making her resistance understandable:

> Tosin did not begin yelling until after the officers grabbed her, and similarly that she did not grab Officer Stickles' (Fischer's) ponytail until after the officers grabbed her. Bearing in mind that Tosin is a mentally disabled individual who functioned at a Kindergarten to second grade level and had chronic difficulty in appropriately communicating her feelings and understanding how her behavior and attitude affected those around her, her conduct can best be likened to that of a frightened and confused six- or seven-year old child.
>
> Defendants' assertion that Tosin dragged them to the concrete floor of the porch does not accurately reflect their own reports, which suggest, although do not make clear that the three women fell to the floor after Defendant Knutowicz applied a "knee strike," and knocked Tosin's feet out from under her. It seems likely that Tosin's hand was twisted in Defendant Stickles' ((Fischer's) hair at the time, which resulted in at least two of the women falling to the porch. A panicked child-like person, who was terrified and incapable of understanding why she was being attacked by police officers, found herself underneath two female officers with an EMT sitting on her legs. Is it any wonder that she struggled?

ECF No. 85-17 at pp. 20-21.

Defendants respond, in their reply, that Plaintiff seems to be arguing that the officers should not have used any force, which is incorrect, since the officers were legally entitled to make the arrest. *See*, ECF No. 86 at p. 10 ("[Plaintiff] seems to be arguing that

the officers were required to take no action against Tosin whatsoever. Where, as here, the officers had probable cause to make a mental hygiene arrest, they were entitled to effectuate the arrest.”). Further, Defendants reiterate that the force used was proportional in countering the force that Tosin was exerting to avoid arrest. *Id*. (“Tosin reacted violently, grabbing Officer Stickles by her ponytail and violently twisting and pulling her hair. At that point, the officers used very limited physical interventions to get Tosin to release her hold of Officer Stickles’ hair. That included a hand strike and a knee strike. That force was in direct proportion to the physicality of Tosin grabbing Officer Stickles by the ponytail and yanking her head around. Tosin was told numerous times to stop resisting, but she did not.”). Defendants thus maintain that there was no excessive force violation, and alternatively, that they are entitled to qualified immunity. Lastly, Defendants assert that there is no evidence that Stickles and Knutowicz were responsible for allegedly slamming Tosin onto the ambulance gurney.

Having considered the parties’ arguments, the Court finds that Stickles and Knutowicz are entitled to summary judgment. In this regard, the relevant legal principles are clear:

> “The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest.” *Tracy*, 623 F.3d at 96. Application of this reasonableness test “requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.” *Graham v. Connor*, 490 U.S. 386, 396 (1989). “Graham [ ] stands for the proposition that a government officer may not intrude on a person's Fourth Amendment rights by employing a degree of force beyond that which is warranted by the objective circumstances of an arrest.” *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019). The *Graham* factors and the reasonableness of a use of force are “judged from the perspective of a

> reasonable officer on the scene," and we must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

*Singh v. City of New York*, No. 23-24-CV, 2024 WL 319117, at *4 (2d Cir. Jan. 29, 2024); see alo, *see also, id*. at *7 ("[A] police officer cannot use significant force against an individual where that individual does not pose an immediate threat to the safety of others or is not actively resisting arrest or attempting to evade arrest by flight.") (citation omitted).

"In light of the fact-specific nature of an excessive force claim, granting summary judgment against a plaintiff on such a claim is not appropriate unless no reasonable fact-finder could conclude that the officers' conduct was objectively unreasonable." *Mercedes v. City of New York*, No. 22-1776-CV, 2023 WL 8594055, at *3 (2d Cir. Dec. 12, 2023) (quoting *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (internal quotation marks omitted). In this regard, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. at 396–97, 109 S. Ct. at 1872.

Moreover, the doctrine of qualified immunity may shield defendants from suits for damages for excessive force:

> The doctrine of qualified immunity "shields police officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (alteration omitted). When a defendant moves for summary judgment based on qualified immunity, courts consider "whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established

at the time of [the] defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). If the constitutional right invoked by the plaintiff was not "clearly established" at the time of the purported violation, qualified immunity precludes civil liability and the defendant is entitled to summary judgment. *See Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ("[R]easonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.").

A right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Taravella*, 599 F.3d at 133. This requires that "'controlling authority' or 'a robust consensus of cases of persuasive authority'" have recognized the right at issue. *Liberian Cmty. Assoc. of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). Although we do not require a case "directly on point" to hold that a defendant's conduct violated a clearly established right, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017).

"When a plaintiff alleges excessive force ... the federal right at issue is the Fourth Amendment right against unreasonable seizures." Tolan v. Cotton, 572 U.S. 650, 656, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014). In analyzing whether this right has been violated, courts must be careful "not to define clearly established law at a high level of generality," *al-Kidd*, 563 U.S. at 742, 131 S.Ct. 2074, because "[t]he dispositive question" for the purpose of qualified immunity "is 'whether the violative nature of particular conduct is clearly established,'" *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (quoting *al-Kidd*, 563 U.S. at 742, 131 S.Ct. 2074); *see also District of Columbia v. Wesby*, ––– U.S. ––––, 138 S. Ct. 577, 590, 199 L.Ed.2d 453 (2018) ("The 'clearly established' standard ... requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him."). Qualified immunity would be "no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015).

> Accordingly, our inquiry focuses on the specific "factual situation the officer[s] confront[ed]," and the defendants will be "entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, [584] U.S. [100], 138 S. Ct. 1148, 1152-53, 200 L.Ed.2d 449 (2018).

*McKinney v. City of Middletown*, 49 F.4th 730, 738–39 (2d Cir. 2022).

In the instant case, Plaintiff does not clearly articulate, using the applicable legal factors, why the specific force used was excessive, except to assert primarily that "all of Tosin's alleged physical actions were in response to Defendants' unjustified use of force against her." ECF No. 85-17 at p. 19. Alternatively, Plaintiff seemingly argues only that Tosin's actions were understandable in light of her mental condition, and that the officers therefore should not have continued with the arrest once she began to resist. ECF No. 85-17 at p. 21 ("A panicked child-like person, who was terrified and incapable of understanding why she was being attacked by police officers, found herself underneath two female police officers with an EMT sitting on her legs. Is it any wonder that she struggled?").[15] That is, Plaintiff maintains that the alleged constitutional violation consisted of the officers making a bad prudential judgment about whether to forcibly arrest Tosin at all. Indeed, Plaintiff insists that the officers "mishandled the situation" by attempting to arrest Tosin, when they instead should have simply waited for her to calm down. *See*, Ogunbekun Aff., ECF No. 85-1 at ¶ ¶ 83-85 ("Defendant Stickles (Fischer) told me that she was initiating a mental hygiene arrest. I told Defendant Stickles that *I believed that was the wrong call*. Based upon my years of experience with Tosin, *I believed* that it was necessary to back off a bit, and patiently wait for Tosin to relax and clam down and move

---

[15] This quote from Plaintiff misstates the order of events, since Tosin "found herself beneath two police officers" precisely because she violently resisted the officers' attempt to arrest her.

off the porch.”) (emphasis added).

However, Plaintiff’s arguments lack merit. Preliminarily, insofar as Plaintiff’s excessive force claim is based on the alleged “slamming” of Tosin’s body onto the ambulance gurney, which Ogunbekun insists was the most serious and upsetting example of excessive force, the Court finds that even assuming *arguendo* that such action was of constitutional magnitude, Stickles and Knutowicz are entitled to summary judgment since they were not personally involved. There is no genuine material issue of fact as to whether Stickles or Knutowicz was one of the officers who did the alleged slamming, since both have indicated in sworn statements that they did not lift and transfer Tosin onto the gurney, and Ogunbekun has admitted that he is not sure which officers did. Specifically, Ogunbekun’s vague statement, that ‘the female assisted in putting [Tosin] on the gurney,” after he previously admitted, in response to very clear questioning from Defendants’ counsel attempting to pin him down on this point, that he did not know who did what, is insufficient to raise a triable issue of fact as to whether either Stickles or Knutowicz slammed Tosin onto the gurney. In this regard, the Court notes that even the operative pleading, the SAC, is consistent with the version of events testified to by Stickles and Knutowicz, since it indicates that Tosin was put onto the ambulance gurney by “additional officers” who arrived at or about the time that Tosin was handcuffed. *See*, SAC at ¶ 18 (“*Additional police officers* arrived on the scene – *they* lifted [Tosin] (now handcuffed) from the ground and slammed her on the stretcher provided by the Emergency Medical Technicians[.]”) (emphasis added).[16]

---

[16] Ogunbekun made the same factual admission in his first Amended Complaint, ECF No. 4 at p. 4, ¶ 18 (“Additional police officers arrived on the scene – they lifted [Tosin] (now handcuffed) from the

Nor can either Stickles or Knutowicz be said to have failed to protect Tosin from the other officers, since there is no suggestion that either had any warning that such "slamming" was going to occur, or any opportunity to intervene.

Consequently, any excessive force claim against Stickles and Knutowicz must be based solely on the force that the two officers used to subdue and handcuff Tosin, after she began violently resisting the arrest.

As to that use of force, Plaintiff's arguments also lack merit. To begin with, insofar as Plaintiff claims that any force used was excessive since the Officers had no probable cause to arrest Tosin, the argument fails, since the Court has already determined that there was probable cause for the arrest. Plaintiff's alternative argument, that the officers should not have forcibly arrested Tosin since she is mentally ill and afraid of police officers, also fails, since, again, there was probable cause for the arrest, and "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Otherwise, Plaintiff has not articulated, let alone shown, how the force used by the officers was excessive under the circumstances, particularly considering that it is undisputed that the force used was applied primarily, if not exclusively, to force Tosin to release Stickles' hair.[17] There is no contention or indication that Stickles or Knutowicz applied force that was gratuitous or exceeded what was reasonably necessary to effect the arrest

---

ground and slammed her on the stretcher provided by the Emergency Medical Technicians[.]"), and in his proposed Third Amended Complaint, ECF No. 36-2 at ¶ 19.

[17] There is no indication that the officers continued punching Tosin after she released Stickles' hair. Indeed, Ogunbekun is not capable of making such an assertion, since he stated, in his sworn deposition testimony, that he never actually saw whether or not Tosin had grabbed Stickles' hair, and that he did not see what Tosin was doing with her hands during Tosin's scuffle with the officers.

and overcome Tosin's violent efforts to avoid being handcuffed.

In that regard, applying the "*Graham*" factors set forth earlier,[18] the Court finds that the "crime" for which Tosin was being arrested was not "severe," which weighs in Plaintiff's favor, but that the other two factors weigh heavily in Defendants' favor, since, according to the undisputed facts, Tosin actively and violently resisted arrest throughout the entire incident, which posed an immediate threat to the officers' safety. In particular, after Stickles explained to Tosin that she needed to go to the ambulance and grabbed Tosin's arm, Tosin violently fought the officers by grabbing Stickle's hair, punching Stickles, kicking, and then attempting to hit and bite Stickles and Knutowicz, all while yelling, "You're not going to put cuffs on me!" ECF No. 82-9 at p. 2. Tosin had control of Stickles' head, and refused approximately ten orders to let go of Stickles' hair.[19] Tosin refused to release Stickle's hair until after the officers applied a knee strike and several punches.[20] Even after releasing Stickles' hair, Tosin continued fighting and attempting to kick the officers, until a paramedic sat on her legs.[21] While Tosin and the officers were struggling on the ground, Tosin's head made incidental contact with the concrete porch surface, resulting

---

[18] "Application of this reasonableness test "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resist-ing arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[19] *See*, ECF No. 82-10 at p. 2 ("The African American girl had the younger longer [haired] blonde [officer] by her hair. The officers were yelling let go of my hair and stop resisting. I heard them yelling the command 10 or more times.").

[20] *See*, ECF No. 82-10 at p. 2 ("The younger officer was punching the African American girl in the head trying to get her to let go of her hair.").

[21] *See*, ECF 82-9 at p. 3 ("Paramedics did go and sit on the black female's legs. But she continued to fight. She also tried kicking the officers, the tools, and the plants by the sidewalk.").

in an abrasion to her forehead.[22]

On these facts, the Court finds that no reasonable factfinder would conclude that the force used exceeded what was reasonably necessary under the circumstances to overcome Tosin's resistance. *See, Kalfus v. New York & Presbyterian Hosp*., 476 F. App'x 877, 880–81 (2d Cir. 2012) ("Kalfus resisted arrest by refusing to stand up or to permit himself to be handcuffed, and that the patrolmen used only reasonable force to overcome Kalfus's resistance. . . . No reasonable factfinder could conclude that such actions were excessive in the circumstances.") (citations omitted); *see also*, *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) ("[In conducting the *Graham* balancing test,] we are careful to evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Moreover, we are required to make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.") (citations and internal quotation marks omitted); *Matusak v. Daminski*, 755 F. Supp. 3d 325, 337 (W.D.N.Y. 2024) ("[A]mple authority supports the conclusion that law enforcement officers may use significant force to subdue a resisting arrestee who poses an ongoing threat.") (collecting cases). Indeed, despite the

[22] Contrary to the bald assertion in the SAC that the officers "banged" Tosin's head on the pavement, there is no evidentiary proof in the record that the officers intentionally caused Tosin's head to strike the concrete surface on which the arrest happened to take place. The fact that Tosin sustained this injury does not imply that the force used against her was excessive. *See, e.g., Kalfus v. New York & Presbyterian Hosp*., 476 F. App'x at 881 ("Nor does Kalfus's shoulder injury demonstrate excessive force. Kalfus points to nothing in the record to refute his own surgeon's testimony that the rotator cuff tear was an extension of a pre-existing tear, about which Kalfus failed to inform the arresting officers. Because the patrolmen had no reason to know that Kalfus's existing shoulder injury might be aggravated if his arms were pulled or he were handcuffed, the amount of force that they used to respond to Kalfus's resistance to arrest could not be deemed objectively "unreasonable" by any reasonable jury."). Tosin also struck her head on the ambulance gurney handrail while continuing to flail about, but that injury is not attributable to defendants.

use of force by Stickles and Knutowicz, the officers were still not able to gain control of Tosin and apply handcuffs, until after a non-party EMT sat on Tosin's legs. Consequently, Stickles and Knutowicz are entitled to summary judgment on the Fourth Amendment excessive force claim.

Alternatively, the Court finds that Stickles and Knutowicz are entitled to qualified immunity as to that claim, since Plaintiff has not identified either a controlling authority or a robust consensus of cases of persuasive authority clearly establishing the constitutional violation he alleges,[23] which forecloses the conclusion that the defendant officers violated clearly established constitutional rights of which a reasonable person would have known. Rather, the Court finds that reasonable officers could disagree as to whether the force Stickles and Knutowicz employed was lawful, considering Tosin's continued violent resistance during the arrest. *See, McKinney v. City of Middletown*, 49 F.4th 730, 734 (2d Cir. 2022) ("The undisputed facts of the case show that McKinney threatened the defendant officers and actively resisted their efforts to subdue and secure him. Under those circumstances, reasonable officers could disagree as to whether the force the defendant

---

[23] Plaintiff has not provided authority clearly establishing that it violates the Fourth Amendment for police officers to use a knee strike and punches to the head, against someone who is actively resisting arrest by attempting to punch and bite the officers while holding one of the officers by the hair. *See, e.g., Kisela v. Hughes*, 584 U.S. at 104, 138 S. Ct. at 1152 ("[E]xisting precedent must have placed the statutory or constitutional question beyond debate. . . . Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the *specific facts at issue*.") (emphasis added, citations and internal quotation marks omitted).

officers applied in this case was lawful.")[24] Consequently, Defendants are also entitled to summary judgment on Plaintiff's excessive force claim.

CONCLUSION

Defendants' motion for summary judgment (ECF No. 82) is granted, and this action is dismissed. The Clerk of the Court is directed to enter judgment for Defendants and close this case.

SO ORDERED.

DATED: May 15, 2025
Rochester, New York

CHARLES J. SIRAGUSA
United States District Judge

[24] *McKinney* involved three jail officers who used baton strikes, taser, and K-9 officer, to subdue a jail inmate who refused to allow officers to enter his cell or to handcuff him, including allowing the K-9 to continue biting the inmate, even after he stopped actively resisting, until he allowed himself to be handcuffed. *See, McKinney v. City of Middletown*, 49 F.4th at 739 ("The undisputed facts of this case establish that McKinney threatened, attacked, and resisted the defendant officers as they tried to subdue him so that he could be transferred to a different cell. The undisputed facts further establish that the officers' incremental and combined uses of a baton, a canine, and a taser were undertaken in response to McKinney's resistance and that once McKinney "finally gave up fighting" and was "handcuffed and secured," the officers withdrew their force.").

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

IBUKUN OGUNBEKUN, as Limited Conservator for the Estate of OLUWATOSIN OGUNBEKUN, an incapacitated person,

Plaintiff,

vs.

15-CV-06332 (CJS-JWF)

TOWN OF BRIGHTON, BRIGHTON POLICE DEPARTMENT, JULIE KNUTOWICZ and RENEE (STICKLES) FISCHER,

Defendants.

---

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Anna Marie Richmond
Attorney for Plaintiff
2500 Rand Building
14 Lafayette Square
Buffalo, NY 14203
716-854-1100
annamarierichmondesq@gmail.com

# Table of Contents

Table of Authorities ........ iii

INTRODUCTION ........ 1

FACTUAL ALLEGATIONS ........ 2

A. Background ........ 2

B. May 29, 2012 ........ 3

LEGAL ARGUMENT ........ 9

A. Summary Judgment Standard ........ 9

B. Defendant Stickles Did Not Have Probable Cause to Initiate a Mental Hygiene Arrest ........ 11

C. Defendants Stickles' (Fischer's') and Knutowicz's Use of Force Violated the Fourth Amendment ........ 15

D. Defendants are Not Entitled to Qualified Immunity ........ 18

*E.* *Monell* and Potential State Law Claims ........ 19

CONCLUSION ........ 19

# Table of Authorities

## Cases

*Curry v. City of Syracuse*, 316 F. 3d 324, 333 (2d Cir. 2003) .................... 10
*Frederick v. New York*, 449 F. Supp. 3d 115, 133 (WDNY 2020) .................... 14, 18
*Graham v. Connor,* 490 US 398 (1989).................... 15, 19
*Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 240 (E.D.N.Y. 2015) .................... 19
*Hicks v. City of N.Y.*, No. 12-CV-5081 (PKC) (SMG), 2015 U.S. Dist. LEXIS 136362, at *11 (E.D.N.Y. Sep. 30, 2015) .................... 19
*Kerman v. City of N.Y.*, 261 F.3d 229, 237 (2d Cir. 2001) .................... 11
*Myers v. Patterson*, 819 F.3d 625, 634 (2d Cir. 2016) .................... 12
*Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991).................... 10
*Rogoz v. City of Hartford*, 796 F.3d 236, 246-47 (2d Cir. 2015).................... 15
*Tolan v. Cotton*, 572 U.S. 650, 651, (2014).................... 10, 18

## Statutes

Fed. R. Civ. P. 56(a) .................... 9, 10
N.Y. Mental Hyg. Law § 9.41 .................... 11

## INTRODUCTION

Oluwatosin ("Tosin") Ogunbekun is a mentally retarded young woman who has suffered from a seizure disorder from the age of four months old.[1] In May of 2012, at the age of 25[2], she was living in Brighton, NY, at the home of her parents, a medical doctor and a dentist,[3] having been recently released from a two-month in-patient psychiatric admission at Strong Memorial Hospital ("Strong").[4] On the morning of May 29, 2012, Tosin's Dad informed her that she was scheduled for a neurologist's appointment later that day.[5] Tosin, who was terrified of hospitals and doctors after her two-month stay at Strong, told her father she was not going anywhere, that he and her mother had no right to make such appointments for her, and went out of the house to let off steam.[6]

Unfortunately for Tosin, she is Black.[7] At 1:21 p.m. a neighbor called in a report to the Brighton Police that a Black female who was possibly mentally challenged had been standing in the rain for approximately 45 minutes.[8] The Brighton Police dispatched Defendant Renee Stickles (Fischer) to the scene. *Id.* Stickles Fischer arrived at 1:28 p.m. By 2:09 p.m., Tosin was bleeding from a gash in her forehead, handcuffed behind her back,[9] and on her way to Strong Memorial Hospital in an ambulance, even though her father had repeatedly requested that she be taken to Rochester General due to Tosin's fear of Strong.[10]

Plaintiff has sued the Town of Brighton, the Brighton Police Department and arresting

---

[1]. Item 82-2, p.12, *lines 2-3*.
[2]. *Id.* p.21, *line* 17-19.
[3]. *Id.*, p. 11 *lines* 9-13.
[4]. *Id.,* pp. 68 *lines* 19-20, 69, *line* 11, 70, *lines* 9-11, 72, *lines* 13-15.
[5]. *Id.*, p. 34 *lines* 5-6.
[6]. *Id.*, *lines* 9, 12-15.
[7]. Item 89-14.
[8]. *Id.*
[9]. Item 82-2, p. 50, *lines* 13-25; p. 53, *line* 6.
[10]. *Id.*, p. 57, *line* 22 – p. 58, *line* 20.

officers Fischer (Stickles) and Knutowicz seeking damages and injunctive relief for alleged violations of her Fourth Amendment rights.[11] Defendants have moved for summary judgment, dismissing the complaint in its entirety.[12] For the reasons discussed *below*, Defendants' motion should be denied as to the Officers, and Plaintiff's claims should be presented to a jury.

## FACTUAL ALLEGATIONS

### A. Background

Tosin moved with her family to Brighton in 2003.[13] She was educated in Special Education classes,[14] and in 2006 when she was 19 years old, she was evaluated and determined to be reading at a second grade level, writing at a Kindergarten to first grade level, and having mathematical abilities at a Kindergarten to first grade level.[15] The evaluation includes that she could be stubborn, and that she had chronic difficulty in appropriately communicating her feelings and understanding how her behavior and attitude affected those around her.[16]

Tosin lived in a group home from 2009 until December of 2011, when she suffered mental disorientation and hallucinations and was observed overnight at Strong.[17] On January 6, 2012, she was admitted as an in-patient to Strong and treated for mental health issues for two months.[18] Tosin was transported to Strong via a mental hygiene arrest in January 2012: she had not eaten or slept for 36 hours, and her parents called 911, because they deemed the situation to

---

[11]. Item 32-1.
[12]. Item 82.
[13]. Ogunbekun Declaration ¶ 14.
[14]. *Id.* ¶ 13.
[15]. *Id.*, ¶¶ 15-16.
[16]. *Id.* ¶¶ 17-18.
[17]. *Id.*, ¶¶ 19-20.
[18]. *Id.*, ¶¶ 23, 25.

be a medical emergency.[19] The mental hygiene arrest itself was calm, and the transport to the hospital was without physical restraints.[20]

After Tosin's discharge from Strong, the police were again summoned to her home in response to a 911 call, on April 5, 2012, this time from Tosin herself, who called 911 because she objected to being asked to vacate her bedroom for an overnight guest.[21] Officer Montes, who responded to the call spoke to Tosin, secured her agreement to comply with her father's requests, and left.[22] Both the Plaintiff, Dr. Ibukun Ogunbekun ("Dr. Ogunbekun") and Defendant Sickles (Fischer) agree that Defendant Sickles (Fisher) was one of the officers who responded to the call on April 5.[23]

After Tosin was discharged from Strong in March 2012, her father observed that her mental acuity had diminished, her mental status was very severely compromised, and she became more easily agitated by strangers, especially law enforcement officers.[24] Her parents determined that it was no longer safe for Tosin to stay at home unsupervised, as she was no longer mentally competent to distinguish risks to herself.[25] Due to the nature of his work, Tosin's father, Dr. Ogunbekun, was the parent who was able to work from home and supervise Tosin. He did so.[26]

**B. May 29, 2012**

As has been discussed *above,* on the morning of May 29, 2012, Dr. Ogunbekun informed

[19] *Id.*, ¶ 23; Item 82-2, p. 59, *lines*, 19-20.
[20]. Ogunbekun Declaration, ¶ 25.
[21]. *Id.*, ¶ 35.
[22]. Item 82-2, p. 29, *line* 12 – p. 30, *line* 14; Item 82-4.
[23]. Item 82-2, p. 29, lines 12-19*;* Item 82-6, p. 40, *lines* 20-22; *see also* Defendants' Statement of Undisputed Facts, ¶¶ 37-39.
[24]. Ogunbekun Declaration ¶¶ 33; Item 82-2, p.14, *lines*, 2-19.
[25]. Ogunbekun Declaration, ¶ 34; Item 82-2, p. 23, *lines* 6-13.
[26]. Ogunbekun Declaration ¶ 35; Item 82-2, *Id.*

Tosin that she was scheduled for a neurologist's appointment later that day.[27] Tosin, who was terrified of hospitals and doctors after her two-month stay at Strong, vehemently objected. She told her father she was not going anywhere, and that he and her mother had no right to make such appointments for her. She then went out of the house to let off steam.[28]

The Ogunbekun family lived at 32 Wintergreen Way in Brighton, a dead-end residential street. The street has a sidewalk on only one side – the odd-numbered side. It was common for residents of the even-numbered houses to walk in the roadway when going from one even-numbered house to another or to the main road.[29] After Tosin went outside, Dr. Ogunbekun monitored her from an upstairs window in the house. He observed that it was drizzling, and that Tosin was walking back and forth on the sidewalk and appeared to be talking to herself.[30] After a short while, Tosin came back into the house, picked up her brother's basketball, and went back out the front door. Dr. Ogunbekun continued to monitor her from the upstairs window, and observed that she was carrying the ball and occasionally bouncing it, and that she appeared calm.[31]

Kim DeCastro, who lived at 84 Wintergreen Way, noticed Tosin when she left her house at about 1:15 p.m.[32] At 1:22 p.m., in response to a call from the resident at 76 Wintergreen Way, Defendant Stickles (Fischer) was dispatched to Wintergreen Way to respond to a call of "B/F 13YO standing in the rain for 45 min poss mentally challenged playing w/ basketball."[33] Defendant Stickles (Fischer) testified that the call was to "check-the-welfare for a female standing – female, black, standing in the roadway for 45 minutes that appeared mentally

[27]. Item 82-2, p. 34 *lines* 5-6.
[28] *Id.*, *lines* 9, 12-15.
[29]. Ogunbekun Declaration, ¶¶ 27, 42-43.
[30]. *Id.*, ¶¶ 44-47.
[31]. *Id.*, ¶¶ 50-54.
[32]. Item 82-13
[33]. Item 82-14

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (116 of 151)

challenged in the rain."[34] The 9-1-1 caller did not report that the Black female in question was in the roadway, merely that she had been standing in the rain.

Defendant Stickles (Fischer) arrived on the scene at 1:28 p.m.[35] Upon arrival, she recognized Tosin from prior police calls, thought that Tosin "seemed out of touch with reality," and "knew that [she] suffers from mental health problems."[36]

Between 1:28 p.m. and 1:44 p.m., Defendant Stickles (Fischer) engaged in conversation with Tosin, obtained Dr. Ogunbekun's telephone number from Tosin, had a short phone conversation with Dr. Ogunbekun, walked with Tosin to 32 Wintergreen Way, walked with Tosin and Dr. Ogunbekun through the house to the back door and patio gate to the lawn beyond the fence, had a discussion with Tosin about whether Tosin would be willing to play with the ball on the grassy common area behind the house, followed Tosin back through the house and out the front door, and followed Tosin "all over the neighborhood" while instructing Tosin to stop running away, and stopped at 84 Wintergreen Way.[37] The parties dispute whether Tosin walked calmly out of the front door at 32 Wintergreen Way after she and Defendant Stickles (Fischer) spoke to Dr. Ogunbekun at the house; they do not dispute that Tosin and Stickles entered the house and then left.[38]

It is at this point that the parties' descriptions of the events diverge drastically. Dr. Ogunbekun has attested that although Tosin was angry with him, "Everything was benign" when she left the house after 1:30 p.m., and she "walked leisurely out through the door."[39] Dr. Ogunbekun did not follow Tosin and Defendants Stickles (Fischer) on foot, in order to not upset

---

[34]. Item 82-14; Exhibit10, Stickles (Fischer) Tr. P. 33, *line* 25 – p. 34, *line* 4.
[35]. Item 82-14, Item 82-6, p. 37, *line* 2; Item 82-1, p. 3/6.
[36]. Item 82-1, p. 3/6.
[37]. Item 82-1, pp 3-4/6.
[38]. *Compare* Item *82-6,* p. 56, *lines* 2 – 5 *with* Item 82-2, p. 39 *lines* 18-22.
[39]. Item 82-2, p. 39, *lines* 20-22; Ogunbekun Declaration, ¶¶ 68-69.

Tosin, and to allow Defendant Stickles (Fischer) to defuse the situation. Instead, he stayed behind a few minutes, then followed Tosin and Defendant Stickles (Fisher) to 84 Wintergreen Way in his car.[40]

According to the Police Radio Log, Tosin and Defendant Stickles (Fischer) arrived at 84 Wintergreen Way at 1:44 p.m.[41] According to Defendant Stickles' (Fischer's) Incident Report, by the time she and Tosin arrived at 84 Wintergreen Way, Defendant Stickles (Fischer) had already summoned another patrol unit to the scene, and had decided to execute a Mental Hygiene Arrest.[42]

When Dr. Ogunbekun arrived at 84 Wintergreen Way, Tosin and Defendant Stickles (Fischer) were on the porch of the home. Dr. Ogunbekun observed that Tosin was backed up against the door in a corner of the porch in a defensive posture, and appeared to Dr. Ogunbekun to be trying to escape from Defendant Sickles (Fischer).[43] Defendant Stickles (Fischer) told Dr. Ogunbekun that she was going to initiate a mental hygiene arrest. She did not tell him that Tosin had allegedly stated that she was 1) "going to kill her Dad" or 2) that she "wanted [Officer Stickles (Fischer)] to die."[44] Dr. Ogunbekun did not hear any such threats.[45] If she had told him of the alleged threats, Dr. Ogunbekun would have pointed out that children often express hyperbolic "threats" such as were attributed to Tosin that day, without truly intending to harm their parents.[46]

Dr. Ogunbekun told Defendant Stickles (Fischer) that he believed she was making the wrong call. As he testified:

---

[40]. Item 82-2, p. 42, *lines* 3-16; Ogunbekun Declaration, ¶¶ 72-74.
[41]. Items 82-14,
[42]. Item 82-1, pp. 4-5.
[43]. Item 82-2, pp. 42 *lines* 22-25; Ogunbekun Declaration, ¶¶ 79-80.
[44]. Ogunbekun Declaration, ¶¶ 82, 86-88; Item 82-2, p. 62, *lines* 16-23; *Compare* to Item 82-1, p. 5/6.
[45]. Ogunbekun Declaration ¶ 86.
[46]. Ogunbekun Declaration, ¶¶ 89.

Case: 26-1671, 09/24/2026, DktEntry: 33.1 (118 of 151)

> Q. What could have been done to get her off that porch and back home?
>
> A. Give her time.
>
> Q. Time?
>
> A. Keep her distance, give her time. She will get tired with it.
>
> Don't forget what I said earlier on. I think it's very important. You are dealing with somebody whose mental state is compromised.
>
> I expected at least that this officer who was there in April and knew that – apart from the fact that they had records in the department – that this is a person with special needs.
>
> She had mental health issues on top of intellectual disabilities. You are going to have been patient when dealing with such people.
>
> It's a benign situation. It would tire itself out.
>
> Don't forget that I also said she was afraid of law enforcement. She was afraid of cops. So the more of them that came, the more it aggravated the situation.[47]

Defendant Knutowicz arrived at 84 Wintergreen Way at 1:50 p.m., after Dr. Ogunbekun got there,[48] and the situation was no longer "benign." Defendant Knutowicz joined Defendant Stickles (Fischer) on the porch. Both defendants are significantly taller than Tosin: Defendant Knutowicz is 5'6" tall and Defendant Stickles (Fischer) is 5'9";[49] Tosin is 5'3Tosin kept saying that she hadn't done anything wrong, and that she just wanted to play basketball with her friends.[50]

The Defendants grabbed Tosin's arms, and she began flailing and attempting to escape.

---

47. Ogunbekun Declaration, ¶¶ 91-93; Item 82-2, p. 44, *line* 18 – p. 45, *line* 15.
48. Item 82-14; Item 82-2, p.46, *lines*, 2-5.
49. Item 82-25, p. 2.
50. Ogunbekun Declaration, ¶¶ 95-96.

The Defendants were yelling, "Stop resisting!" Tosin was yelling, "Jesus Christ!" According to the police reports and the reports of the civilian witnesses, Tosin grabbed Defendant Stickles' (Fischer's) long blond ponytail and twisted it. Also, according to the civilian witnesses (including Dr Ogunbekun), Defendant Knutowicz punched Tosin several times on the head with a closed fist, and Defendant Stickles Fischer may have punched Tosin as well.

According to one of the civilian witnesses, Tosin yelled, "You're not going to put cuffs on me!" During the approximately five-minute-long struggle, Defendant Stickles (Fischer) documented that after Defendant Knutowicz "applied a knee strike" to Tosin, and the three women went to the ground. Tosin was under the two officers on the concrete porch. Tosin was struggling and yelling, as were the officers. An ambulance employee sat on Tosin's legs, as the officers applied "a forearm stun" and wrist locks, and cuffed Tosin's hands behind her back using two sets of handcuffs.[51] Tosin was bleeding from a laceration in her forehead where it had struck the concrete floor of the porch.[52]

At least four more police cars arrived between 2 p.m. and 2:11 p.m., one of which contained two officers. Additionally, at least two ambulances arrived on the scene. Defendants Knutowicz and Stickles (Fischer) directed Tosin, who had suffered a concussion (closed head injury), was cuffed behind her back, and was bleeding from her forehead to stand. Tosin could not stand, so several officers, including Defendant Stickles (Fischer) picked her up and carried her to a gurney. Dr. Ogunbekun observed that the officers were unnecessarily rough; they slammed her onto the gurney, and the cut on her head began bleeding more.[53]

---

[51]. Item 82-1, p. 5; Item 82-15, p.2; Item 82-5; Item 82-9; Item 82-10, Item 82-11; Item 82-13; Item 82-15. Ogunbekun Declaration, ¶¶ 98-104, 111-117.
[52]. Item 82-2, p. 50, *lines* 13-14; Ogunbekun Declaration, ¶ 118.
[53]. Items 81-14, 82-2, pp. 50-55; Exhibit 13, Strong Memorial Hospital Discharge Summary; Exhibit 11 Brighton Volunteer Ambulance report; Exhibit 5 Photos of Tosin in hospital.

Tosin was transported to Strong Memorial Hospital over Dr. Ogunbekun's objections. He had requested that she be taken to Rochester General Hospital because of her recent traumatic experience at Strong. Initially the ambulance crew and the two police officers (Stickles and Knutowicz) agreed that she should be taken to Rochester General, but they were overruled by a higher-ranking police officer who directed that Tosin be taken to Strong.[54]

The Emergency Room doctor at Strong informed Dr. Ogunbekun that the police had informed the Hospital that Tosin had been transported to the hospital because she had threatened to kill her father.[55] Tosin was released from Strong the following morning, after being treated in the Emergency Room, and after observation in the mental health unit. She required three stitches for the laceration in her forehead, and was diagnosed with Closed Head Injury and Laceration. She was not administered any medications to address psychiatric issues by either the hospital or ambulance staffs.[56]

## LEGAL ARGUMENT

### A. Summary Judgment Standard

Fed. R. Civ. P. 56(a) provides that, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." It is well-established that:

> The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. The function of the

[54]. Item 82-2, p. 57 *line* 22 – p. 59, *line* 25; Ogunbekun Declaration, ¶¶ 125-127.
[55]. Ogunbekun Declaration, ¶¶ 135-136; Item 82-2, p. 62, *lines* 11-23.
[56]. Exhibit 13, Strong Memorial Hospital Discharge Summary; Exhibit 102 Brighton Volunteer Ambulance records; Item 82-2, p. 64, *line* 2 – 65, *line* 9; Ogunbekun Declaration, ¶¶ 137-141.

> district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. In assessing the record, including affidavits, exhibits, interrogatory answers, and depositions, to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought If, with respect to a material fact as to which the moving party contends there is no dispute, there is evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper

*Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 (1986); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, (1970); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); other citations omitted).

It is axiomatic that, "in ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651, (2014) (citing *Anderson v. Liberty Lobby, Inc.* 477 US 242, 255 (1986316 f 3d 324

Additionally,

> It is well established that "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment. If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.

*Curry v. City of Syracuse*, 316 F. 3d 324, 333 (2d Cir. 2003) (citations omitted).

Here, there are genuine issues as to material fact that render a grant of summary judgment to Defendants improper. Broadly, the disputed issues of material fact are whether Defendant Stickles (Fischer) had probable cause to initiate a Mental Hygiene arrest, and whether Defendants Stickles (Fischer) and Knutowicz subjected Tosin to unconstitutionally excessive

force during the course of that arrest. As is set forth in detail in Plaintiff's Response to Defendants' Rule 56 Statement, these broad disputes are manifested in a number of disputes as to the events that occurred on May 29, 2012. The disputes between the parties must be resolved at trial.

**B. Defendant Stickles Did Not Have Probable Cause to Initiate a Mental Hygiene Arrest**

Defendants Stickles and Knutowicz assert that they effectuated a Mental Hygiene arrest of Tosin.[57] Pursuant to N.Y. Mental Hygiene Law, a "police officer . . . may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others[] . . . and . . . may direct the removal of such person or remove him or her to any hospital" specified in the law. N.Y. Mental Hyg. Law § 9.41. In 2012, it was clearly established that in order to arrest a person pursuant to Mental Hygiene Law § 9.41, the officer must have had probable cause to believe that the person presented a risk of harm to herself or others. *Kerman v. City of N.Y.*, 261 F.3d 229, 237 (2d Cir. 2001).

Here, the key question in dispute is whether at 1:44 p.m. on that afternoon of May 29, 2012, Tosin presented a risk of harm to herself or others. Defendants Stickles (Fischer) and Knutowicz argue that she did. However, an examination of the supporting arguments they propound for that proposition demonstrates that there is a genuine issue as to whether the Defendants had probable cause to arrest Tosin pursuant to Mental Hygiene Law § 9.41,

The conduct attributed to Tosin in the Defendant officers' reports and in the supporting depositions before Defendant Stickles' (Fischer's) decision to arrest her includes the following:

- Tosin was standing (or dancing) in the rain playing with a basketball in the road, talking

[57]. Item 82-21, ¶ 83, Item 82-11.

to herself. (Items 82-10, 82-13, 82-14);

- Tosin repeatedly told HVAC Tech Viglino, “I see you.” (Item 82-10);
- After Tosin and Defendant Stickles (Fischer) left 32 Wintergreen Way, Tosin allegedly told Defendant Stickles (Fischer) that she (Tosin) was going to kill her Dad, and wanted Defendant Stickles (Fischer) to die. Items 82-1. The only person who allegedly heard these statements was Defendant Stickles (Fischer). Although Defendant Knutowicz repeats the claims in her Addendum, Item 82-11, she does not say she heard Tosin make the statements. Knutowicz arrived at 84 Wintergreen Way after Dr. Ogunbekun was there, and Dr. Ogunbekun did not hear the alleged statements. Ogunbekun Declaration ¶¶ 86, 92.

It is significant that Dr. Ogunbekun has attested that there was “minimal” traffic on Wintergreen Way on the date in question, and also that residents of the even-numbered homes typically walked in the roadway. He has also attested that when he checked on Tosin from an upstairs window in his home, and when he drove to the end of Wintergreen Way, she was on the sidewalk. *Id.* ¶¶ 42, 45, 46, 55. Thus, although Tosin’s conduct was odd enough to cause a resident to telephone 911 at approximately 1:20 p.m., (Item 82-14) and to warrant comment in the supporting depositions of Nicholas Viglino and Kim DeCastro, (Items 82-10 and 82-13), it does not rise to the level of placing Tosin or anyone else at risk of “serious harm.” As the Court of Appeals for the Second Circuit observed in denying qualified immunity to a police officer in another case involving a Mental Hygiene Law arrest: “A person may be annoyed, uncooperative and irrational without presenting a danger to herself or of violence to others.” *Myers v. Patterson*, 819 F.3d 625, 634 (2d Cir. 2016).

There is a genuine issue of material fact as to whether Tosin actually uttered the words attributed to her by the Defendant police officers. Dr. Ogunbekun did not hear those words, and

was not aware that Tosin had been accused of uttering them until informed by a doctor at the hospital. Ibukun Declaration ¶¶ 135-136. And even if Tosin did utter those words, the words in and of themselves cannot be said to have evinced a danger that Tosin was conducting herself in a manner likely to result in serious harm to herself or others. Certainly, the officers did not discuss Tosin's alleged comments with Dr. Ogunbekun to ascertain if Tosin's alleged threat posed reasonable fear of serious physical harm to him.

It is important to note that the 911 entry at 1:21 p.m. begins "B/F 13YO standing in the rain . . ." (Item 82-14) Assuming that the abbreviation means "Black female 13-year-old" it suggests that the caller thought Tosin was a 13-year-old child." Here we have a tiny woman, who looked far younger than her years[58] and who functioned at a primary school level of intellectual ability, carrying a basketball, and perhaps venting her resentment toward her father by exaggerated statements that cannot have been construed as genuine threats by any reasonable adult, much less by a police officer who had purportedly undergone 40 hours of training on interacting with individuals with mental health issues. Item 82-21, ¶ 29.

An objective assessment of Tosin's physical stature belies the Defendants' descriptions of her as a 200-pound threat to their safety. (Kim DeCastro described her as "not petite, but solid." Item 82-13.) However, it is significant that all of the people involved in the incident were white, with the exception of Tosin and Dr. Ogunbekun. The white witnesses' implicit bias against Blacks is evident in their descriptions of Tosin, including, but not limited to, Defendant Stickles' (Fischer's) inflating Tosin's height by 3 inches, and her weight by 40 pounds or more in the resistance report Item 82-15 p. 1; Michael Rozzi opining that she was "high on some drug," Item 82-9, p. 3/3; and Kim DeCastro concluding that the police officers rather than Tosin

[58]. *See* Exhibit 6 for a contemporaneous image of Tosin. Ogunbekun Declaration Regarding Exhibits ¶¶ 9-10.

"needed help." Item 82-13. (It is not clear for DeCastro's supporting deposition whether she estimated Tosin's height at 5'0" or 5'10".) Item 82-13. Tosin suffered a laceration in her forehead that required three stitches to close, and a concussion; in contrast, Defendant Stickles (Fisher) sustained minor scrapes and scratches, Item 82-1. and Defendant Knutowicz was unscathed. *Compare* Exhibits 5 and 12.

There is a genuine issue of material fact as to whether Defendants had probable cause to effectuate a mental hygiene arrest. Assuming that they did not have probable cause, Plaintiff's right to be free from unreasonable search and seizure was established as early as 2001. As Chief Judge Wolford has held:

> A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law. "This protection adheres whether the seizure is for purposes of law enforcement or due to an individual's mental illness. . . . To handcuff and detain, even briefly, a person for mental-health reasons, an officer must have 'probable cause to believe that the person presented a risk of harm to [them]self or others.'" "Under New York law, an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" New York law also provides that "the existence of probable cause is an absolute defense to a false arrest claim."

*Frederick v. New York*, 449 F. Supp. 3d 115, 133 (WDNY 2020) (quoting *Kerman, supra;* other citations omitted.) Here, it is undisputed that the Defendants intended to confine Tosin, that Tosin was conscious of the confinement, and that Tosin did not consent to the confinement. The only issue to be decided is whether the confinement was otherwise privileged. For the reasons discussed *above*, Plaintiff contends there is a genuine issue to be tried on that question. Plaintiff must be allowed to proceed to trial.

**C. Defendants Stickles' (Fischer's') and Knutowicz's Use of Force Violated the Fourth Amendment**

It is well-established that: "'The "reasonableness" of' the amount of force used . . . "must be judged from the perspective of a reasonable officer on the scene.... at the moment" the force is used. In sum, the "standard" to be applied in determining whether "the amount of force" used exceeded the amount that was "necessary" in the particular circumstances is "reasonableness at the moment."''" *Rogoz v. City of Hartford*, 796 F. 3d 236, 246-47 (2d Cir. 2015) (citing *Graham v. Connor,* 490 US 398 (1989); other citations omitted).

The *Graham* plaintiff was tightly cuffed, slammed face-down into the hood of a police car and thrown into the back seat of a police car. *Graham v. Connor*, 490 US 386, 389-90 (1989). The Court held that "*all* claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard[.]" *Id.,* at 395 (emphasis in original). The Court articulated a balancing test of the individual's Fourth Amendment interests against the "countervailing governmental interests at stake," *Id.*, at 396, noted that the "reasonableness" of a particular use of force must be evaluated from the perspective of a "reasonable officer on the scene," *Id.*, and stressed that the "reasonableness inquiry is an excessive force case is an objective one. *Id.*, at 397.

More recently, in a case involving a claim of excessive force brought by a pre-trial detainee, the Supreme Court held that such cases involve "two separate state-of-mind questions:" a question of the officer's "state of mind with respect to the bringing about of certain physical consequences in the world," and a question as to whether the officer considered the force applied to be "excessive." *Kingsley v. Hendrickson*, 576 U.S. 389, 395, (2015). With respect to the

latter question – whether the force used was "excessive", the Court held, "that the relevant standard is objective not subjective." *Id.* Determining that the use of force in the *Kingsley* case was deliberate, which it defined as "purposeful" or knowing," the Court held that the Plaintiff "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396-97.

Here, taking all facts of the excessive force claim in the light most favorable to Tosin, the evidence before the Court establishes that the force used against Tosin was objectively unreasonable. Defendants point to Tosin's "talking nonsensically, confronting workers on private property, her threats about her father, [her] trespassing on private property and attempting to enter the house such that the resident had to lock her door and she called 9-1-1, Tosin's yelling, Tosin's grabbing of Officer Stickles; pony tail and dragging both Officer Stickles and Knutowicz onto the concrete floor of the porch, her continue resistance even after being handcuffed, the need for an EMT to sit on her legs . . . and her flailing and fighting as additional officers placed her on the gurney so she could be loaded into the ambulance." Item 82-19, p. 10.

When each of these alleged actions are examined objectively, it becomes clear that some of the actions attributed to Tosin provide no basis whatsoever for a use of force (i.e., talking nonsensically, and telling the HVAC workers that she saw them and was watching them); that some of the descriptions of Tosin's actions have been misrepresented by Defendants (i.e. the alleged death threats, the purported trespass and attempted forced entry); and that all of Tosin's alleged physical actions were in response to Defendants' unjustified use of force against her.

"Talking nonsensically" is not a justification for a police use of force. The action Defendants characterize as "confronting workers on private property" consisted of Tosin saying, "I'm watchin' you. I see you" to Messrs. Lenz and Viglino – which is also no justification for a

police use of force. As has been discussed in detail *above* Tosin's alleged "threat" against her father amounts to nothing more than childish expostulations that were not entitled to credence. None of these actions satisfied the standards for a mental hygiene arrest, nor did they justify any use of force.

Tosin did enter onto the porch of 84 Wintergreen Way. Based upon Defendant Stickles' (Fischer's) own report, she did so believing her non-existent ex-husband lived there, and as she was becoming more and more agitated as a result of Defendant Stickles' (Fischer's) pursuit. Items 82-1, 82-13; Ogunbekun Declaration ¶¶ 79-81. The witnesses agree that Tosin was not behaving rationally, however there is no indication in the records that she had engaged in any conduct that justified the use of force before ascending onto the porch at 84 Wintergreen Way.

Dr. Ogunbekun has attested that Tosin's efforts to enter 84 Wintergreen Way were efforts to escape the officers, Ogunbekun Declaration ¶ 80. There is no evidence in the record to refute that observation. Contrary to the characterization provided by Defendants, Ms. DeCastro locked her door after she called 9-1-1 because it was clear to her that the officers were not in control of the situation. Item 82-13.

The witness depositions agree that Tosin did not begin yelling until after the officers grabbed her, and similarly that she did not grab Officer Stickles' (Fischer's) ponytail until after the officers grabbed her. Items 82-1, 82-5, 82-9, 82-10, 82-11, 82-13, 82-15. Bearing in mind that Tosin is a mentally disabled individual who functioned at a Kindergarten to second grade level and had chronic difficulty in appropriately communicating her feelings and understanding how her behavior and attitude affected those around her, Exhibit 4, her conduct can best be likened to that of a frightened and confused six- or seven-year old child.

Defendants' assertion that Tosin dragged them to the concrete floor of the porch does not

accurately reflect their own reports, which suggest, although do not make clear that the three women fell to the floor after Defendant Knutowicz applied a "knee strike," and knocked Tosin's feet out from under her. It seems likely that Tosin's hand was twisted in Defendant Stickles' ((Fischer's) hair at the time, which resulted in at least two of the women falling to the porch. A panicked child-like person, who was terrified and incapable of understanding why she was being attacked by police officers, found herself underneath two female officers with an EMT sitting on her legs. Is it any wonder that she struggled?

The evidence in the record establishes that there are genuine issues as to whether the force employed by Defendants Stickles (Fischer) and Knutowicz violate Tosin's Fourth Amendment rights. She must be permitted to proceed to trial on this issue.

### D. Defendants are Not Entitled to Qualified Immunity

The *Tolan* Court succinctly recapitulated the standard governing a defense of qualified immunity at the summary judgment stage in an excessive force case under the Fourth Amendment:

> In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury ... show the officer's conduct violated a [federal] right [.]"
>
> * * *
>
> The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation.

*Tolan, supra.* Here, as Chief Judge Wolford observed, the law governing mental hygiene law arrests was clearly established after the *Kerman* decision was rendered in 2001. *Frederick, supra*, at 133. Tosin's right to be free from excessive force during an arrest was established in

1989. *Graham, supra.*

Where, as here, there are significant factual disputes about whether a plaintiff poses a threat to anyone, there is neither probable cause nor arguable probable cause for a mental hygiene arrest, and a finding of qualified immunity is not warranted. *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 240 (EDNY 2015); *Hicks v. City of N.Y.*, No. 12-CV-5081 (PKC) (SMG), 2015 U.S. Dist. LEXIS 136362, at *11 (EDNY Sep. 30, 2015).

Assuming that a jury finds that Tosin's rights were violated, her right to be free from unreasonable seizure under the Fourth Amendment was clearly established at the time of her arrest in 2012. Thus, Defendants may not avail themselves of the protections of the qualified immunity doctrine.

### *E. Monell* and Potential State Law Claims

Plaintiff withdraws the claims against the Town and the Brighton Police Department. Plaintiff has not raised a claim of malicious prosecution under state law.

## CONCLUSION

For the reasons discussed herein, Plaintiff respectfully urges this Court to deny the motions of summary judgment of Defendants Stickles (Fischer) and Knutowicz, and to schedule this matter for trial on the merits.

Respectfully submitted,

__/s/Anna Marie Richmond____
Anna Marie Richmond
Attorney for Plaintiff

2500 Rand Building
14 Lafayette Square
Buffalo, NY 14203
716-854-1100
annamarierichmondesq@gmail.com

Dated: Buffalo, NY
August 31, 2022

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

IBUKUN OGUNBEKUN, as Limited Conservator for the Estate of OLUWATOSIN OGUNBEKUN, an incapacitated person,

Plaintiff,

Index No. 15-CV-06332 (CJS-JWF)

-vs-

TOWN OF BRIGHTON, BRIGHTON POLICE DEPARTMENT, JULIE KNUTOWICZ and RENEE (STICKLES) FISCHER,

Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TULLY RINCKEY, PLLC**
By: Eugene Welch, Esq.
*Attorneys for Defendant Town of Brighton*
Office and Post Office Address
400 Linden Oaks, Suite 110
Rochester, New York 14625
Telephone: (585) 899-1458

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (133 of 151)

## PROCEDURAL HISTORY

On May 28, 2015 Ibukun Ogunbekun attempted to commence a lawsuit on behalf of his daughter, "Ms. O" (Oluwatosin Ogunbekun) by filing a Complaint signed by him. (Docket # 1). By Order dated June 5, 2015, this Court determined that Ibukun Ogunbekun ("Ogunbekun") did not have authority to proceed with the lawsuit as he was not an attorney and therefore could not represent his daughter as a *pro se* party. (Docket #3). The Order gave the daughter until June 30, 3015 to either sign the Complaint on her own, obtain counsel, or discontinue the action. On June 29, 2015, a new Complaint in the name of Oluwatosin Ogunbekun was filed and signed by Oluwatosin (she signed as "Tosin", which was her nickname). (Docket #).

Ibukun Ogunbekun was named as conservator for Oluwatosin Ogunbekun and the parties then stipulated to the filing of a Second Amended Complaint on December 15, 2018 to reflect this status. (Docket #4). The Second Amended Complaint was filed by Rafael O. Gomez, Gomez & Becker, LLP, on behalf of Ibukun Ogunbekun, as Limited Conservator for the Estate of Oluwatosin Ogunbekun, an incapacitated person. (Docket # 32-1). On December 31, 2018, Plaintiff filed a Third Amended Complaint and a motion to amend the Second Amended Complaint to remove the John Doe defendants and substitute Officers Stickles and Knutowicz. (Docket #36). In a Report and Recommendation entered July 31, 2019 (Docket #42), the Honorable Jonathan W. Feldman held that the operative complaint in the matter was the Second Amended Complaint filed on December 15, 2018 (Docket #32-1) and allowed the individual officers to be added to the caption. The Report and Recommendation was adopted by this Court on August 21, 2019 (Docket #43).

Defendant Town of Brighton answered the Second Amended Complaint. (Docket #44). Plaintiff's counsel, Rafael O. Gomez did not file a motion to allow for late service of the individual officers pursuant to Fed.R.Civ. Proc. 4(m) and instead moved to withdraw as counsel. (Docket

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (134 of 151)

#51). Thereafter, Plaintiff retained new counsel, Anna Marie Richmond. Ms. Richmond moved for leave to serve the individual officers, which was granted. (Docket #62, 72). The individual officers then answered. (Docket #80, 81).

The Second Amended Complaint listed two causes of action: 1) "Constitutional and Civil Rights Pursuant to 24 U.S.C. 1983, 1988, violation of Fourth Amendment Rights against unreasonable seizures" and 2) "Practices and Policies proximately causing constitutional injury pursuant to 42 USC 1983, 1988 Violation of Fourth Amendment". (Docket #32-1). All Defendants are now moving for summary judgment as no material facts exist that require a trial in this matter.

## SUMMARY JUDGMENT STANDARD

It is well settled that summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party moving for summary judgment bears the burden of establishing that no genuine issue of material fact exists. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "A party asserting that a fact … cannot be genuinely disputed must support that assertion by … citing to particular parts of materials in the record ..." Fed.R.Civ.P. 56(c)(1). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. A non-movant cannot oppose a properly supported summary judgment motion with bald assertions that are not supported by the record. See, *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999). Rather, the non-movant must support its assertion that a fact is genuinely disputed by citing to particular parts of the record or showing that the materials cited by the movant are

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (135 of 151)

inadmissible or do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The underlying facts must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Here, the undisputed facts show that Tosin was properly arrested pursuant to the Mental Hygiene Law. She was then prosecuted for Resisting Arrest and Harassment 2nd and she accepted an Adjournment in Contemplation of Dismissal (ACD) on both charges. Tosin's father, by his own admissions, did not see the vast majority of the interactions because he was not outside for the first interactions and then he arrived at 84 Wintergreen Way after some of the interactions. The multiple depositions provided by the eyewitnesses establish that Tosin was out of control, that she was attempting to enter a stranger's home, that she grabbed Officer Stickles by her ponytail and pulled both officers onto the concrete floor of the porch, and that she was screaming at and fighting the officers at the scene.

## ARGUMENT

### A. There Are No Valid State Tort Claims

The Second Amended Complaint contains a section of facts entitled "Defendants' Malicious Prosecution of Ms. O." Second Amended Complaint, ¶¶ 22 – 26. (Docket #32-1). Under New York law, a notice of claim is a condition precedent for suing a municipality or its employees for a tort. See N.Y. Gen. Mun. Law § 50-e(1)(a); *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 358, 445 N.Y.S.2d 687, 689 (1981). No notice of claim was ever filed with the Town of Brighton with regard to these incidents. Therefore, any potential state tort claims, such as malicious

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (136 of 151)

prosecution, false arrest, and use of excessive force, are barred.

**B. Plaintiff has Failed to Establish a Valid Monell Claim Against the Town**

Plaintiff asserts a Monell claim against all defendants in the First Cause of Action. It appears that the claim against the Town is based upon a claim of excessive force, false arrest and failure to train. As this Court stated in *Strobridge v. City of Elmira*, No. 20-CV-1125S (W.D.N.Y. Feb. 28, 2022), *citing* its observations in *Romanac v. Town of Cheektowaga*, No. 17CV334, 2021 WL 409859, at *9-10 (W.D.N.Y. Feb. 5, 2021) (Skretny, J.), "a municipality may not be held liable under §1983 solely because it employs a tortfeasor, " *Board of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). As observed by the Supreme Court, "while Congress never questioned its power to impose civil liability on municipalities for their own illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of others " (citing [*Monell v. Department of Soc. Serv.*, 436 U.S. 658, 665-83, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)] *Monell, supra*, at 665- 683, 98 S.Ct., at 2022-2032). We have consistently refused to hold municipalities liable under a theory of respondeat superior." Id. (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). This also is based in part on the text of that section that imposes liability upon the person who deprived a federal right, *id.*

To establish a claim against a municipality under §1983, a Plaintiff must allege that the actions were taken under color of law; there was a deprivation of constitutional or statutory rights; causation; and damages. *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); see also *Batista v. Rodriquez*, 702 F.2d 393, 397 (2d Cir. 1983); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Monell, supra*, 436 U.S. at 694 (plaintiff must identify the municipal policy or custom that caused plaintiff's injury). That policy or custom must

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (137 of 151)

be "the moving force" behind a violation of federal rights, *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Plaintiff also needs to show that the policy or custom proximately caused the deprivation, *Owen v. City of Independence*, 445 U.S. 622, 633, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)). "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F.Supp.2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 Fed.Appx. 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton v. City of N.Y.*, 566 F.Supp.2d 256 (S.D.N.Y. 2008)], 566 F.Supp.2d at 271; see also *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." (plurality opinion)); *Brogdon v. City of New Rochelle*, 200 F.Supp.2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). "The Supreme Court has identified at least two situations that constitute a municipal policy: (1) where there is an officially promulgated policy as that term is generally understood (i.e., a formal act by the municipality's governing body), and (2) where a single act is taken by a municipal employee who, as a matter of State law, has final policymaking authority in the area in which the action was taken." *Newton*, 566 F.Supp.2d at 271 (footnote omitted). *Dellutri v. Village of Elmsford*, 895 F.Supp.2d 555, 565 (S.D.N.Y. 2012). A "general and conclusory allegation of a municipal policy or custom fails to state a facially plausible Monell claim." *Valdiviezo v.*

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (138 of 151)

*Boyer*, 752 Fed.Appx. 29, 31 (2d Cir. 2018); B*ryant v. Monroe County*, No. 19CV6474, 2022 WL 103889, at *7 (W.D.N.Y. Jan. 11, 2022) (Siragusa, J.).

Plaintiff does not identify any policy, practice, or custom that led to Tosin's injuries. The Plaintiff also fails to state any other instances of such a policy, custom, or practice. Further, the Plaintiff does not identify a Town policymaker who is responsible for Plaintiff's injuries. The Town has policies in place related to in the form of General Orders for police interactions with individuals with mental health issues. [See Rule 56 Statement, ¶¶30-35 and Exhibits G and H]. Plaintiff's conclusory statements do not provide an inference that the manner of enforcement of Mental Hygiene Law arrests deprived Tosin of her constitutional rights. Plaintiff merely focuses upon the actual incident without citing other instances of a policy, custom, or practice. This failure is fatal to the Monell claim against the Town.

In addition, Ogunbekun stated he did not know of any training that was received by Town police officers related to Mental Hygiene arrests. [See Rule 56 Statement, ¶¶117-120, Exhibit B]. The uncontested facts are that Officer Stickles had received 40 hours of mental health training. [See Rule 56 Statement, ¶29, Exhibit F]. She also had interacted with the Decedent in the past and was able to use that training to diffuse the situation such that no mental hygiene arrest was necessary on that occasion. [See Rule 56 Statement, ¶¶37-39, Exhibits B and F]. In fact, on the day in question, Officer Stickles was able to convince Tosin to return to her home in the first interaction with her that day. [See Rule 56 Statement, ¶42, Exhibits B and F]. However, Tosin then left the home again (without any intervention by her father). [See Rule 56 Statement, ¶¶46-47, Exhibits B and F]. Her father opted not to follow her because Tosin was mad at him and was not a witness to much of what occurred at 84 Wintergreen Way. [See Rule 56 Statement, ¶¶48-50, Exhibit B]

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (139 of 151)

Plaintiff's allegations that the Town had a custom, policy, and practices of failing to train officers in conducting mental hygiene arrests cannot meet the high standard necessary to sustain a *Monell* claim. As noted above, the Town of Brighton did provide such training. In addition, Officer Stickles had used her training to successfully interact with Tosin in the past. Ogunbekun admitted he was unaware if the Town of Brighton provided training or not. [See Rule 56 Statement, ¶117, Exhibit B]. Ogunbekun further admitted that his daughter's mental health condition had become much worse, which he attributed to a prior stay Tosin had at Strong Memorial Hospital. [See Rule 56 Statement, ¶¶11-14, Exhibit B].

Plaintiff has again merely alleged a single practice of failure to train leading to the violations of Tosin's rights in this one instance. The Town is not responsible under §1983 for an isolated unconstitutional act. *Curry v. City of Syracuse*, 316 F.3d 324, 330 (2d Cir. 2003). "Normally, 'a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality], '" *Dellutri, supra*, 895 F.Supp.2d at 565 (quoting *Newton, supra,* 566 F.Supp.2d at 271). Merely alleging the failure to follow existing policy fails to state a *Monell* claim, *Ruiz v. Westchester Cnty.*, No. 18-CV-7007, 2020 WL 4340788, at *9 (S.D.N.Y. July 28, 2020); *Walker v. Shaw*, No. 08-CV-10043, 2010 WL 2541711, at *7 (S.D.N.Y. June 23, 2010) (alleged failure to follow a policy "is the antithesis of a link between policy and action"). To support a failure to train claim "Plaintiff must allege facts which support an inference that the County failed to train its employees, that it did so with deliberate indifference, and that the failure to train caused [the] constitutional injuries. *See Treadwell v. County of Putnam*, No. 14-CV-10137, 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016), " *Ruiz, supra*, 2020 WL 4340788, at *8. The Plaintiff must point to "a specific deficiency in the municipality's training," *id.* (quoting *Tieman v. City of Newburgh*, No.

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (140 of 151)

13-CV-4178, 2015 WL 1379652, at *22 (S.D.N.Y. Mar. 26, 2015)). "A failure to train constitutes a policy or custom that is actionable under §1983 only where 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need.' *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 [109 S.Ct. 1197, 103 L.Ed.2d 412] (1989) (footnote omitted)." *Ruiz, supra*, 2020 WL 4340788, at *8. That clearly has not been established here where Officer Stickles had received training, she had been able to deal with Tosin in the past, and she was able to convince Tosin to return to her home in the first instance. *See, supra.*

Plaintiff cannot point to any alleged specific deficiency in training of the officers as Plaintiff erroneously supposed there was none. Further, the Plaintiff cannot show any deliberate indifference by the Town to training as is required under the relevant caselaw. As such, there is no issue of material fact as to the Town's vicarious liability and summary judgment must be granted to the Town for the First Cause of Action.

C. **Plaintiff has Failed to Establish a Valid Claim Against the Individual Officers**

**1. The Individual Officers Are Entitled to Qualified Immunity**

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Harris v. County of Nassau*, 581 F. Supp. 2d 351, 356 (E.D.N.Y. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Qualified immunity bars an action against a government official where the conduct alleged "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harris*, 581 F. Supp. 2d at 356 (quoting *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In the case of a mistake "[t]he

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (141 of 151)

protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009) (receding from the rigid application of qualified immunity as stated in *Saucier v. Katz*, *supra*, but leaving the general principle of qualified immunity intact.)

There has been no showing by the Plaintiff that any force actually used was excessive. The Second Amended Complaint does not address Tosin's actions in talking nonsensically, confronting workers on private property, her threat about her father, Tosin's trespassing on private property and attempting to enter the house such that the resident had to lock her door and she called 9-1-1, Tosin's yelling, Tosin's grabbing of Officer Stickle's ponytail and dragging both Officer Stickles and Knutowicz onto the concrete floor of the porch, her continued resistance even after being handcuffed, the need for an EMT to sit on her legs in an attempt to have her stop fighting and resisting, and her flailing and fighting as additional officers placed her on the gurney so she could be loaded into the ambulance. [See Rule 56 Statement, ¶¶51-102, Exhibits B, E, F, G, H, I, J].

Tosin was arrested for resisting arrest and harassment 2nd as a result of her actions. [See Rule 56 Statement, ¶121, Exhibit Q]. To sustain an excessive force claim "the force used by the defendant generally must be more than de minimis in order for the plaintiff's claim to be actionable." *Jennejahn v. Vill. of Avon*, 575 F. Supp. 2d 473, 478 (W.D.N.Y. 2008) (Payson, Magistrate Judge) (internal citations omitted). The alleged injuries of a small head laceration do "not rise to the level of objective excess that reasonable police officers would consider to be unlawful conduct in an arrest situation." *Wilder v. Vill. of Amityville*, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003). This is especially true where it was the result of Tosin's own conduct in resisting arrest by fighting, kicking, and grabbing Officer Stickle's ponytail and yanking Officer Stickle's

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (142 of 151)

head about so violently that they both went to the ground.

Even if Tosin could show an injury sufficient to maintain her claim, summary judgment should still be granted because Officer Stickles and Knutowicz acted reasonably in the situation in question. "Claims arising from the use of force during an arrest are judged by the 'objective reasonableness' standard of the Fourth Amendment." *Jennejahn*, 575 F. Supp. 2d at 478. Officer Stickles was having her head violently yanked by Tosin which posed a direct threat to Officer Stickle's safety and that of the bystanders. Further, the safety of the resident of 84 Wintergreen Way was also an issue as Tosin was attempting to enter the home. The witnesses confirmed that Tosin repeatedly defied the officers' instructions to her. Simply placing the handcuffs on her after she had grabbed one of the Officer's ponytail and dragged both Officers to the ground and her continued fighting and kicking showed great restraint on the part of the Officers. They used what they believed to be the minimum necessary force in the situation.

The Second Circuit addressed what constitutes reasonable force in *Brown v. City of New York*, 862 F.3d 182 (2d Cir. 2017). In that case, the Court outlined the use of force as follows:

> This Court's opinion in *Brown II* summarized a number of undisputed facts material to Brown's excessive force claim. The two officers "were arresting Brown for disorderly conduct, a violation that[,] under New York law, is subject to a maximum punishment of 15 days in jail." *Brown II,* 798 F.3d at 101. "Officer Plevritis was 5'10" and weighed 215 pounds; Officer Naimoli was 5'7" and weighed 150-160 pounds; Brown was 5'6" and weighed 120 pounds." *Id.* "Officer Plevritis asked Brown to place her hands behind her back so that they could apply handcuffs, and she refused to do so." *Id.* "One of the officers kicked Brown's legs out from under her, causing her to fall to the ground." *Id.* "One officer succeeded in placing handcuffs on Brown's right wrist." *Id.* "Both officers struggled with Brown, forcing her body to the ground." *Id.* "Officer Plevritis used his hand to push Brown's face onto the pavement." *Id.* "Brown's left arm, without a handcuff, was under her as she fell to the ground." *Id.* "The officers endeavored to take hold of Brown's left arm and bring it behind her to complete the handcuffing." *Id.* "While on the ground, Brown did not offer her arms for handcuffing in part because she was trying to keep hold of her phone and wallet and reach for the scattered contents of her purse." *Id.* "Officer Plevritis twice administered a burst of pepper spray directly to Brown's face." *Id.* "The officers completed the handcuffing while

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (143 of 151)

> Brown was still on the ground." Id. "Officer Naimoli was aware of techniques for applying handcuffs to a reluctant arrestee, other than taking a person to the ground." Id.

*Id.* This recitation of facts is very similar as to what happened in this case, except that in the *Brown* case, the plaintiff was also pepper sprayed during the arrest. In addition, here Tosin did not merely refuse to be subjected to handcuffing, she was also actively resisting by screaming, kicking and grabbing Officer Stickle's ponytail. The Second Circuit they agreed with the District Court that under these facts the officers were shielded from liability by their qualified immunity. Here, Tosin's conduct was even more extreme then in *Brown*. Tosin was warned multiple times to stop resisting and yet she continued to fight the officers. The contemporaneous comments of the witness, DeCastro, establish that the officers were having difficulty and that Tosin was overpowering the officers. [See Rule 56 Statement, ¶87, Exhibits M and N]. Tosin was resisting so violently that an EMT had to hold down her legs to assist the officers. [See Rule 56 Statement, ¶84, 89, Exhibits M and N].

Summary judgment should be granted with regard to Ogunbekun's excessive force claim relating to this use of force because the officers' actions were objectively reasonable in the situation, and because the officers could reasonably believe the force used was necessary and justified, and their actions are therefore subject to qualified immunity. Excessive force claims "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). One of the factors to consider in deciding whether the officers' actions were objectively reasonable is "whether the suspect poses an immediate threat to the safety of the officers or others." *Mroz v. City of Tonawanda*, 999 F. Supp. 436, 464 (W.D.N.Y., 1998). Here, both Officers' actions were objectively reasonable because of Ogunbekun's actions such that the officers were protecting themselves, the resident of 84 Wintergreen, the EMTs (one

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (144 of 151)

of whom felt compelled to help restrain Tosin as she was still fighting even after going to the porch floor, and the bystanders who had earlier retreated indoors because of Tosin's harassment of them while they tried to work. The Officers only took those actions which were necessary to protect everyone at the scene and to subdue Tosin. The reasonableness of the Officers' actions is also supported by the fact that Tosin ultimately accepted an Adjournment in Contemplation of Dismissal to both the Resisting Arrest and Harassment 2nd charges.

Ogunbekun was not present the entire time as he had stayed back at home because of Tosin's agitation and anger at him. He drove up to the scene after some time. Ogunbekun stated that he never saw Tosin grab Officer Stickle's ponytail but admitted at his deposition that it was possible. [See Rule 56 Statement, ¶65, Exhibit B]. Multiple witness accounts and the Officers' statements that were given shortly after the incident all established that Tosin was resisting and refusing to follow instructions. It is not reasonable to accept Ogunbekun's bald assertions that Tosin had done nothing to warrant the mental hygiene arrest and that the force used was excessive. See *Casciani v. Nesbitt*, 659 F. Supp2d 427, 434 (W.D.N.Y. 2009) (Larimer, J.), *aff'd* 392 Fed.Appx. 887 (2d Cir. 2010)("It bears emphasis, though, that this standard does not simply require the court to draw *all* inferences in the nonmovant's favor, but all *reasonable* inferences. The issue is whether a reasonable jury could find for the nonmoving party. *See, e.g., Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009) ("Although a district court must rule on a motion for summary judgment after viewing the facts in the light most favorable to the non-moving party, it is not required to accept unreasonable inferences or sheer speculation as fact") (internal quotation marks omitted); *Carney v. City and County of Denver,* 534 F.3d 1269, 1276 (10th Cir. 2008) ("Although our summary judgment standard requires us to view the facts in the light most favorable to the non-moving party, it does not require us to make unreasonable inferences in favor

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (145 of 151)

of the non-moving party") (internal quotation marks and alterations omitted); *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir.2007) (on a motion for summary judgment, "we must draw all reasonable inferences in the light most favorable to the nonmovant. That does not mean, however, that we ought to draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective") (citation omitted); *Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F.Supp.2d 334, 342 (S.D.N.Y. 2005) (although court must construe facts in light most favorable to nonmoving party, "That does not mean, however, that a party can successfully oppose summary judgment on the basis of an unreasonable view of the facts") (quoting *Edwards v. Akzo Nobel,* 193 F.Supp.2d 680, 688 (W.D.N.Y. 2001)").

Granting qualified immunity is appropriate in this case. *See Williams v. Ontario County Sheriff's Dept.*, 662 F. Supp. 2d 321, 330 (W.D.N.Y. 2009). "[T]o deny summary judgment any time a material issue of fact remains on the excessive force claim-could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Saucier*, 533 U.S. at 202. "In particular, a defendant is entitled to summary judgment based on qualified immunity if the court finds that the asserted rights were not clearly established, or if the defendant adduces sufficient facts such that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not violate a federally protected right." *See Williams*, 662 F. Supp. 2d at 332.

Here there is no disputed material issue of fact with regard to the actual use of force. Officers Stickles and Knutowicz have stated that they believed the use of force was reasonable. Ogunbekun has not brought forward any evidence to show that the use of force against Tosin was

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (146 of 151)

unreasonable. Summary judgment should be granted regarding the excessive force claims based on qualified immunity because the Officers' decision to use force "was not a decision that no officer of reasonable competence would have made in similar circumstances." *Williams*, 662 F. Supp. 2d at 330.

**2. The Officers Did Not Use Excessive Force To Make A False Arrest**

Summary judgment should be granted to all defendants with regard to the cause of action for unreasonable seizure because the Brighton Police Officers had probable cause to affect a mental hygiene arrest of Tosin due to her conduct. Since they had probable cause to arrest, the officers did not commit any wrongful act, whether intentional or negligent, in arresting Tosin. Probable cause exists "where an officer 'has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Harris v. County of Nassau*, 581 F. Supp. 2d 351, 355 (E.D.N.Y. 2008) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)).

Probable cause is an "absolute defense" to a claim of false or "unlawful" arrest. *Caldarola*, 298 F.3d at 161. *See also Harris* 581 F. Supp. 2d at 354-55. "Arguable probable cause exists where it was either *objectively reasonable* to believe that probable cause existed *or officers of reasonable competence could disagree on the existence of probable cause*." *Id.* (emphasis added). *See also Martinez v. City of Schenectady*, 115 F.3d 111, 116 (2d Cir. 1997). Under New York law tort claims for unlawful arrest and unlawful imprisonment are identical. *Jacques v. Sears, Roebuck & Co.*, 30 N.Y.2d 466, 472-473 (1972). "The elements of a claim of false arrest under §1983 are substantially the same as the elements of a false arrest claim under New York law." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

The existence of probable cause proves that the plaintiff was not subject to any "deprivation of liberty without due process" because the failure to challenge probable cause and accept an ACD satisfies all of the due process requirements of the Constitution.

In this case, Tosin had a full and fair opportunity to challenge probable cause through the criminal process. Tosin did not challenge the existence of probable cause, and instead opted to take an ACD. Since the lack of probable cause would be an essential element of unreasonable seizure summary judgment should be granted with regard to Tosin's cause of action for the unreasonable seizure of her person.

Because Tosin had the full and fair opportunity to challenge probable cause and she is now collaterally estopped from attacking the existence of probable cause in this civil case. "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude re-litigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Collateral estoppel applies to cases where plaintiffs seek damages pursuant to 42 U.S.C. § 1983, and where the prior case was a criminal proceeding against the plaintiffs. *See id. See also DeFranco v. Town of Irondequoit*, 2009 WL 3822992, 2009 U.S. Dist. LEXIS 106824 (W.D.N.Y. Nov. 16, 2009) (Larimer, J.); *DeFranco v. Town of Irondequoit*, 2009 WL 2957813, 2009 U.S. Dist. LEXIS 82953 (W.D.N.Y. Sept. 11, 2009) (Payson, Magistrate Judge).

In light of the foregoing, summary judgment must be granted to the individual officers as their conduct was objectively reasonable.

**D. Plaintiff has Failed to Establish a Valid Claim Against Defendants For Being Transported to Strong Memorial Hospital**

**1. No Cause of Action Against the Town Where No Policy Exists**

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (148 of 151)

The Second cause of action appears to claim that transporting Tosin to Strong Memorial Hospital, as opposed to Rochester General Hospital, was a violation of her constitutional rights. As noted above, in order to establish such a claim against a municipality under §1983, a Plaintiff must allege that the actions were taken under color of law; there was a deprivation of constitutional or statutory rights; causation; and damages. The Plaintiff is unable to meet any of the required elements. In the first instance, Plaintiff has not shown that the action was taken under the color of law. The Plaintiff has not pointed to any policy of the Town of Brighton regarding where an individual arrested under the Mental Hygiene Law must be transported. The Plaintiff merely alleges a single incident where an unnamed senior police officer on the scene allegedly told the ambulance crew to transport Tosin to Strong Memorial Hospital. As noted above, a single ad hoc decision does not constitute a policy under color of law. See *Brogdon v. City of New Rochelle*, 200 F.Supp.2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

As such, the cause of action fails to meet the first necessary element of the cause of action.

**2. No Cause of Action Where No Constitutional Violation Can Be Shown**

The second element requires a plaintiff to show there was a deprivation of constitutional or statutory rights. Neither the individual defendants nor the Town can be held liable where there is no clear constitutional or statutory violation. The Plaintiff here simply cannot show that choice of hospital is a constitutionally protected right. As noted above, the Town is not responsible under §1983 for an isolated act. *Curry v. City of Syracuse*, 316 F.3d 324, 330 (2d Cir. 2003). "Normally, 'a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]. '" *Dellutri, supra*, 895

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (149 of 151)

F.Supp.2d at 565 (quoting *Newton, supra,* 566 F.Supp.2d at 271).

**3. No Cause of Action Where No Causation or Damages Can Be Shown**

The Plaintiff can show neither causation nor damages as a result of Tosin being transported to Strong Memorial Hospital. Tosin was already resisting arrest and fighting the police officers as she did not want to be brought to any medical facility. In fact, Ogunbekun testified that he had an agreement with Officer Stickles that Tosin would be transported to Rochester General Hospital. So, the alleged injuries to Tosin, the laceration, concussion and bruising, all occurred before she was even loaded onto the ambulance for transport to Strong Memorial Hospital. In addition, Tosin was calm once she arrived at Strong Memorial Hospital, did not receive any medication, including no antipsychotics or antianxiety medications, and she was later released without incident. [See Rule 56 Statement, ¶106-109, Exhibit B]. Under these circumstances, there is no showing of either causation or damages related to her being transported to Strong Memorial Hospital as opposed to Rochester General Hospital. This failure to establish both causation and damages is fatal to the cause of action and requires summary judgment be granted.

**4. No Cause of Action Against the Named Individual Officers As No Conduct On Their Part is Alleged**

There can be no liability as to the Officers Stickles and Knutowicz as there is no alleged conduct on their part as to dictating where Tosin was going to be transported. According to the Second Amended Complaint and Ogunbekun's testimony, an unnamed senior police officer, not the R/O (which was Officer Stickles) directed the ambulance to go to Strong Memorial Hospital. [See Rule 56 Statement, ¶113, 115]. There is no allegation against Officer Knutowicz in this regard at all. As such, there is no evidence that either individually named officer took any action as to this

Case: 26-1671, 09/24/2026, DktEntry: 33.1, (150 of 151)

alleged constitutional violation.

> "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Id.* (quoting *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

*Pagan v. City of Rochester*, 17-CV-6073-CJS (W.D.N.Y. Sep. 13, 2017)(J. Siragusa), citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Where there is a lack of personal involvement by the named individual defendants, summary judgment must be granted for this failure.

## CONCLUSION

In light of the foregoing, the motion for summary judgment should be granted in its entirety and such other and further relief that the Court finds appropriate.

**TULLY RINCKEY, PLLC**

s/ Eugene Welch

Eugene Welch, Esq.
*Attorneys for Defendants*
Office and Post Office Address
400 Linden Oaks, Suite 110
Rochester, New York 14625
Telephone: (585) 899-1458
ewelch@tullylegal.com